ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-5133 & 22-5139

————————————

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————

**RADIYA BUCHANAN**, *et al.*, *Plaintiffs-Appellants*,

v.

**WILLIAM P. BARR**, *et al.*, *Defendants-Appellees*.

————————————

**BLACK LIVES MATTER D.C.**, *et al.*, *Plaintiffs-Appellants*,

v.

**WILLIAM P. BARR**, *et al.*, *Defendants-Appellees*.

————————————

Consolidated Appeals from the U.S. District Court for the District of Columbia
(Nos. 1:20-cv-1469 & 1:20-cv-1542)

————————————

**JOINT APPENDIX**

————————————

Orin Snyder
Anne Champion
Katherine Marquart
Lee R. Crain
Nathan Eagan
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Tel.: 212.351.4000
achampion@gibsondunn.com
lcrain@gibsondunn.com

*Counsel for Plaintiffs-Appellants
in Buchanan v. Barr, No. 22-5133*

Scott Michelman
Arthur B. Spitzer
Michael Perloff
ACLU FOUNDATION OF THE
DISTRICT OF COLUMBIA
915 15th Street, N.W., Second Floor
Washington, D.C. 20005
Tel.: 202.601.4267
smichelman@acludc.org

*Counsel for Plaintiffs-Appellants
in Black Lives Matter D.C. v. Barr, No.
22-5139*

*(counsel listing continues)*

Greta B. Williams
Matthew Guice Aiken
Tessa Gellerson
Austin M. Donohue
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel.: 202.955.8500
gbwilliams@gibsondunn.com

*Further Counsel for Plaintiffs-Appellants in Buchanan v. Barr, No. 22-5133*

Kaitlin Banner
Dennis Corkery
Jonathan M. Smith
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street, N.W., Suite 400
Washington, D.C. 20005
Tel.: 202.319.1000
kaitlin_banner@washlaw.org

Jon Greenbaum
Arthur Ago
David Brody
Arusha Gordon
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, N.W., Suite 900
Washington, D.C. 20005
Tel.: 202.662.8600
jgreenbaum@lawyerscommittee.org

John A. Freedman
David E. Kouba
Sonia Tabriz
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
Tel.: 202.942.5000
john.freedman@arnoldporter.com

*Further counsel for Plaintiffs-Appellants in Black Lives Matter D.C. v. Barr, No. 22-5139*

*(counsel listing continues)*

R. Craig Lawrence
U.S. ATTORNEY'S OFFICE (USA)
CIVIL DIVISION
601 D Street, N.W.
Washington, D.C. 20530
Tel.: 202.252.2500
craig.lawrence@usdoj.gov

Brian James Springer
Mark B. Stern
U.S. DEPARTMENT OF JUSTICE (DOJ)
CIVIL DIVISION
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Tel.: 202.514.2000
brian.j.springer@usdoj.gov
mark.stern@usdoj.gov

Daniel S. Crowley
HANNON LAW GROUP, LLP
1800 M Street, N.W.
Suite 850 S
Washington, D.C. 20036
Tel.: 202.232.3704
dcrowley@hannonlawgroup.com

Christopher A. Zampogna
ZAMPOGNA P.C.
1776 K Street, N.W.
Suite 700
Washington, D.C. 20006
Tel.: 202.803.7988
caz@zampognalaw.com

*Counsel for Defendants-Appellees
in Nos. 22-5133 and 22-5139*

November 23, 2022

# TABLE OF CONTENTS

Page

Docket Sheet for No. 20-cv-1469 (D.D.C.)............................................................JA1

Docket Sheet for No. 20-cv-1542 (D.D.C.)..........................................................JA45

Third Amended Complaint,
No. 20-cv-1469, ECF 52 (Sept. 3, 2020)........................................................JA70

Amended Complaint,
No. 20-cv-1542, ECF 29 (Sept. 3, 2020)......................................................JA128

Motion to Amend the Docket and for Issuance of Summonses,
No. 20-cv-1469, ECF 84 (Oct. 15, 2020) .....................................................JA181

Order Granting in Part and Denying in Part Motions to Dismiss,
No. 20-cv-1542, ECF 68 (June 21, 2021)......................................................JA183

Updated Opinion Granting in Part and Denying in Part Motions to Dismiss,
No. 20-cv-1542, ECF 72 (Aug. 25, 2021) .....................................................JA186

Opinion and Order Granting Partial Final Judgment,
No. 20-cv-1542, ECF 90 (May 16, 2022)......................................................JA237

Partial Final Judgment,
No. 20-cv-1469, ECF 186 (May 16, 2022)....................................................JA241

Partial Final Judgment,
No. 20-cv-1542, ECF 91 (May 16, 2022)......................................................JA242

Notice of Appeal,
No. 20-cv-1469, ECF 187 (May 16, 2022)....................................................JA243

Notice of Appeal,
No. 20-cv-1542, ECF 92 (May 16, 2022)......................................................JA245

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:20-cv-01469-DLF

BLACK LIVES MATTER D.C. et al v. TRUMP et al
Assigned to: Judge Dabney L. Friedrich
 Cases: 1:20-cv-01517-DLF
      1:20-cv-01623-TNM
      1:20-cv-01542-DLF
      1:20-cv-02163-DLF
      1:20-cv-01622-DLF
      1:20-cv-03682-EGS
Case in other court:  22-05139
Cause: 42:1986 Neglect of Duty

Date Filed: 06/04/2020
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Defendant**

**CARA SEIBERLING**
*TERMINATED: 04/14/2022*

represented by **David Gregory Cutler**
U.S. DEPARTMENT OF JUSTICE
Torts-Constitutional Torts
P.O. Box 7146, Benjamin Franklin Station
Washington, DC 20044-7146
202-616-0674
Email: david.g.cutler@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John BlairFishwick Martin**
U.S. DEPARTMENT OF JUSTICE
175 N Street, NE
Ste 7112
Washington, DC 20002
202-616-4492
Email: john.b.martin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Alfonso Gonzalez**
DOJ-CIV
175 N St. NE
Ste 7th Floor
Washington DC, DC 20002
202-598-3888
Email: joseph.a.gonzalez@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**THOMAS LOCASICO**
*Helmet Number A702*
*TERMINATED: 04/14/2022*

represented by **Daniel S. Crowley**
HANNON LAW GROUP, LLP
1800 M Street NW

**JA1**

Washington, DC 20036
202-232-1907
Fax: 202-232-3704
Email: dcrowley@hannonlawgroup.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**NICHOLAS JARMUZEWSKI**          represented by   **David Gregory Cutler**
*Helmet Number A704*                               (See above for address)
*TERMINATED: 04/14/2022*                           *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                  **John BlairFishwick Martin**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                  **Joseph Alfonso Gonzalez**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFREY HENDRICKSON**          represented by   **David Gregory Cutler**
*Helmet Number A706*                               (See above for address)
*TERMINATED: 04/14/2022*                           *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                  **John BlairFishwick Martin**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                  **Joseph Alfonso Gonzalez**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Defendant**

**SEAN COX**                      represented by   **David Gregory Cutler**
*Helmet Number B714*                               (See above for address)
*TERMINATED: 04/14/2022*                           *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                  **John BlairFishwick Martin**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                  **Joseph Alfonso Gonzalez**
                                                   (See above for address)

**JA2**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BRYAN MCDONALD**                          represented by    **David Gregory Cutler**
*Helmet Number C723*                                          (See above for address)
*TERMINATED: 04/14/2022*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **John BlairFishwick Martin**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Joseph Alfonso Gonzalez**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**LAWRENCE SINACORE**                       represented by    **David Gregory Cutler**
*Helmet Number S735*                                          (See above for address)
*TERMINATED: 04/14/2022*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **John BlairFishwick Martin**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Joseph Alfonso Gonzalez**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**JONATHAN DANIELS**                        represented by    **David Gregory Cutler**
*Arm Patch Number JD97*                                       (See above for address)
*TERMINATED: 04/14/2022*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **John BlairFishwick Martin**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Joseph Alfonso Gonzalez**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**LUIS FELICIANO**                          represented by    **David Gregory Cutler**

**JA3**

*Arm Patch Number LP71*
*TERMINATED: 04/14/2022*

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John BlairFishwick Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Alfonso Gonzalez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**SEAN KELLENBERGER**                    represented by    **Christopher A. Zampogna**
*Arm Patch Number SK10*                                     ZAMPOGNA, P.C.
*TERMINATED: 04/14/2022*                                    1776 K Street NW
                                                            Suite 700
                                                            Washington, DC 20006
                                                            (202) 223-6635
                                                            Fax: 202-318-1433
                                                            Email: caz@zampognalaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**CONCERNED LEGAL ACADEMICS**            represented by    **Eric Lawrence Klein**
**AND HISTORIANS**                                         BEVERIDGE & DIAMOND PC
                                                           155 Federal Street
                                                           Suite 1600
                                                           Boston, MA 02110-1716
                                                           6174192316
                                                           Fax: 6174192301
                                                           Email: eklein@bdlaw.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**INTERNATIONAL CENTER FOR**             represented by    **Alexandre de Gramont**
**ADVOCATES AGAINST**                                      DECHERT LLP
**DISCRIMINATION**                                         1900 K Street NW
                                                           Washington, DC 20006
                                                           202-261-3320
                                                           Fax: 202-261-3082
                                                           Email: alexandre.degramont@dechert.com
                                                           *ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**INTERNATIONAL HUMAN RIGHTS**           represented by    **Alexandre de Gramont**
**CLINIC, UNIVERSITY OF VIRGINIA**                         (See above for address)
**SCHOOL OF LAW**                                          *ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**JA4**

**LEITNER CENTER FOR INTERNATIONAL LAW & JUSTICE, FORDHAM UNIVERSITY SCHOOL OF LAW**

represented by **Alexandre de Gramont**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**ROBERT AND HELEN BERNSTEIN INSTITUTE FOR HUMAN RIGHTS, NEW YORK UNIVERSITY SCHOOL OF LAW**

represented by **Alexandre de Gramont**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**WILLIAM J. ACEVES**

represented by **Alexandre de Gramont**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**CHARLES AVERY, JR.**

represented by **Bruce Van Spiva**
1718 Crestwood Drive NW
Washington, DC 20011
202-654-6203
Email: bvspiva@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MARGARET BURNHAM**

represented by **Bruce Van Spiva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**CLAYBORNE CARSON**

represented by **Bruce Van Spiva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**HAZEL DUKES**

represented by **Bruce Van Spiva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MARY FRANCES BERRY**

represented by **Bruce Van Spiva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**WADE HENDERSON**

represented by **Bruce Van Spiva**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JUDITH HEUMANN**                    represented by **Bruce Van Spiva**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**DOLORES HUERTA**                    represented by **Bruce Van Spiva**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**JESSE JACKSON, SR.**                represented by **Bruce Van Spiva**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**BENJAMIN JEALOUS**                  represented by **Bruce Van Spiva**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**MARTIN LUTHER KING, III**           represented by **Bruce Van Spiva**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**MARC MORIAL**                       represented by **Bruce Van Spiva**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**RICHARD MORRISROE**                 represented by **Bruce Van Spiva**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**RUBY SALES**                        represented by **Bruce Van Spiva**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**MARIAN WRIGHT EDELMAN**                    represented by  **Bruce Van Spiva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CARLOS M. VAZQUEZ**                    represented by  **Hyland Hunt**
DEUTSCH HUNT, PLLC
300 New Jersey Ave NW
Ste 900
Washington, DC 20001
202-868-6915
Fax: 202-609-8410
Email: hhunt@deutschhunt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ANYA BERNSTEIN**                    represented by  **Hyland Hunt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JAMES PFANDER**                    represented by  **Hyland Hunt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STEPHEN I. VLADECK**                    represented by  **Hyland Hunt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**REPORTERS COMMITTEE FOR**                    represented by  **Bruce D. Brown**
**FREEDOM OF THE PRESS**                    REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St, NW
Suite 1020
Washington, DC 20005
(202) 795-9301
Fax: (202) 795-9310
Email: bbrown@rcfp.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gabriel Rottman**
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW
Ste 1020

Washington, DC 20005
202-795-9316
Email: grottman@rcfp.org
*ATTORNEY TO BE NOTICED*

**KatieLynn Boyd Townsend**
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St, NW
Suite 1020
Washington, DC 20005
(202) 795-9300
Fax: (202) 795-9310
Email: ktownsend@rcfp.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BLACK LIVES MATTER D.C.**                    represented by   **John Arak Freedman**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942-5316
Fax: (202) 942-5999
Email: john.freedman@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th Street NW
Ste 2nd Floor
Washington, DC 20005
202-601-4266
Fax: 202-457-0805
Email: artspitzer@gmail.com
*ATTORNEY TO BE NOTICED*

**David Ryan Brody**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St. NW
Suite 900
Washington, DC 20005
202-662-8320
Email: dbrody@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Dennis A. Corkery**
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS
& URBAN AFFAIRS
700 14th Street, NW

**JA8**

Suite 400
Washington, DC 20005
(202) 319-1000
Fax: (202) 319-1010
Email: dennis_corkery@washlaw.org
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
(202) 662-8325
Email:
jgreenbaum@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Michael Krevans Perloff**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
915 15th Street NW
2nd Floor
Washington, DC 20005
202-601-4278
Email: mperloff@acludc.org
*ATTORNEY TO BE NOTICED*

**Noah Baron**
ELIAS LAW GROUP
10 G Street NE
Suite 600
Washington, DC 20002
202-968-4556
Email: nbaron@lawyerscommittee.org
*TERMINATED: 10/15/2021*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th Street, NW
2nd Floor
Washington, DC 20005
(202) 457-0800
Fax: (202) 457-0805
Email: smichelman@acludc.org
*ATTORNEY TO BE NOTICED*

**Sonia Tabriz**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001

(202) 942-6574
Email: sonia.tabriz@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Thomas Dallas McSorley**
1727 D Street NE
Washington, DC 20001
202-596-2006
Email: tmcsorley@gmail.com
*TERMINATED: 02/01/2022*
*ATTORNEY TO BE NOTICED*

**Kaitlin Rose Banner**
WASH.LAWYERS' CMTE FOR CIVIL
RIGHTS & URB.AFFAIRS
700 14th Street NW
Ste Fourth Floor
Washington, DC 20005
202-319-1000
Email: kaitlin_banner@washlaw.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TONI SANDERS**                    represented by **David Edward Kouba**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5626
Fax: (202) 942-5999
Email: david.kouba@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Ryan Brody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dennis A. Corkery**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Krevans Perloff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noah Baron**
(See above for address)
*TERMINATED: 10/15/2021*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia Tabriz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Dallas McSorley**
(See above for address)
*TERMINATED: 02/01/2022*
*ATTORNEY TO BE NOTICED*

**Kaitlin Rose Banner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**J.N.C.**
*through his mother Demetria Bright*

represented by **John Arak Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Ryan Brody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dennis A. Corkery**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Krevans Perloff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noah Baron**

(See above for address)
*TERMINATED: 10/15/2021*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia Tabriz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Dallas McSorley**
(See above for address)
*TERMINATED: 02/01/2022*
*ATTORNEY TO BE NOTICED*

**Kaitlin Rose Banner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KISHON MCDONALD**                 represented by   **David Edward Kouba**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Ryan Brody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dennis A. Corkery**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Krevans Perloff**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Noah Baron**
(See above for address)
*TERMINATED: 10/15/2021*
*ATTORNEY TO BE NOTICED*

**Sonia Tabriz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Dallas McSorley**
(See above for address)
*TERMINATED: 02/01/2022*
*ATTORNEY TO BE NOTICED*

**Kaitlin Rose Banner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GARRETT BOND**                 represented by **David Edward Kouba**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Ryan Brody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dennis A. Corkery**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Krevans Perloff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noah Baron**
(See above for address)

**JA13**

*TERMINATED: 10/15/2021*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia Tabriz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Dallas McSorley**
(See above for address)
*TERMINATED: 02/01/2022*
*ATTORNEY TO BE NOTICED*

**Kaitlin Rose Banner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KEARA SCALLAN**                    represented by    **David Edward Kouba**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Ryan Brody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dennis A. Corkery**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Krevans Perloff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noah Baron**
(See above for address)
*TERMINATED: 10/15/2021*

**JA14**

*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia Tabriz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Dallas McSorley**
(See above for address)
*TERMINATED: 02/01/2022*
*ATTORNEY TO BE NOTICED*

**Kaitlin Rose Banner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LIA POTEET**                              represented by   **David Edward Kouba**
*on behalf of themselves and all others*                    (See above for address)
*similarly situated*                                        *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Ryan Brody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noah Baron**
(See above for address)
*TERMINATED: 10/15/2021*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia Tabriz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kaitlin Rose Banner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DUSTIN FOLEY**                            represented by   **David Edward Kouba**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**E.X.F.**                                      represented by    **Arthur B. Spitzer**
*through her father, Dustin Foley*                               (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Scott Michelman**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**                            represented by    **Christopher Charles Hair**
*President of the United States*                                U.S. ATTORNEY'S OFFICE FOR THE
*TERMINATED: 04/14/2022*                                        DISTRICT OF COLUMBIA
                                                                555 Fourth Street, NW
                                                                Washington, DC 20530
                                                                (202) 252-2541
                                                                Fax: (202) 252-2599
                                                                Email: christopher.hair@usdoj.gov
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Sean Patrick Mahard**
                                                                DOJ-USAO
                                                                555 4th St. NW
                                                                Ste 4408
                                                                Washington, DC 20530
                                                                (202) 252-2574
                                                                Email: sean.mahard@usdoj.gov
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**WILLIAM P. BARR**                            represented by    **Christopher Charles Hair**
*Attorney General of the United States*                         (See above for address)
*TERMINATED: 04/14/2022*                                        *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **David Gregory Cutler**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**John BlairFishwick Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Alfonso Gonzalez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK T. ESPER**
*Secretary of Defense of the United States*
*TERMINATED: 04/14/2022*

represented by **Christopher Charles Hair**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**GREGORY T. MONAHAN**
*Acting Chief of the U.S. Park Police*
*TERMINATED: 04/14/2022*

represented by **Christopher Charles Hair**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES M. MURRAY**
*Director, U.S. Secret Service*
*TERMINATED: 04/14/2022*

represented by **Christopher Charles Hair**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES C. MCCONVILLE**
*General, Chief of Staff of the United States*

**JA17**

*Army*
*TERMINATED: 08/05/2020*

<u>**Defendant**</u>

**WILLIAM J. WALKER**                    represented by   **Christopher Charles Hair**
*Major General, Commanding General of*                   (See above for address)
*the District of Columbia National Guard*                *LEAD ATTORNEY*
*TERMINATED: 04/14/2022*                                 *ATTORNEY TO BE NOTICED*

                                                         **Sean Patrick Mahard**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**MICHAEL D. CARVAJAL**                  represented by   **Christopher Charles Hair**
*TERMINATED: 04/14/2022*                                 (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Sean Patrick Mahard**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**PETER NEWSHAM**                        represented by   **Brendan Russell Heath**
*Chief of the Metropolitan Police*                       OFFICE OF THE ATTORNEY
*Department of the District of Columbia*                 GENERAL FOR THE DISTRICT OF
                                                         COLUMBIA
                                                         Public Interest Division, Equity Section
                                                         400 Sixth Street, N.W.
                                                         Suite 10100
                                                         Washington, DC 20001
                                                         202-442-9880
                                                         Email: Brendan.Heath@dc.gov
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Duane Gordon Blackman**
                                                         CALEBANDONIAN PLLC
                                                         1100 H Street, N.W.
                                                         Suite 315
                                                         Washington, DC 20005
                                                         202-953-9854
                                                         Email: duane@calebandonian.com
                                                         *TERMINATED: 09/09/2021*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Richard P. Sobiecki**
                                                         OFFICE OF THE ATTORNEY
                                                         GENERAL FOR THE DISTRICT OF
                                                         COLUMBIA
                                                         400 Sixth Street, NW

**JA18**

Suite 10100
Washington, DC 20001
202-805-7512
Email: richard.sobiecki@dc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK ADAMCHIK**                    represented by    **David Gregory Cutler**
*TERMINATED: 04/14/2022*                               (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **John BlairFishwick Martin**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Joseph Alfonso Gonzalez**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFERY CARROLL**                  represented by    **Brendan Russell Heath**
                                                       OFFICE OF THE ATTORNEY
                                                       GENERAL FOR THE DISTRICT OF
                                                       COLUMBIA
                                                       Public Interest, Equity
                                                       400 Sixth Street, N.W.
                                                       Suite 10100
                                                       Washington, DC 20001
                                                       202-442-9880
                                                       Email: Brendan.Heath@dc.gov
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Duane Gordon Blackman**
                                                       (See above for address)
                                                       *TERMINATED: 09/09/2021*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Richard P. Sobiecki**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**ANTHONY ALIOTO**                   represented by    **Brendan Russell Heath**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Duane Gordon Blackman**
                                                       (See above for address)
                                                       *TERMINATED: 09/09/2021*
                                                       *ATTORNEY TO BE NOTICED*

**JA19**

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**S. BUCHANAN**                    represented by  **Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**FIRST NAME UNKNOWN**             represented by  **Brendan Russell Heath**
**HARGROVE**                       (See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**C.W. MEYER**                     represented by  **Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**C.J. MURPHY**                    represented by  **Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**

**JA20**

(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**T.C. PAYNE**                    represented by    **Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**FIRST NAME UNKNOWN TAYLOR**    represented by    **Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANIEL M. THAU**               represented by    **Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANTHONY A. WILLIS**            represented by    **Brendan Russell Heath**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**WAYNE VINCENT**                    represented by    **MinhChau Nguyen Corr**
*TERMINATED: 04/14/2022*                              OFFICE OF THE COUNTY ATTORNEY
                                                      2100 Clarendon Blvd.
                                                      Suite 403
                                                      Arlington, VA 22201
                                                      571-882-4617
                                                      Email: mcorr@arlingtonva.us
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Ryan Carson Samuel**
                                                      OFFICE OF THE COUNTY ATTORNEY
                                                      2100 Clarendon Blvd.
                                                      Suite 403
                                                      Arlington, VA 22201
                                                      703-228-3100
                                                      Fax: 703-228-7106
                                                      Email: rsamuel@arlingtonva.us
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN DOE 1-100**

**Defendant**

**JOHN POE 1-20**

**Defendant**

**JOHN ROES 1-50**                    represented by    **Brendan Russell Heath**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/04/2020 | 1 | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 400 receipt number ADCDC-7196327) filed by BLACK LIVES MATTER DC, TONI SANDERS, KEARA SCALLAN, J.N.C., GARRETT BOND, KISHON MCDONALD. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Civil Cover Sheet) (Banner, Kaitlin) (Entered: 06/04/2020) |

| 06/04/2020 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by BLACK LIVES MATTER DC (Banner, Kaitlin) (Entered: 06/04/2020) |
| 06/04/2020 | 3 | NOTICE of Appearance by Scott Michelman on behalf of BLACK LIVES MATTER DC, GARRETT BOND, J.N.C., KISHON MCDONALD, TONI SANDERS, KEARA SCALLAN (Michelman, Scott) (Entered: 06/04/2020) |
| 06/04/2020 | | Case Assigned to Judge Dabney L. Friedrich. (zsb) (Entered: 06/04/2020) |
| 06/04/2020 | 4 | SUMMONS (8) Issued Electronically as to WILLIAM P. BARR, MARK ESPER, JAMES C. MCCONVILLE, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER, and U.S. Attorney (Attachment: # 1 Notice and Consent)(zsb) (Entered: 06/04/2020) |
| 06/04/2020 | 5 | NOTICE of Appearance by Jon M. Greenbaum on behalf of All Plaintiffs (Greenbaum, Jon) (Entered: 06/04/2020) |
| 06/04/2020 | 6 | NOTICE of Appearance by Arthur B. Spitzer on behalf of All Plaintiffs (Spitzer, Arthur) (Entered: 06/04/2020) |
| 06/04/2020 | 7 | NOTICE of Appearance by John Arak Freedman on behalf of All Plaintiffs (Freedman, John) (Entered: 06/04/2020) |
| 06/05/2020 | 8 | NOTICE of Appearance by Thomas Dallas McSorley on behalf of All Plaintiffs (McSorley, Thomas) (Entered: 06/05/2020) |
| 06/05/2020 | 9 | NOTICE of Appearance by Dennis A. Corkery on behalf of BLACK LIVES MATTER D.C., GARRETT BOND, J.N.C., KISHON MCDONALD, TONI SANDERS, KEARA SCALLAN (Corkery, Dennis) (Entered: 06/05/2020) |
| 06/06/2020 | 10 | NOTICE of Appearance by Michael Krevans Perloff on behalf of All Plaintiffs (Perloff, Michael) (Entered: 06/06/2020) |
| 06/09/2020 | 11 | AMENDED COMPLAINT *FIRST AMENDED CLASS ACTION COMPLAINT* against All Defendants with Jury Demand filed by BLACK LIVES MATTER D.C., TONI SANDERS, KEARA SCALLAN, J.N.C., GARRETT BOND, KISHON MCDONALD, LIA POTEET. (Attachments: # 1 Summons)(Banner, Kaitlin) (Entered: 06/09/2020) |
| 06/09/2020 | 12 | SUMMONS (1) Issued Electronically as to MICHAEL D. CARVAJAL. (eg) (Entered: 06/09/2020) |
| 06/17/2020 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 6/11/2020. Answer due for ALL FEDERAL DEFENDANTS by 8/10/2020. (Freedman, John) (Entered: 06/17/2020) |
| 06/17/2020 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILLIAM P. BARR served on 6/15/2020 (Freedman, John) (Entered: 06/17/2020) |
| 06/22/2020 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILLIAM P. BARR served on 6/17/2020 (Freedman, John) (Entered: 06/22/2020) |
| 06/24/2020 | 16 | NOTICE of Appearance by David Ryan Brody on behalf of All Plaintiffs (Brody, David) (Entered: 06/24/2020) |
| 06/29/2020 | 17 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARK ESPER served on 6/16/2020 (Freedman, John) (Entered: 06/29/2020) |
| 06/29/2020 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD J. TRUMP served on 6/22/2020 (Freedman, John) (Entered: 06/29/2020) |

| 06/29/2020 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MICHAEL D. CARVAJAL served on 6/15/2020 (Freedman, John) (Entered: 06/29/2020) |
|---|---|---|
| 07/08/2020 | 20 | MOTION for Leave to File *Second Amended Complaint* by BLACK LIVES MATTER D.C., GARRETT BOND, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Redline of proposed amended complaint, # 2 Proposed Second Amended Complaint, # 3 Text of Proposed Order) (Michelman, Scott) (Entered: 07/08/2020) |
| 08/03/2020 | 21 | NOTICE of Appearance by Sonia Tabriz on behalf of All Plaintiffs (Tabriz, Sonia) (Entered: 08/03/2020) |
| 08/04/2020 | 22 | NOTICE of Appearance by Christopher Charles Hair on behalf of WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Hair, Christopher) (Entered: 08/04/2020) |
| 08/04/2020 | 23 | MOTION for Extension of Time to File Answer re 11 Amended Complaint, by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Hair, Christopher) (Entered: 08/04/2020) |
| 08/04/2020 | 24 | NOTICE of Appearance by Noah Baron on behalf of All Plaintiffs (Baron, Noah) (Entered: 08/04/2020) |
| 08/04/2020 | 25 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILLIAM P. BARR served on 8/3/2020 (Tabriz, Sonia) (Entered: 08/04/2020) |
| 08/05/2020 | 26 | RESPONSE re 23 MOTION for Extension of Time to File Answer re 11 Amended Complaint, filed by BLACK LIVES MATTER D.C., GARRETT BOND, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order)(Michelman, Scott) (Entered: 08/05/2020) |
| 08/05/2020 | 27 | MOTION for Discovery *To Identify Unnamed Defendants* by BLACK LIVES MATTER D.C., GARRETT BOND, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Exhibit A (proposed early discovery), # 2 Exhibit B (proposed third party subpoena), # 3 Text of Proposed Order) (Michelman, Scott) (Entered: 08/05/2020) |
| 08/05/2020 |  | MINUTE ORDER. Upon consideration of the plaintiffs' 20 Motion for Leave to File Second Amended Complaint, and the lack of opposition thereto, it is ORDERED that the motion is GRANTED. It is further ORDERED that the defendants' 23 Motion for Extension of Time is DENIED as moot. Finally, it is ORDERED that the defendants shall file, on or before August 12, 2020, any opposition to the plaintiffs' 27 Motion for Discovery; and the plaintiffs shall file, on or before August 17, 2020, any reply. So Ordered by Judge Dabney L. Friedrich on August 5, 2020. (lcdlf2) (Entered: 08/05/2020) |
| 08/05/2020 |  | Set/Reset Deadlines: Responses due by 8/12/2020 Replies due by 8/17/2020. (zjch) (Entered: 08/06/2020) |
| 08/05/2020 | 29 | Second AMENDED COMPLAINT against WILLIAM P. BARR, MICHAEL D. CARVAJAL, JOHN DOE 1-100, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, JOHN POE 1-20, DONALD J. TRUMP, WILLIAM J. WALKER, PETER NEWSHAM, JOHN ROES 1-50 with Jury Demand filed by GARRETT BOND, TONI SANDERS, J.N.C., KEARA SCALLAN, LIA POTEET, KISHON MCDONALD, E.X.F., DUSTIN FOLEY.(eg) (Entered: 08/06/2020) |

| 08/06/2020 | 28 | REQUEST FOR SUMMONS TO ISSUE *(3 summonses -- Newsham, D.C. Mayor, D.C. Att'y Gen.)* re Order on Motion for Leave to File,,, Order on Motion for Extension of Time to Answer,, filed by BLACK LIVES MATTER D.C., GARRETT BOND, TONI SANDERS, J.N.C., KEARA SCALLAN, LIA POTEET, KISHON MCDONALD. Related document: Order on Motion for Leave to File,,, Order on Motion for Extension of Time to Answer,,. (Attachments: # 1 Summons, # 2 Summons)(Michelman, Scott) (Entered: 08/06/2020) |
|---|---|---|
| 08/06/2020 | 30 | SUMMONS (3) Issued Electronically as to PETER NEWSHAM, District of Columbia Attorney General, and the District of Columbia Mayor. (eg) (Entered: 08/06/2020) |
| 08/06/2020 | 31 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILLIAM J. WALKER served on 8/3/2020 (Tabriz, Sonia) (Entered: 08/06/2020) |
| 08/06/2020 | 32 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JAMES C. MCCONVILLE served on 6/15/2020 (Tabriz, Sonia) (Entered: 08/06/2020) |
| 08/06/2020 | 33 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. GREGORY T. MONAHAN served on 6/15/2020 (Tabriz, Sonia) (Entered: 08/06/2020) |
| 08/06/2020 | 34 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JAMES M. MURRAY served on 6/15/2020 (Tabriz, Sonia) (Entered: 08/06/2020) |
| 08/11/2020 | 35 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PETER NEWSHAM served on 8/7/2020 (Tabriz, Sonia) (Entered: 08/11/2020) |
| 08/12/2020 | 36 | NOTICE of Appearance by John BlairFishwick Martin on behalf of WILLIAM P. BARR (Martin, John) (Entered: 08/12/2020) |
| 08/12/2020 | 37 | NOTICE of Appearance by David Gregory Cutler on behalf of WILLIAM P. BARR (Cutler, David) (Entered: 08/12/2020) |
| 08/12/2020 | 38 | Memorandum in opposition to re 27 MOTION for Discovery *To Identify Unnamed Defendants* filed by WILLIAM P. BARR. (Martin, John) (Entered: 08/12/2020) |
| 08/12/2020 | 39 | Memorandum in opposition to re 27 MOTION for Discovery *To Identify Unnamed Defendants* filed by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Hair, Christopher) (Entered: 08/12/2020) |
| 08/12/2020 | 40 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on the Mayor of the District of Columbia. Date of Service Upon the Mayor for the District of Columbia on 08/07/2020. (Tabriz, Sonia) (Entered: 08/12/2020) |
| 08/12/2020 | 41 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 8/7/2020. Answer due for ALL D.C. DEFENDANTS by 8/28/2020. (Tabriz, Sonia) (Entered: 08/12/2020) |
| 08/12/2020 | 42 | Memorandum in opposition to re 27 MOTION for Discovery *To Identify Unnamed Defendants* filed by PETER NEWSHAM, JOHN ROES 1-50. (Attachments: # 1 Text of Proposed Order)(Heath, Brendan) (Entered: 08/12/2020) |
| 08/17/2020 | 43 | REPLY to opposition to motion re 27 MOTION for Discovery *To Identify Unnamed Defendants and to stay Defendants' response deadline,* filed by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Spitzer, Arthur) (Entered: 08/17/2020) |

| 08/17/2020 | 44 | NOTICE *of filing Revised Proposed Order (Exhibit C) to Motion for Early Discovery* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN re 43 Reply to opposition to Motion, (Attachments: # 1 Exhibit C: Revised Proposed Order)(Spitzer, Arthur) (Entered: 08/17/2020) |
|---|---|---|
| 08/17/2020 | 45 | ERRATA *attaching correct attachments to Plaintiffs' Reply in Support of their Motion for Early Discovery* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN 27 MOTION for Discovery *To Identify Unnamed Defendants* filed by TONI SANDERS, BLACK LIVES MATTER D.C., J.N.C., LIA POTEET, KEARA SCALLAN, GARRETT BOND, KISHON MCDONALD. (Attachments: # 1 Exhibit C to Motion for Early Discovery: Revised proposed discovery to District of Columbia, # 2 Revised proposed order)(Spitzer, Arthur) (Entered: 08/17/2020) |
| 08/19/2020 | 46 | ORDER denying the plaintiffs' 27 Motion for Limited Early Discovery. See text for details. Signed by Judge Dabney L. Friedrich on August 19, 2020. (lcdlf2) (Entered: 08/19/2020) |
| 08/19/2020 | | MINUTE ORDER. Given that cases 20-cv-1469 and 20-cv-1542 appear to raise common questions of law and fact, the Court directs the parties in both cases to confer and file, on or before August 24, 2020, a proposed consolidated briefing schedule, or explain to the Court why briefing schedules should not be consolidated pursuant to Federal Rule of Civil Procedure 42(a). Signed by Judge Dabney L. Friedrich on August 19, 2020. (lcdlf2) (Entered: 08/19/2020) |
| 08/19/2020 | | Set/Reset Deadlines: Proposed Briefing Schedule due by 8/24/2020 (zjch) (Entered: 08/19/2020) |
| 08/19/2020 | | Set/Reset Deadlines: Status Report due by 9/2/2020 (zjch) (Entered: 08/19/2020) |
| 08/20/2020 | 47 | MOTION to Certify Class *[PLAINTIFFS' MOTION FOR CLASS CERTIFICATION]* by GARRETT BOND, DUSTIN FOLEY, KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Memorandum in Support, # 2 Declaration of David E. Kouba, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28, # 31 Exhibit 29, # 32 Exhibit 30, # 33 Exhibit 31, # 34 Exhibit 32, # 35 Exhibit 33, # 36 Exhibit 34, # 37 Exhibit 35, # 38 Exhibit 36, # 39 Exhibit 37, # 40 Exhibit 38, # 41 Exhibit 39, # 42 Exhibit 40, # 43 Exhibit 41, # 44 Text of Proposed Order)(Kouba, David) (Entered: 08/20/2020) |
| 08/21/2020 | | NOTICE OF ERROR re 47 Motion to Certify Class; emailed to david.kouba@arnoldporter.com, cc'd 32 associated attorneys -- The PDF file you docketed contained errors: 1. Invalid attorney signature, 2. FYI: DO NOT REFILE. Attorney signature must match login/password. (zeg, ) (Entered: 08/21/2020) |
| 08/24/2020 | 48 | RESPONSE TO ORDER OF THE COURT re Order, *(Joint Response to the Court's August 19, 2020 Order)* filed by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 08/24/2020) |

| 08/24/2020 | | MINUTE ORDER. Upon consideration of the parties' 48 Response to the Court's August 19, 2020 Order, it is hereby ORDERED that the plaintiffs shall file any motion to amend the complaint on or before September 1, 2020. It is further ORDERED that on or before October 1, 2020, the defendants shall file their motions to dismiss the complaint; on or before November 19, 2020, the plaintiffs shall file their oppositions; and on or before December 17, 2020, the defendants shall file any reply. So Ordered by Judge Dabney L. Friedrich on August 24, 2020. (lcdlf2) (Entered: 08/24/2020) |
|---|---|---|
| 08/24/2020 | | Set/Reset Deadlines: Dispositive Motions due by 10/1/2020. Response to Dispositive Motions due by 11/19/2020. Reply to Dispositive Motions due by 12/17/2020. Motion to Amend due by 9/1/2020. (zjch) (Entered: 08/25/2020) |
| 08/26/2020 | 49 | Consent MOTION to Stay re 47 MOTION to Certify Class *[PLAINTIFFS' MOTION FOR CLASS CERTIFICATION]* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Hair, Christopher) (Entered: 08/26/2020) |
| 09/01/2020 | 50 | MOTION for Leave to File *Third Amended Complaint* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Redline of proposed amended complaint, # 2 Proposed Third Amended Complaint, # 3 Text of Proposed Order)(Michelman, Scott) (Entered: 09/01/2020) |
| 09/02/2020 | 51 | NOTICE of Appearance by Duane Gordon Blackman on behalf of PETER NEWSHAM (Blackman, Duane) (Entered: 09/02/2020) |
| 09/03/2020 | | MINUTE ORDER. Upon consideration of the plaintiffs' 50 Motion for Leave to File Third Amended Complaint, it is ORDERED that the motion is GRANTED. The plaintiffs' [50-2] Third Amended Complaint shall be accepted for filing. Signed by Judge Dabney L. Friedrich on September 3, 2020. (lcdlf2) (Entered: 09/03/2020) |
| 09/03/2020 | | MINUTE ORDER. Upon consideration of the defendants' 49 Motion to Stay the plaintiffs' 47 Motion for Class Certification, it is ORDERED that the defendants' 49 Motion is GRANTED. The defendants shall respond to the plaintiffs' 47 Motion for Class Certification within 30 days of the Court's resolution of the defendants' forthcoming motions to dismiss. Signed by Judge Dabney L. Friedrich on September 3, 2020. (lcdlf2) (Entered: 09/03/2020) |
| 09/03/2020 | 52 | Third AMENDED COMPLAINT against All Defendants with Jury Demand filed by E.X.F., DUSTIN FOLEY, KEARA SCALLAN, LIA POTEET, KISHON MCDONALD, BLACK LIVES MATTER D.C., GARRETT BOND, TONI SANDERS, J.N.C..(eg) (Entered: 09/04/2020) |
| 09/09/2020 | 53 | REQUEST FOR SUMMONS TO ISSUE re 52 Amended Complaint filed by E.X.F., DUSTIN FOLEY, KEARA SCALLAN, LIA POTEET, KISHON MCDONALD, BLACK LIVES MATTER D.C., GARRETT BOND, TONI SANDERS, J.N.C.. Related document: 52 Amended Complaint filed by TONI SANDERS, BLACK LIVES MATTER D.C., J.N.C., E.X.F., KEARA SCALLAN, DUSTIN FOLEY, LIA POTEET, KISHON MCDONALD, GARRETT BOND. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Summons, # 18 Summons, # 19 Summons, # 20 Summons, # 21 Summons, # 22 Summons, # 23 Summons, # 24 Summons, # 25 Summons)(Michelman, Scott) (Entered: 09/09/2020) |
| 09/09/2020 | 54 | STANDARD ORDER for Civil Cases. See text for details. Signed by Judge Dabney L. |

| | | Friedrich on September 9, 2020. (lcdlf2) (Entered: 09/09/2020) |
|---|---|---|
| 09/10/2020 | 55 | SUMMONS (14) Issued Electronically as to MARK ADAMCHIK, ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, C.W. MEYER, C.J. MURPHY, T.C. PAYNE, DANIEL M. THAU, WAYNE VINCENT, ANTHONY A. WILLIS, District of Columbia Attorney General, and the District of Columbia Mayor., SUMMONS Issued Electronically as to MARK ADAMCHIK, ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, C.W. MEYER, C.J. MURPHY, T.C. PAYNE, DANIEL M. THAU, WAYNE VINCENT, ANTHONY A. WILLIS, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(eg) (Entered: 09/10/2020) |
| 09/18/2020 | 56 | MOTION TO REQUIRE FURTHER IDENTIFICATION OF DEFENDANTS OR, IN THE ALTERNATIVE, FOR ISSUANCE OF SUMMONSES by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Text of Proposed Order)(Michelman, Scott). Added MOTION to Issue Summons on 9/21/2020 (znmw). (Entered: 09/18/2020) |
| 09/21/2020 | 57 | NOTICE of FILING REVISED PROPOSED ORDER by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN re 56 MOTION TO REQUIRE FURTHER IDENTIFICATION OF DEFENDANTS OR, IN THE ALTERNATIVE, FOR ISSUANCE OF SUMMONSES (Attachments: # 1 Text of Proposed Order as Revised)(Michelman, Scott) (Entered: 09/21/2020) |
| 09/22/2020 | 58 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARK ADAMCHIK served on 9/16/2020 (Attachments: # 1 Affidavit of Service on USAODC)(Michelman, Scott) (Entered: 09/22/2020) |
| 09/22/2020 | 59 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WAYNE VINCENT served on 9/15/2020, answer due 10/6/2020 (Michelman, Scott) (Entered: 09/22/2020) |
| 09/25/2020 | 60 | WAIVER OF SERVICE. FIRST NAME UNKNOWN TAYLOR waiver sent on 9/23/2020, answer due 11/22/2020. (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/25/2020 | 61 | WAIVER OF SERVICE. FIRST NAME UNKNOWN HARGROVE waiver sent on 9/23/2020, answer due 11/22/2020. (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/25/2020 | 62 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ANTHONY ALIOTO served on 9/23/2020 (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/25/2020 | 63 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ANTHONY A. WILLIS served on 9/23/2020 (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/25/2020 | 64 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. S. BUCHANAN served on 9/23/2020 (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/25/2020 | 65 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. C.W. MEYER served on 9/23/2020 (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/25/2020 | 66 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. C.J. MURPHY served on 9/23/2020 (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/25/2020 | 67 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DANIEL M. THAU served on 9/23/2020 (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/25/2020 | 68 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. |

| | | JEFFERY CARROLL served on 9/23/2020 (Tabriz, Sonia) (Entered: 09/25/2020) |
|---|---|---|
| 09/25/2020 | 69 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. T.C. PAYNE served on 9/23/2020 (Tabriz, Sonia) (Entered: 09/25/2020) |
| 09/28/2020 | 70 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 9/16/2020. Answer due for ALL FEDERAL DEFENDANTS by 11/15/2020. (Michelman, Scott) (Entered: 09/28/2020) |
| 09/29/2020 | 71 | Memorandum in opposition to re 56 MOTION TO REQUIRE FURTHER IDENTIFICATION OF DEFENDANTS OR, IN THE ALTERNATIVE, FOR ISSUANCE OF SUMMONSES MOTION to Issue Summons filed by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Hair, Christopher) (Entered: 09/29/2020) |
| 09/29/2020 | 72 | Memorandum in opposition to re 56 MOTION TO REQUIRE FURTHER IDENTIFICATION OF DEFENDANTS OR, IN THE ALTERNATIVE, FOR ISSUANCE OF SUMMONSES MOTION to Issue Summons filed by WILLIAM P. BARR. (Cutler, David) (Entered: 09/29/2020) |
| 10/01/2020 | 73 | REPLY to opposition to motion re 56 MOTION TO REQUIRE FURTHER IDENTIFICATION OF DEFENDANTS OR, IN THE ALTERNATIVE, FOR ISSUANCE OF SUMMONSES MOTION to Issue Summons filed by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Michelman, Scott) (Entered: 10/01/2020) |
| 10/01/2020 | 74 | NOTICE of Appearance by Sean Patrick Mahard on behalf of WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Mahard, Sean) (Entered: 10/01/2020) |
| 10/01/2020 | 75 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 09-16-2020. (Michelman, Scott) (Entered: 10/01/2020) |
| 10/01/2020 | 76 | MOTION to Dismiss *All Individual Capacity Claims* by WILLIAM P. BARR (Attachments: # 1 Text of Proposed Order)(Martin, John) (Entered: 10/01/2020) |
| 10/01/2020 | 77 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on the Mayor of the District of Columbia. Date of Service Upon the Mayor for the District of Columbia on 09-24-2020. (Michelman, Scott) (Entered: 10/01/2020) |
| 10/01/2020 | 78 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 9/24/2020. Answer due for ALL D.C. DEFENDANTS by 10/15/2020. (Michelman, Scott) (Entered: 10/01/2020) |
| 10/01/2020 | 79 | MOTION to Dismiss *Plaintiffs' Claims Against Official Capacity Federal Defendants* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Hair, Christopher) (Entered: 10/01/2020) |
| 10/01/2020 | 80 | MOTION to Dismiss by ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FIRST NAME UNKNOWN HARGROVE, C.W. MEYER, C.J. MURPHY, PETER NEWSHAM, T.C. PAYNE, FIRST NAME UNKNOWN |

| | | |
|---|---|---|
| | | TAYLOR, DANIEL M. THAU, ANTHONY A. WILLIS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Blackman, Duane) (Entered: 10/01/2020) |
| 10/02/2020 | | MINUTE ORDER. Upon consideration of the plaintiffs' 56 Motion to Require Further Identification of Defendants or, in the Alternative, for Issuance of Summonses, it is ORDERED that the motion is GRANTED. Plaintiffs' request is exceedingly narrow and will not impose a significant burden on defendants. Accordingly, defendant Monahan is ORDERED to provide to plaintiffs' counsel the first and last names of the U.S. Park Police officers described in plaintiffs' Third Amended Complaint as [first name unknown] Seberling, helmet number A702, helmet number A704, helmet number A706, helmet number B714, helmet number C723, helmet number S735, arm patch number JD97, arm patch number LP71, and arm patch number SK10, on or before October 9, 2020. Defendant Newsham is ORDERED to provide to plaintiffs' counsel the first and last names of the D.C. Metropolitan Police officers described in plaintiffs' Third Amended Complaint as [first name unknown] Hargrove and [first name unknown] Taylor, on or before October 9, 2020. So Ordered by Judge Dabney L. Friedrich on October 2, 2020. (lcdlf3) (Entered: 10/02/2020) |
| 10/02/2020 | 81 | REQUEST FOR SUMMONS TO ISSUE re 52 Amended Complaint filed by E.X.F., DUSTIN FOLEY, KEARA SCALLAN, LIA POTEET, KISHON MCDONALD, BLACK LIVES MATTER D.C., GARRETT BOND, TONI SANDERS, J.N.C.. Related document: 52 Amended Complaint filed by TONI SANDERS, BLACK LIVES MATTER D.C., J.N.C., E.X.F., KEARA SCALLAN, DUSTIN FOLEY, LIA POTEET, KISHON MCDONALD, GARRETT BOND. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons)(Michelman, Scott) (Entered: 10/02/2020) |
| 10/02/2020 | | Set/Reset Deadlines: List of selected DC Metropolitan Police officer names due by 10/9/2020. (zjch) (Entered: 10/05/2020) |
| 10/06/2020 | 82 | NOTICE of Appearance by Richard P. Sobiecki on behalf of ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FIRST NAME UNKNOWN HARGROVE, C.W. MEYER, C.J. MURPHY, PETER NEWSHAM, T.C. PAYNE, FIRST NAME UNKNOWN TAYLOR, DANIEL M. THAU, ANTHONY A. WILLIS (Sobiecki, Richard) (Entered: 10/06/2020) |
| 10/06/2020 | 83 | MOTION to Dismiss by WAYNE VINCENT (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Exhibit)(Samuel, Ryan) (Entered: 10/06/2020) |
| 10/15/2020 | 84 | MOTION to Amend/Correct *Docket & for Issuance of Summonses* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Text of Proposed Order)(Michelman, Scott) (Entered: 10/15/2020) |
| 10/16/2020 | | MINUTE ORDER. Upon consideration of the plaintiffs' 84 Motion To Amend The Docket And For Issuance Of Summonses, it is ORDERED that the motion is GRANTED. The Clerk of the Court is directed to add the following individuals to the docket as defendants in this action: LUIS FELICIANO, THOMAS LOCASICO, NICHOLAS JARMUZEWSKI, JEFFREY HENDRICKSON, SEAN COX, BRYAN MCDONALD, LAWRENCE SINACORE, JONATHAN DANIELS, SEAN KELLENBERGER, and CARA SEIBERLING. The Clerk of the Court is further directed to issue the ten summonses filed at ECF 84-1, 84-2, 84-3, 84-4, 84-5, 84-6, 84-7, 84-8, 84-9, and 84-10. So ordered by Judge Dabney L. Friedrich on October 16, 2020. (lcdlf3) (Entered: 10/16/2020) |

| 10/16/2020 | 85 | SUMMONS (10) Issued Electronically as to SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, SEAN KELLENBERGER, THOMAS LOCASICO, BRYAN MCDONALD, CARA SEIBERLING, LAWRENCE SINACORE. (eg) (Entered: 10/16/2020) |
|---|---|---|
| 11/06/2020 | 86 | Unopposed MOTION for Leave to File Excess Pages *in response to the briefs of Federal and D.C. Defendants* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Text of Proposed Order) (Michelman, Scott) (Entered: 11/06/2020) |
| 11/06/2020 | | MINUTE ORDER granting the plaintiffs' 86 Motion for Leave to File Excess Pages. Accordingly, in responding to the motions to dismiss filed by defendant Barr in his individual capacity, the federal defendants sued in their official capacities, and the District of Columbia defendants, plaintiffs are granted leave to file, in lieu of three separate briefs, a single brief of no more than 90 pages. So ordered by Judge Dabney L. Friedrich on November 6, 2020. (lcdlf3) (Entered: 11/06/2020) |
| 11/13/2020 | 87 | NOTICE of Appearance by John BlairFishwick Martin on behalf of MARK ADAMCHIK (Martin, John) (Entered: 11/13/2020) |
| 11/13/2020 | 88 | NOTICE of Appearance by John BlairFishwick Martin on behalf of CARA SEIBERLING (Martin, John) (Entered: 11/13/2020) |
| 11/13/2020 | 89 | NOTICE of Appearance by David Gregory Cutler on behalf of MARK ADAMCHIK (Cutler, David) (Entered: 11/13/2020) |
| 11/13/2020 | 90 | NOTICE of Appearance by David Gregory Cutler on behalf of CARA SEIBERLING (Cutler, David) (Entered: 11/13/2020) |
| 11/13/2020 | 91 | Joint MOTION for Briefing Schedule *and extensions of time on oppositions and replies* by MARK ADAMCHIK, CARA SEIBERLING (Attachments: # 1 Text of Proposed Order)(Martin, John) (Entered: 11/13/2020) |
| 11/14/2020 | 92 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/20/2020. Answer due for ALL FEDERAL DEFENDANTS by 12/19/2020. (Tabriz, Sonia) (Entered: 11/14/2020) |
| 11/14/2020 | 93 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 10/26/2020. (Tabriz, Sonia) (Entered: 11/14/2020) |
| 11/14/2020 | 94 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CARA SEIBERLING served on 11/11/2020 (Tabriz, Sonia) (Entered: 11/14/2020) |
| 11/14/2020 | 95 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JONATHAN DANIELS served on 11/9/2020 (Tabriz, Sonia) (Entered: 11/14/2020) |
| 11/14/2020 | 96 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. NICHOLAS JARMUZEWSKI served on 11/9/2020 (Tabriz, Sonia) (Entered: 11/14/2020) |
| 11/16/2020 | | MINUTE ORDER granting the parties' 91 Joint Motion for Briefing Schedule. Accordingly, the following schedule shall govern further proceedings: on or before November 16, 2020, Defendant Adamchik shall file his Motion to Dismiss; on or before December 14, 2020, Plaintiffs shall file their opposition to Defendant Adamchiks Motion to Dismiss; on or before January 11, 2021, Defendant Adamchik shall reply to Plaintiffs opposition;on or before January 11, 2021, Defendant Seiberling |

| | | |
|---|---|---|
| | | shall file her Motion to Dismiss; on or before February 8, 2021, Plaintiffs shall file their opposition to Defendant Seiberlings Motion to Dismiss; on or before March 8, 2021, Defendant Seiberling shall reply to Plaintiffs opposition.So ordered by Judge Dabney L. Friedrich on November 16, 2020. (lcdlf3) (Entered: 11/16/2020) |
| 11/16/2020 | | Set/Reset Deadlines: Dispositive Motions due by 11/16/2020. Response to Dispositive Motions due by 12/14/2020. Reply to Dispositive Motions due by 1/11/2021. Defendant Seiberling shall file her Motion to Dismiss by 1/11/2021. Plaintiffs shall file their opposition to Defendant Seiberlings Motion to Dismiss by 2/8/2021. Defendant Seiberling shall reply to Plaintiffs opposition by 3/8/2021. (zjch) (Entered: 11/16/2020) |
| 11/16/2020 | 97 | MOTION to Dismiss by MARK ADAMCHIK (Attachments: # 1 Text of Proposed Order)(Cutler, David) (Entered: 11/16/2020) |
| 11/19/2020 | 98 | Memorandum in opposition to re 76 MOTION to Dismiss *All Individual Capacity Claims*, 79 MOTION to Dismiss *Plaintiffs' Claims Against Official Capacity Federal Defendants*, 80 MOTION to Dismiss filed by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Unpublished decision cited, # 2 Text of Proposed Order)(Michelman, Scott) (Entered: 11/19/2020) |
| 11/19/2020 | 99 | Memorandum in opposition to re 83 MOTION to Dismiss filed by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order)(Michelman, Scott) (Entered: 11/19/2020) |
| 11/24/2020 | 100 | MOTION for Leave to File *Amicus Brief* by CONCERNED LEGAL ACADEMICS AND HISTORIANS (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Klein, Eric) (Entered: 11/24/2020) |
| 11/25/2020 | 101 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JEFFREY HENDRICKSON served on 11/10/2020 (Tabriz, Sonia) (Entered: 11/25/2020) |
| 11/25/2020 | 102 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. LUIS FELICIANO served on 11/17/2020 (Tabriz, Sonia) (Entered: 11/25/2020) |
| 11/25/2020 | 103 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SEAN KELLENBERGER served on 11/17/2020 (Tabriz, Sonia) (Entered: 11/25/2020) |
| 11/25/2020 | 104 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. THOMAS LOCASICO served on 11/11/2020 (Tabriz, Sonia) (Entered: 11/25/2020) |
| 11/27/2020 | 105 | REPLY to opposition to motion re 83 MOTION to Dismiss filed by WAYNE VINCENT. (Samuel, Ryan) (Entered: 11/27/2020) |
| 11/27/2020 | 106 | MOTION for Leave to File *Amicus Brief* by INTERNATIONAL CENTER FOR ADVOCATES AGAINST DISCRIMINATION, THE INTERNATIONAL HUMAN RIGHTS CLINIC, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, THE LEITNER CENTER FOR INTERNATIONAL LAW & JUSTICE, FORDHAM UNIVERSITY SCHOOL OF LAW, THE ROBERT AND HELEN BERNSTEIN INSTITUTE FOR HUMAN RIGHTS, NEW YORK UNIVERSITY SCHOOL OF LAW, WILLIAM J. ACEVES (Attachments: # 1 Exhibit A, # 2 Exhibit B)(de Gramont, Alexandre) (Entered: 11/27/2020) |
| 11/27/2020 | 107 | MOTION for Leave to File *Amicus Curiae Brief* by Charles Avery, Jr., Margaret Burnham, Clayborne Carson, Hazel Dukes, Mary Frances Berry, Wade Henderson, Judith Heumann, Dolores Huerta, Jesse Jackson, Sr., Benjamin Jealous, Martin Luther King III, Marc Morial, Richard Morrisroe, Ruby Sales, Marian Wright Edelman |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit Amicus Curiae Brief, # 2 Text of Proposed Order)(Spiva, Bruce) (Entered: 11/27/2020) |
| 11/27/2020 | 108 | Amended MOTION for Leave to File *Amicus Curiae Brief* by Charles Avery, Jr., Mary Frances Berry, Margaret Burnham, Clayborne Carson, Hazel Dukes, Marian Wright Edelman, Wade Henderson, Dolores Huerta, Benjamin Jealous, Martin Luther King III, Marc Morial, Richard Morrisroe, Ruby Sales (Attachments: # 1 Exhibit Amicus Curiae Brief, # 2 Text of Proposed Order)(Spiva, Bruce) (Entered: 11/27/2020) |
| 11/30/2020 | 109 | RESPONSE re 108 Amended MOTION for Leave to File *Amicus Curiae Brief* filed by MARK ADAMCHIK, WILLIAM P. BARR, CARA SEIBERLING. (Cutler, David) (Entered: 11/30/2020) |
| 11/30/2020 | | MINUTE ORDER. Upon consideration of Amicus International Center for Advocates Against Discrimination et al.'s 106 Motion for Leave to File Amicus Brief, it is ORDERED that the motion is GRANTED. So Ordered by Judge Dabney L. Friedrich on November 30, 2020. (lcdlf3) (Entered: 11/30/2020) |
| 11/30/2020 | | MINUTE ORDER. Upon consideration of Amicus Concerned Legal Academics and Historians' 100 Motion for Leave to File Amicus Brief, it is ORDERED that the motion is GRANTED. So Ordered by Judge Dabney L. Friedrich on November 30, 2020. (lcdlf3) (Entered: 11/30/2020) |
| 11/30/2020 | | MINUTE ORDER. Upon consideration of Amicus Veterans of the Civil Rights Movement et al.'s 107 Motion for Leave to File Amicus Brief and 108 Amended Motion for Leave to File Amicus Curiae Brief, it is ORDERED that the motion is GRANTED. So Ordered by Judge Dabney L. Friedrich on November 30, 2020. (lcdlf3) (Entered: 11/30/2020) |
| 11/30/2020 | 110 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CARLOS M. VAZQUEZ, ANYA BERNSTEIN, JAMES PFANDER, STEPHEN I. VLADECK (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Proposed Amicus Brief)(Hunt, Hyland) (Entered: 11/30/2020) |
| 11/30/2020 | 114 | AMICUS BRIEF by WILLIAM J. ACEVES, INTERNATIONAL CENTER FOR ADVOCATES AGAINST DISCRIMINATION, INTERNATIONAL HUMAN RIGHTS CLINIC, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, LEITNER CENTER FOR INTERNATIONAL LAW & JUSTICE, FORDHAM UNIVERSITY SCHOOL OF LAW, ROBERT AND HELEN BERNSTEIN INSTITUTE FOR HUMAN RIGHTS, NEW YORK UNIVERSITY SCHOOL OF LAW. (eg) (Entered: 12/02/2020) |
| 11/30/2020 | 115 | AMICUS BRIEF by CONCERNED LEGAL ACADEMICS AND HISTORIANS. (eg) (Entered: 12/02/2020) |
| 11/30/2020 | 116 | AMICUS BRIEF by CHARLES AVERY, JR, MARY FRANCES BERRY, MARGARET BURNHAM, CLAYBORNE CARSON, HAZEL DUKES, MARIAN WRIGHT EDELMAN, WADE HENDERSON, DOLORES HUERTA, BENJAMIN JEALOUS, MARTIN LUTHER KING, III, MARC MORIAL, RICHARD MORRISROE, RUBY SALES. (eg) Modified to remove Jesse Jackson, Sr. as a filer per counsel on 12/3/2020 (ztd). (Entered: 12/02/2020) |
| 12/01/2020 | | MINUTE ORDER. Upon consideration of Amici Federal Courts Scholars' 110 Unopposed Motion for Leave to File Amicus Brief, it is ORDERED that the motion is GRANTED. So Ordered by Judge Dabney L. Friedrich on December 1, 2020. (lcdlf3) (Entered: 12/01/2020) |
| 12/01/2020 | 111 | MOTION for Extension of Time to *Serve Defendant Bryan McDonald* by BLACK |

**JA33**

| | | LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Text of Proposed Order)(Tabriz, Sonia) (Entered: 12/01/2020) |
|---|---|---|
| 12/01/2020 | 112 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SEAN COX served on 12/1/2020 (Tabriz, Sonia) (Entered: 12/01/2020) |
| 12/01/2020 | 113 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. LAWRENCE SINACORE served on 11/25/2020 (Tabriz, Sonia) (Entered: 12/01/2020) |
| 12/01/2020 | 120 | AMICUS BRIEF by ANYA BERNSTEIN, JAMES PFANDER, CARLOS M. VAZQUEZ, STEPHEN I. VLADECK. (eg) (Entered: 12/09/2020) |
| 12/02/2020 | | MINUTE ORDER. Upon consideration of the plaintiffs' 111 Motion for Extension of Time to Serve Defendant Bryan McDonald, it is ORDERED that the motion is GRANTED. Accordingly, the plaintiffs shall serve defendant Bryan McDonald on or before February 1, 2021. So ordered by Judge Dabney L. Friedrich on December 2, 2020. (lcdlf3) (Entered: 12/02/2020) |
| 12/07/2020 | 117 | Unopposed MOTION for Leave to File Excess Pages *for Reply on Motion to Dismiss* by WILLIAM P. BARR (Attachments: # 1 Text of Proposed Order)(Martin, John) (Entered: 12/07/2020) |
| 12/07/2020 | 118 | NOTICE of Appearance by Christopher A. Zampogna on behalf of SEAN KELLENBERGER (Zampogna, Christopher) (Entered: 12/07/2020) |
| 12/07/2020 | 119 | Joint MOTION for Briefing Schedule *on Defendant Kellenberger's Motion to Dismiss* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Text of Proposed Order)(Michelman, Scott). Added MOTION for Extension of Time to on 12/10/2020 (znmw). (Entered: 12/07/2020) |
| 12/08/2020 | | MINUTE ORDER granting Attorney General Barr's 117 Unopposed Motion for Leave to File Excess Pages. Accordingly, Attorney General Barr may file a reply of up to 40 pages in support of his motion to dismiss the individual capacity claims. So ordered by Judge Dabney L. Friedrich on December 8, 2020. (lcdlf3) (Entered: 12/08/2020) |
| 12/08/2020 | | MINUTE ORDER granting the parties' 119 Joint Motion to Set Briefing Schedules. Accordingly, the following schedule shall govern further proceedings: defendant Kellenberger shall file his motion to dismiss on or before January 13, 2021; the plaintiffs shall file their opposition to defendant Kellenberger's motion on or before February 17, 2021; and defendant Kellenberger shall reply on or before March 10, 2021. So ordered by Judge Dabney L. Friedrich on December 8, 2020. (lcdlf3) (Entered: 12/08/2020) |
| 12/14/2020 | 121 | NOTICE OF SUPPLEMENTAL AUTHORITY by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Michelman, Scott) (Entered: 12/14/2020) |
| 12/14/2020 | 122 | Memorandum in opposition to re 97 MOTION to Dismiss *by Defendant Adamchik* filed by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order)(Michelman, Scott) (Entered: 12/14/2020) |
| 12/15/2020 | 123 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. BRYAN MCDONALD served on 12/15/2020 (Tabriz, Sonia) (Entered: 12/15/2020) |

| 12/17/2020 | 124 | NOTICE of Appearance by Daniel S. Crowley on behalf of THOMAS LOCASICO (Crowley, Daniel) (Entered: 12/17/2020) |
| 12/17/2020 | 125 | Unopposed MOTION for Leave to File Excess Pages *in Reply in Support of District Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint* by ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FIRST NAME UNKNOWN HARGROVE, C.W. MEYER, C.J. MURPHY, PETER NEWSHAM, T.C. PAYNE, FIRST NAME UNKNOWN TAYLOR, DANIEL M. THAU, ANTHONY A. WILLIS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Heath, Brendan) (Entered: 12/17/2020) |
| 12/17/2020 | 126 | REPLY to opposition to motion re 80 MOTION to Dismiss filed by ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FIRST NAME UNKNOWN HARGROVE, C.W. MEYER, C.J. MURPHY, PETER NEWSHAM, T.C. PAYNE, FIRST NAME UNKNOWN TAYLOR, DANIEL M. THAU, ANTHONY A. WILLIS. (Blackman, Duane) (Entered: 12/17/2020) |
| 12/17/2020 | 127 | REPLY to opposition to motion re 76 MOTION to Dismiss *All Individual Capacity Claims* filed by WILLIAM P. BARR. (Cutler, David) (Entered: 12/17/2020) |
| 12/17/2020 | 128 | REPLY to opposition to motion re 79 MOTION to Dismiss *Plaintiffs' Claims Against Official Capacity Federal Defendants* filed by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Hair, Christopher) (Entered: 12/17/2020) |
| 12/18/2020 |  | MINUTE ORDER. Upon consideration of the District of Columbia defendants' 125 Unopposed Motion for Leave to Exceed Page Limit, it is ORDERED that the motion is GRANTED. Accordingly, the District of Columbia defendants may file a reply in support of their motion to dismiss plaintiffs Third Amended Complaint not exceeding 35 pages in length. So ordered by Judge Dabney L. Friedrich on December 18, 2020. (lcdlf3) (Entered: 12/18/2020) |
| 12/21/2020 | 129 | NOTICE of Appearance by John BlairFishwick Martin on behalf of SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, BRYAN MCDONALD, LAWRENCE SINACORE (Martin, John) (Entered: 12/21/2020) |
| 12/21/2020 | 130 | Joint MOTION for Extension of Time to *respond to/move to dismiss complaint, set a schedule for consolidated briefing, and extend page limits* by SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, BRYAN MCDONALD, CARA SEIBERLING, LAWRENCE SINACORE (Martin, John) (Entered: 12/21/2020) |
| 12/21/2020 | 131 | MOTION for Leave to File *Brief of Amicus Curiae* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Brown, Bruce) (Entered: 12/21/2020) |
| 12/21/2020 | 132 | NOTICE of Appearance by Bruce D. Brown on behalf of REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Brown, Bruce) (Entered: 12/21/2020) |
| 12/21/2020 | 133 | NOTICE of Appearance by KatieLynn Boyd Townsend on behalf of REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Townsend, KatieLynn) (Entered: 12/21/2020) |
| 12/21/2020 | 134 | NOTICE of Appearance by Gabriel Rottman on behalf of REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Rottman, Gabriel) (Entered: 12/21/2020) |

| 12/21/2020 | 136 | AMICUS BRIEF by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (eg) (Entered: 12/29/2020) |
|---|---|---|
| 12/22/2020 | 135 | Consent MOTION for Leave to File Excess Pages *in reply on motion to dismiss* by MARK ADAMCHIK (Attachments: # 1 Text of Proposed Order)(Martin, John) (Entered: 12/22/2020) |
| 12/24/2020 | | MINUTE ORDER. Upon consideration of defendant Adamchik's 135 Consent Motion to File an Oversize Reply, it is ORDERED that the motion is GRANTED. Accordingly, defendant Adamchik may file a reply brief of up to 40 pages. So Ordered by Judge Dabney L. Friedrich on December 24, 2020. (lcdlf3) (Entered: 12/24/2020) |
| 12/24/2020 | | MINUTE ORDER. Upon consideration of the Reporters Committee for Freedom of the Press's 131 Motion for Leave to File Brief as Amicus Curiae in Support of Neither Party, it is ORDERED that the Motion is GRANTED. So Ordered by Judge Dabney L. Friedrich on December 24, 2020. (lcdlf3) (Entered: 12/24/2020) |
| 12/26/2020 | | MINUTE ORDER. Upon consideration of the parties' 130 Joint Motion for Extension of Time, it is ORDERED that the motion is GRANTED IN PART. Accordingly, the following schedule shall govern further proceedings: the Motion to Dismiss for defendants Sean Cox, Jonathan Daniels, Luis Feliciano, Jeffrey Hendrickson, Nicholas Jarmuzewski, Bryan McDonald, Cara Seiberling, and Lawrence Sinacore shall be due on or before January 22, 2021, with a page limit of 70 pages; the Opposition to the Motion to Dismiss shall be due on or before February 19, 2021 with a page limit of 70 pages; and the Reply shall be due on or before March 12, 2021 with a page limit of 40 pages. So Ordered by Judge Dabney L. Friedrich on December 26, 2020. (lcdlf3) (Entered: 12/26/2020) |
| 12/26/2020 | | Set/Reset Deadlines: Dispositive Motions due by 1/22/2021. Response to Dispositive Motions due by 2/19/2021. Reply to Dispositive Motions due by 3/12/2021. (zjch) (Entered: 12/27/2020) |
| 01/07/2021 | 137 | Joint MOTION for Extension of Time to *File Motion to Dismiss and Opposition* by THOMAS LOCASICO (Attachments: # 1 Text of Proposed Order)(Crowley, Daniel) (Entered: 01/07/2021) |
| 01/08/2021 | | MINUTE ORDER. Upon consideration of the 137 Joint Motion to Set Briefing Schedule for defendant LoCascio's Motion to Dismiss, it is ORDERED that the motion is GRANTED. Accordingly, the following schedule shall govern further proceedings: defendant LoCascio's motion to dismiss shall be due on or before January 26, 2021; the plaintiffs' oppositions shall be due on or before February 24, 2021; and defendant LoCascio's reply shall be due on or before March 17, 2021. So ordered by Judge Dabney L. Friedrich on January 8, 2021. (lcdlf3) (Entered: 01/08/2021) |
| 01/11/2021 | 138 | REPLY to opposition to motion re 97 MOTION to Dismiss filed by MARK ADAMCHIK. (Cutler, David) (Entered: 01/11/2021) |
| 01/11/2021 | 139 | Unopposed MOTION to Modify *Briefing Schedules and Extend the Time to File Briefs with Respect to Defendant Kellenbergers Motion to Dismiss* by SEAN KELLENBERGER (Attachments: # 1 Text of Proposed Order)(Zampogna, Christopher) (Entered: 01/11/2021) |
| 01/12/2021 | | MINUTE ORDER. Upon consideration of the defendant Kellenberger's 139 Unopposed Motion to Modify Briefing Schedules, it is ORDERED that the motion is GRANTED. Accordingly, the following schedule shall govern further proceedings: defendant Kellenberger's motion to dismiss shall be due on or before January 22, 2021; the plaintiffs' opposition shall be due on or before February 26, 2021; and defendant Kellenberger's reply shall be due on or before March 19, |

| | | 2021. So ordered by Judge Dabney L. Friedrich on January 12, 2021. (lcdlf3) (Entered: 01/12/2021) |
|---|---|---|
| 01/12/2021 | [140](#) | NOTICE of Appearance by MinhChau Nguyen Corr on behalf of WAYNE VINCENT (Corr, MinhChau) (Entered: 01/12/2021) |
| 01/21/2021 | [141](#) | Joint MOTION for Briefing Schedule *extended briefing schedule* by SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, BRYAN MCDONALD, CARA SEIBERLING, LAWRENCE SINACORE. (Martin, John) (Entered: 01/21/2021) |
| 01/22/2021 | | MINUTE ORDER granting the parties' [141](#) Joint Motion For Extended Briefing Schedule On Motion To Dismiss By Individual Federal Defendants Cox, Daniels, Feliciano, Hendrickson, Jarmuzewski, Mcdonald, Seiberling, And Sinacore. Accordingly, the following schedule shall govern further proceedings: the motion to dismiss for the individual federal defendants shall be due on or before February 16, 2021; the opposition shall be due on or before March 16, 2021; and the reply shall be due on or before April 6, 2021. So ordered by Judge Dabney L. Friedrich on January 22, 2021. (lcdlf3) (Entered: 01/22/2021) |
| 01/22/2021 | [142](#) | MOTION to Dismiss *All Individual-Capacity Claims* by SEAN KELLENBERGER. (Attachments: # [1](#) Text of Proposed Order)(Zampogna, Christopher) (Entered: 01/22/2021) |
| 01/26/2021 | [143](#) | MOTION to Dismiss by THOMAS LOCASICO. (Attachments: # [1](#) Memorandum in Support, # [2](#) Text of Proposed Order)(Crowley, Daniel) (Entered: 01/26/2021) |
| 02/12/2021 | [144](#) | NOTICE of Appearance by David Gregory Cutler on behalf of SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, BRYAN MCDONALD, LAWRENCE SINACORE (Cutler, David) (Entered: 02/12/2021) |
| 02/16/2021 | [145](#) | NOTICE of Appearance by Joseph Alfonso Gonzalez on behalf of MARK ADAMCHIK, WILLIAM P. BARR, SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, BRYAN MCDONALD, CARA SEIBERLING, LAWRENCE SINACORE (Gonzalez, Joseph) (Entered: 02/16/2021) |
| 02/16/2021 | [146](#) | MOTION to Dismiss by SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, BRYAN MCDONALD, CARA SEIBERLING, LAWRENCE SINACORE. (Attachments: # [1](#) Text of Proposed Order)(Gonzalez, Joseph) (Entered: 02/16/2021) |
| 02/24/2021 | [147](#) | Memorandum in opposition to re [143](#) MOTION to Dismiss filed by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # [1](#) Text of Proposed Order)(Michelman, Scott) (Entered: 02/24/2021) |
| 02/26/2021 | [148](#) | Memorandum in opposition to re [142](#) MOTION to Dismiss *All Individual-Capacity Claims* filed by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # [1](#) Text of Proposed Order)(Michelman, Scott) (Entered: 02/26/2021) |
| 03/10/2021 | [149](#) | REPLY to opposition to motion re [142](#) MOTION to Dismiss *All Individual-Capacity Claims* filed by SEAN KELLENBERGER. (Attachments: # [1](#) Proposed Order) (Zampogna, Christopher) (Entered: 03/10/2021) |
| 03/16/2021 | [150](#) | Memorandum in opposition to re [146](#) MOTION to Dismiss filed by BLACK LIVES |

| | | |
|---|---|---|
| | | MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order)(Michelman, Scott) (Entered: 03/16/2021) |
| 03/17/2021 | 151 | Consent MOTION for Extension of Time to File Response/Reply as to 143 MOTION to Dismiss by THOMAS LOCASICO. (Attachments: # 1 Text of Proposed Order) (Crowley, Daniel) (Entered: 03/17/2021) |
| 03/18/2021 | | MINUTE ORDER granting defendant LoCascio's 151 Consent Motion for Extension of Time to File Reply. Accordingly, the defendant shall file his reply on or before March 23, 2021. So ordered by Judge Dabney L. Friedrich on March 18, 2021. (lcdlf3) (Entered: 03/18/2021) |
| 03/23/2021 | 152 | REPLY to opposition to motion re 143 MOTION to Dismiss filed by THOMAS LOCASICO. (Crowley, Daniel) (Entered: 03/23/2021) |
| 04/06/2021 | 153 | REPLY to opposition to motion re 146 MOTION to Dismiss filed by SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, BRYAN MCDONALD, CARA SEIBERLING, LAWRENCE SINACORE. (Gonzalez, Joseph) (Entered: 04/06/2021) |
| 05/19/2021 | 154 | Unopposed MOTION for Leave to File *Supplemental Memorandum In Further Support of Motion to Dismiss* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Supplemental Memorandum) (Hair, Christopher) (Entered: 05/19/2021) |
| 05/19/2021 | | MINUTE ORDER granting the defendants' 154 Motion for Leave to File. Accordingly, the [154-1] Supplemental Memorandum shall be filed on the docket. The plaintiffs are directed to file any response on or before May 26, 2021. So ordered by Judge Dabney L. Friedrich on May 19, 2021. (lcdlf3) (Entered: 05/19/2021) |
| 05/19/2021 | | Set/Reset Deadlines: Responses due by 5/26/2021 (zjch) (Entered: 05/19/2021) |
| 05/19/2021 | 155 | SUPPLEMENTAL MEMORANDUM to re 146 MOTION to Dismiss filed by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (eg) (Entered: 05/21/2021) |
| 05/20/2021 | | NOTICE of Hearing: Motion Hearing set for 5/28/2021 at 10:15 AM via Video before Judge Dabney L. Friedrich. (zjch) (Entered: 05/20/2021) |
| 05/26/2021 | 156 | Response to re 155 Supplemental Memorandum *regarding mootness* filed by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Michelman, Scott) Modified docket event/text on 5/27/2021 (eg). (Entered: 05/26/2021) |
| 05/28/2021 | | Minute Entry for proceedings held before Judge Dabney L. Friedrich: Motion Hearing held on 5/28/2021 re (76 in 1:20-cv-01469-DLF) MOTION to Dismiss *All Individual Capacity Claims* filed by WILLIAM P. BARR, (21 in 1:20-cv-02163-DLF) MOTION to Dismiss *Plaintiff's Claims Against Official-Capacity Federal Defendants* filed by WILLIAM P. BARR, MARK T. ESPER, DONALD J. TRUMP, GREGORY T. MONAHAN, WILLIAM J. WALKER, JAMES M. MURRAY, JAMES C. MCCONVILLE, (143 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by THOMAS LOCASICO, (79 in 1:20-cv-01469-DLF) MOTION to Dismiss *Plaintiffs' Claims Against Official Capacity Federal Defendants* filed by MARK T. ESPER, WILLIAM P. BARR, DONALD J. TRUMP, MICHAEL D. CARVAJAL, GREGORY |

| | | |
|---|---|---|
| | | T. MONAHAN, WILLIAM J. WALKER, JAMES M. MURRAY, (19 in 1:20-cv-01622-DLF) MOTION to Dismiss *Plaintiff's Claims Against Official-Capacity Federal Defendants* filed by MARK T. ESPER, WILLIAM P. BARR, DONALD J. TRUMP, GREGORY T. MONAHAN, WILLIAM J. WALKER, JAMES M. MURRAY, JAMES C. MCCONVILLE, (142 in 1:20-cv-01469-DLF) MOTION to Dismiss *All Individual-Capacity Claims* filed by SEAN KELLENBERGER, (146 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by LAWRENCE SINACORE, SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, CARA SEIBERLING, BRYAN MCDONALD, (97 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by MARK ADAMCHIK, (54 in 1:20-cv-01542-DLF) MOTION to Dismiss filed by FNU TAYLOR, FNU HARGROVE, ANTHONY A. WILLIS, PETER NEWSHAM, S. BUCHANAN, ANTHONY ALIOTO, DANIEL THAU, JEFFERY CARROLL, C.W MEYER, CLIFTON MURPHY, THOMAS PAYNE, (59 in 1:20-cv-01542-DLF) MOTION to Dismiss *All Individual-Capacity Claims* filed by RUSSELL FENNELLY, FNU SEBERLING, MARK ADAMCHIK, (80 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by ANTHONY A. WILLIS, PETER NEWSHAM, S. BUCHANAN, ANTHONY ALIOTO, T.C. PAYNE, C.J. MURPHY, FIRST NAME UNKNOWN HARGROVE, JEFFERY CARROLL, DANIEL M. THAU, FIRST NAME UNKNOWN TAYLOR, C.W. MEYER, (83 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by WAYNE VINCENT, (20 in 1:20-cv-01622-DLF) MOTION to Dismiss *Plaintiff's Claims Against Attorney General William P. Barr in his Individual Capacity* filed by WILLIAM P. BARR, (34 in 1:20-cv-01542-DLF) MOTION to Dismiss *All Individual-Capacity Claims* filed by GREGORY T. MONAHAN, WILLIAM P. BARR, (36 in 1:20-cv-01542-DLF) MOTION to Dismiss filed by RYAN ALLEN, RYAN BLACK, WAYNE VINCENT, (22 in 1:20-cv-02163-DLF) MOTION to Dismiss *Plaintiff's Claims Against Attorney General William P. Barr in his Individual Capacity* filed by WILLIAM P. BARR. Court Reporter Sara Wick. (zjch) (Entered: 05/28/2021) |
| 06/15/2021 | 157 | MOTION for Leave to File *Supplemental Memorandum* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Proposed Supplemental Memorandum, # 2 Exhibit A to Supp. Memo., # 3 Exhibit B to Supp. Memo., # 4 Text of Proposed Order)(Michelman, Scott) (Entered: 06/15/2021) |
| 06/15/2021 | | MINUTE ORDER. Upon consideration of the plaintiffs' 157 Motion for Leave to File Supplemental Memorandum, the motion is DENIED. So ordered by Judge Dabney L. Friedrich on June 15, 2021. (lcdlf3) (Entered: 06/15/2021) |
| 06/16/2021 | 158 | NOTICE *Regarding Preliminary Settlement Discussions* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Hair, Christopher) (Entered: 06/16/2021) |
| 06/21/2021 | 159 | ORDER regarding the defendants' Motions to Dismiss. See text for details. Signed by Judge Dabney L. Friedrich on June 21, 2021. (lcdlf3) (Entered: 06/21/2021) |
| 06/21/2021 | 160 | MEMORANDUM OPINION regarding the defendants' Motions to Dismiss. See text for details. Signed by Judge Dabney L. Friedrich on June 21, 2021. (lcdlf3) (Main Document 160 replaced on 8/26/2021) (zjch, ). (Main Document 160 replaced on 8/26/2021) (zjch, ). (Entered: 06/21/2021) |
| 06/21/2021 | | Set/Reset Deadlines: Responses due by 7/21/2021 (zjch) (Entered: 06/21/2021) |
| 06/23/2021 | 161 | MOTION to Clarify by WAYNE VINCENT. (Samuel, Ryan) (Entered: 06/23/2021) |
| 06/24/2021 | 162 | NOTICE *of Plaintiffs' Position* by WAYNE VINCENT re 161 MOTION to |

| | | |
|---|---|---|
| | | Clarify (Samuel, Ryan) (Entered: 06/24/2021) |
| 06/24/2021 | | MINUTE ORDER. Upon consideration of defendant Vincent's 161 Motion to Clarify, it is ORDERED that his motion is GRANTED. The Third Amended Complaint in Black Lives Matter v. Trump, unlike the other three complaints in these related cases, see Buchanan v. Trump First Amended Complaint, Dkt. 29 (No. 20-cv-1542); Roth v. Trump Complaint, Dkt. 1 (No. 20-cv-1622); Kavanagh v. Trump Complaint, Dkt. 1 (20-cv-2163), lists specific defendants corresponding to each claim for relief. Only two of the claims for relief, "Claim 5: Violation of 42 U.S.C. § 1985(3)" and "Claim 6: Violation 42 U.S.C. § 1986," list "all defendants." Both of those claims were dismissed in the Court's Order and Memorandum Opinion on the motions to dismiss. See Memorandum Opinion, Dkt. 160. Captain Wayne Vincent is not listed by name under any of the remaining claims in the current Third Amended Complaint. Accordingly, he is dismissed as a defendant in this case. So Ordered by Judge Dabney L. Friedrich on June 24, 2021. (lcdlf3) (Entered: 06/24/2021) |
| 07/02/2021 | 163 | Consent MOTION for Extension of Time to File Answer *(for all Defendants)*, MOTION to Hold in Abeyance *Plaintiffs' Motion for Class Certification* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Hair, Christopher) (Entered: 07/02/2021) |
| 07/02/2021 | | MINUTE ORDER. Upon consideration of the District of Columbia and Federal Defendants' 163 Consent Motion for Extension of Time and Holding the Class Certification Motion in Abeyance, it is ORDERED that the motion is GRANTED IN PART. The extension of time is GRANTED. Accordingly, the D.C. and federal defendants shall file an answer or otherwise respond to the Complaint on or before August 5, 2021. The motion for abeyance is DENIED. Rather than hold the motion in abeyance, given the length of time the 47 Motion to Certify Class has been pending on the Court's docket, the Court will DENY the class certification motion WITHOUT PREJUDICE at this time, and permit the plaintiffs to refile the motion when it is ready for resolution. The Court will grant the plaintiffs leave to refile the motion for class certification, pursuant to Local Rule 23.1(b), anytime on or before October 2, 2021. So ordered by Judge Dabney L. Friedrich on July 2, 2021. (lcdlf3) (Entered: 07/02/2021) |
| 07/02/2021 | | Set/Reset Deadlines: Answer due by 8/5/2021. Motion for class certification due by 10/2/2021. (zjch) (Entered: 07/06/2021) |
| 07/14/2021 | 164 | Joint MOTION to Stay by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order) (Michelman, Scott) (Entered: 07/14/2021) |
| 07/14/2021 | | MINUTE ORDER granting the parties' 164 Joint Motion to Stay the case and all pretrial deadlines pending ongoing settlement negotiations. The stay shall remain in effect until September 12, 2021. The parties shall file, on or before September 13, 2021, a joint status report proposing a schedule for any further proceedings. So Ordered by Judge Dabney L. Friedrich on July 14, 2021. (lcdlf3) (Entered: 07/14/2021) |
| 07/14/2021 | | Set/Reset Deadlines: Status Report due by 9/13/2021 (zjch) (Entered: 07/15/2021) |
| 08/25/2021 | 165 | ORDER. In the 160 Memorandum Opinion of June 21, 2021, the Court noted that this opinion would be updated to include citations to the final hearing transcript from the May 28, 2021 motions hearing once it became available. The Court is now in receipt of that transcript. Accordingly, attached is an updated version of the 160 Memorandum Opinion that includes those citations. The Clerk of Court is directed to update the |

| | | |
|---|---|---|
| | | docket accordingly. So Ordered by Judge Dabney L. Friedrich on August 25, 2021. (Entered: 08/25/2021) |
| 09/09/2021 | 166 | NOTICE OF WITHDRAWAL OF APPEARANCE as to ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FIRST NAME UNKNOWN HARGROVE, C.W. MEYER, C.J. MURPHY, PETER NEWSHAM, T.C. PAYNE, FIRST NAME UNKNOWN TAYLOR, DANIEL M. THAU, ANTHONY A. WILLIS. Attorney Duane Gordon Blackman terminated. (Blackman, Duane) (Entered: 09/09/2021) |
| 09/13/2021 | 167 | Joint MOTION to Stay *and Status Report* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 09/13/2021) |
| 09/13/2021 | | MINUTE ORDER granting the parties' 167 Joint Motion to Stay the case pending ongoing settlement negotiations. The stay shall remain in effect until November 15, 2021. The parties shall file, on or before November 15, 2021, a joint status report proposing a schedule for any further proceedings. So Ordered by Judge Dabney L. Friedrich on September 13, 2021. (lcdlf3) (Entered: 09/13/2021) |
| 09/13/2021 | 168 | STATUS REPORT by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (See Docket Entry 167 to view document). (znmw) (Entered: 09/15/2021) |
| 09/24/2021 | 169 | Joint MOTION for Protective Order *(Stipulation and Proposed Protective Order)* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Hair, Christopher) (Entered: 09/24/2021) |
| 10/01/2021 | | MINUTE ORDER. Upon consideration of the parties' 169 Joint Motion for Protective Order, it is hereby ORDERED that the motion is GRANTED. So Ordered by Judge Dabney L. Friedrich on October 1, 2021. (lcdlf3) (Entered: 10/01/2021) |
| 10/15/2021 | 170 | NOTICE OF WITHDRAWAL OF APPEARANCE as to BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. Attorney Noah Baron terminated. (Baron, Noah) (Entered: 10/15/2021) |
| 11/15/2021 | 171 | Joint STATUS REPORT *AND MOTION TO STAY* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order)(Michelman, Scott) (Entered: 11/15/2021) |
| 11/15/2021 | | MINUTE ORDER. Upon consideration of the parties' 171 Joint Status Report and Motion to Stay, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until January 14, 2022. The parties shall file, on or before January 13, 2022, another joint status report proposing a schedule for any further proceedings, if a stipulation of dismissal is not filed before then. So Ordered by Judge Dabney L. Friedrich on November 15, 2021. (lcdlf3) (Entered: 11/15/2021) |
| 11/15/2021 | 172 | MOTION to Stay by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (See Docket Entry 171 to view document). (znmw) (Entered: 12/03/2021) |
| 01/13/2022 | 173 | Joint MOTION to Stay *AND STATUS REPORT* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA |

| | | |
|---|---|---|
| | | POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order)(Michelman, Scott) (Entered: 01/13/2022) |
| 01/13/2022 | | MINUTE ORDER. Upon consideration of the parties' 173 Joint Motion to Stay and Joint Status Report, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until February 14, 2022. The parties shall file, on or before February 14, 2022, another joint status report proposing a schedule for any further proceedings, if a stipulation of dismissal is not filed before then. So Ordered by Judge Dabney L. Friedrich on January 13, 2022. (lcdlf3) (Entered: 01/13/2022) |
| 01/13/2022 | 174 | STATUS REPORT by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (See Docket Entry 173 to view document). (zeg) (Entered: 01/14/2022) |
| 02/01/2022 | 175 | NOTICE OF WITHDRAWAL OF APPEARANCE as to BLACK LIVES MATTER D.C.. Attorney Thomas Dallas McSorley terminated. (McSorley, Thomas) (Entered: 02/01/2022) |
| 02/14/2022 | 176 | Joint MOTION to Stay *and Status Report* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 02/14/2022) |
| 02/14/2022 | | MINUTE ORDER. Upon consideration of the parties' 176 Joint Motion to Stay and Joint Status Report, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until February 28, 2022. The parties shall file, on or before February 28, 2022, another joint status report proposing a schedule for any further proceedings, if a stipulation of dismissal is not filed before then. So Ordered by Judge Dabney L. Friedrich on February 14, 2022. (lcdlf3) (Entered: 02/14/2022) |
| 02/14/2022 | 177 | STATUS REPORT by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (See Docket Entry 176 to view document). (zeg) (Entered: 02/17/2022) |
| 02/28/2022 | 178 | Joint STATUS REPORT *AND MOTION TO STAY* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order)(Michelman, Scott) (Entered: 02/28/2022) |
| 02/28/2022 | | MINUTE ORDER. Upon consideration of the parties' 178 Joint Status Report and Motion to Stay, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until March 30, 2022. The parties shall file on or before March 30, 2022, (1) a stipulation of dismissal as to the settling defendants and (2) a joint scheduling motion with the remaining defendants informing the Court how they would like to proceed in this matter. So Ordered by Judge Dabney L. Friedrich on February 28, 2022. (lcdlf3) (Entered: 02/28/2022) |
| 02/28/2022 | 179 | MOTION to Stay by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (See Docket Entry 178 to view document). (zeg) (Entered: 03/03/2022) |
| 03/30/2022 | 180 | Joint MOTION to Stay *For Additional Two Weeks* by WILLIAM P. BARR, MICHAEL D. CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 03/30/2022) |

| | | |
|---|---|---|
| 03/30/2022 | | MINUTE ORDER. Upon consideration of the parties' 180 Joint Motion to Stay, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until April 13, 2022. The parties shall file, on or before April 13, 2022, (1) a stipulation of dismissal as to the settling defendants and (2) a joint scheduling report proposing a schedule for further proceedings. So Ordered by Judge Dabney L. Friedrich on March 30, 2022. (lcdlf3) (Entered: 03/30/2022) |
| 04/13/2022 | 181 | STIPULATION of Dismissal by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Michelman, Scott) (Entered: 04/13/2022) |
| 04/13/2022 | 182 | NOTICE *of Filing of Settlement* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN (Attachments: # 1 Exhibit (Settlement Agreement))(Michelman, Scott) (Entered: 04/13/2022) |
| 04/13/2022 | 183 | STATUS REPORT - *PROPOSED SCHEDULE* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order)(Michelman, Scott) (Entered: 04/13/2022) |
| 04/14/2022 | | MINUTE ORDER. Upon consideration of the 181 Stipulation of Dismissal, it is hereby ORDERED that all claims against DONALD J. TRUMP, WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, WILLIAM J. WALKER, and MICHAEL D. CARVAJAL, in their official capacities, are DISMISSED WITH PREJUDICE. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii).<br><br>Furthermore, upon consideration of the parties' 183 Scheduling Report, it is hereby ORDERED that the plaintiffs shall file their Motion for Entry of Partial Final Judgment or for Certification of Interlocutory Appeal on or before April 20, 2022; any opposition shall be filed on or before May 11, 2022; and any replies in support of the motion shall be filed on or before May 24, 2022. So Ordered by Judge Dabney L. Friedrich on April 14, 2022. (lcdlf3) (Entered: 04/14/2022) |
| 04/20/2022 | 184 | Unopposed MOTION for Entry of Final Judgment *Under Rule 54(b) or for Certification of Interlocutory Appeal* by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. (Attachments: # 1 Text of Proposed Order) (Michelman, Scott) (Entered: 04/20/2022) |
| 05/16/2022 | 185 | ORDER granting plaintiffs' 184 Unopposed Motion for Entry of Partial Final Judgment. See text for details. Signed by Judge Dabney L. Friedrich on May 16, 2022. (lcdlf3) (Entered: 05/16/2022) |
| 05/16/2022 | 186 | PARTIAL FINAL JUDGMENT in favor of defendants WILLIAM P. BARR, MARK ADAMCHICK, JONATHAN DANIELS, SEAN COX, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, BRYAN MCDONALD, CARA SEIBERLING, LAWRENCE SINACORE, THOMAS LOCASICO, and SEAN KELLENBERGER against plaintiffs. See text for details. Signed by Judge Dabney L. Friedrich on May 16, 2022. (lcdlf3) Modified date on 5/16/2022 (lcdlf3). (Entered: 05/16/2022) |
| 05/16/2022 | 187 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 186 Judgment,, Terminate Deadlines, by BLACK LIVES MATTER D.C., GARRETT BOND, E.X.F., DUSTIN FOLEY, J.N.C., KISHON MCDONALD, LIA POTEET, TONI SANDERS, KEARA SCALLAN. Filing fee $ 505, receipt number ADCDC-9239126. Fee Status: Fee Paid. Parties have been notified. (Michelman, Scott) (Entered: 05/16/2022) |

| 05/17/2022 | 188 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 187 Notice of Appeal to DC Circuit Court,. (zeg) (Entered: 05/17/2022) |
|---|---|---|
| 05/24/2022 | | USCA Case Number 22-5139 for 187 Notice of Appeal to DC Circuit Court, filed by TONI SANDERS, BLACK LIVES MATTER D.C., J.N.C., E.X.F., KEARA SCALLAN, DUSTIN FOLEY, LIA POTEET, KISHON MCDONALD, GARRETT BOND. (zeg) (Entered: 05/26/2022) |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:20-cv-01542-DLF

BUCHANAN et al v. TRUMP et al
Assigned to: Judge Dabney L. Friedrich
 Cases: 1:20-cv-01469-DLF
        1:20-cv-01517-DLF
        1:20-cv-01622-DLF
        1:20-cv-02163-DLF
Case in other court:  22-05133
Cause: 28:1391 Personal Injury

Date Filed: 06/11/2020
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**RADIYA BUCHANAN**                    represented by  **Amanda LeSavage**
                                                        GIBSON DUNN & CRUTCHER LLP
                                                        200 Park Ave
                                                        Ste 48th Floor
                                                        New York, NY 10166
                                                        410-960-2725
                                                        Email: alesavage@gibsondunn.com
                                                        *TERMINATED: 07/14/2022*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Anne M. Champion**
                                                        GIBSON, DUNN & CRUTCHER LLP
                                                        200 Park Avenue
                                                        New York, NY 10166
                                                        212-351-5361
                                                        Email: achampion@gibsondunn.com
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Katherine Michelle Marquart**
                                                        GIBSON DUNN & CRUTCHER LLP
                                                        200 Park Ave
                                                        Ste 48th Floor
                                                        New York, NY 10166
                                                        212-351-5261
                                                        Email: kmarquart@gibsondunn.com
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Lee Ross Crain**
                                                        GIBSON, DUNN & CRUTCHER, LLP
                                                        200 Park Avenue
                                                        47th Floor
                                                        New York City, NY 10166-0193
                                                        212-351-2454
                                                        Email: lcrain@gibsondunn.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Guice Aiken**
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
319-530-6659
Email: maiken@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Mylan L. Denerstein**
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
Ste 47th Floor
New York, NY 10166
212-351-4000
Fax: 212-351-4035
Email: mdenerstein@gibsondunn.com
*TERMINATED: 01/10/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Naima Lillian Farrell**
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
202-887-3559
Email: nfarrell@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Orin Samuel Snyder**
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
47th Floor
New York, NY 10166
212-351-4000
Fax: 212-351-4035
Email: osnyder@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Randy M. Mastro**
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
212-556-2100
Fax: 212-556-2222
Email: rmastro@kslaw.com
*TERMINATED: 08/19/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Greta B. Williams**

GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Suite 300
Washington, DC 20036-5306
202-955-8500
Email: gbwilliams@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ANN DAGRIN**                    represented by **Amanda LeSavage**
(See above for address)
*TERMINATED: 07/14/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anne M. Champion**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine Michelle Marquart**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Ross Crain**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Guice Aiken**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mylan L. Denerstein**
(See above for address)
*TERMINATED: 01/10/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Naima Lillian Farrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Orin Samuel Snyder**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Randy M. Mastro**
(See above for address)
*TERMINATED: 08/19/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Greta B. Williams**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LINDSAY FIELD**                    represented by    **Amanda LeSavage**
(See above for address)
*TERMINATED: 07/14/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anne M. Champion**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine Michelle Marquart**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Ross Crain**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Guice Aiken**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mylan L. Denerstein**
(See above for address)
*TERMINATED: 01/10/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Naima Lillian Farrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Orin Samuel Snyder**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Randy M. Mastro**
(See above for address)
*TERMINATED: 08/19/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Greta B. Williams**

**JA48**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**DONALD J. TRUMP**
*in his official capacity as President of the*
*United States*
*TERMINATED: 04/14/2022*

represented by **Christopher Charles Hair**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2541
Fax: (202) 252-2599
Email: christopher.hair@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
DOJ-USAO
555 4th St. NW
Ste 4408
Washington, DC 20530
(202) 252-2574
Email: sean.mahard@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**WILLIAM P. BARR**
*in his individual capacity and official*
*capacity as U.S. Attorney General*
*TERMINATED: 04/14/2022*

represented by **Christopher Charles Hair**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Bartolotto**
U.S. DEPARTMENT OF JUSTICE
Civil Division
Ben Franklin Station
P.O. Box 7146
Washington, DC 20044
(202) 616-4174
Fax: 202-616-4314
Email: james.bartolotto@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Elisabeth Whitman**
UNITED STATES DEPARTMENT OF
JUSTICE
Civil Division, Torts Branch
175 N Street, NE
Washington, DC 20002
(202) 616-0089
Email: sarah.whitman@usdoj.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK T. ESPER**
*in his official capacity as U.S. Secretary of*
*Defense*
*TERMINATED: 04/14/2022*

represented by **Christopher Charles Hair**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Bartolotto**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Elisabeth Whitman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**WILLIAM J. WALKER**
*Major General; in his official capacity as*
*Commanding General of the District of*
*Columbia National Guard*
*TERMINATED: 04/14/2022*

represented by **Christopher Charles Hair**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Bartolotto**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Elisabeth Whitman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**GREGORY T. MONAHAN**
*in his individual capacity and official*

represented by **Christopher Charles Hair**
(See above for address)

*capacity as Acting Chief of the United*
*States Park Police*
*TERMINATED: 04/14/2022*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Bartolotto**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Elisabeth Whitman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES M. MURRAY**                    represented by    **Christopher Charles Hair**
*in his official capacity as Director, U.S.*                (See above for address)
*Secret Service*                                            *LEAD ATTORNEY*
*TERMINATED: 04/14/2022*                                    *ATTORNEY TO BE NOTICED*

**James George Bartolotto**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Elisabeth Whitman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Patrick Mahard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN & JANE 1-50 DOES**

**Defendant**

**MICHAEL CARVAJAL**                    represented by    **Christopher Charles Hair**
*In his official capacity as Director of the*               (See above for address)
*Federal Bureau of Prisons*                                 *LEAD ATTORNEY*
*TERMINATED: 04/14/2022*                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL FENNELLY**                    represented by    **James George Bartolotto**
*In his individual capacity and official*                   (See above for address)
*Capacity as Captain of the United States*                  *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**JA51**

*Park Police.*
*TERMINATED: 04/14/2022*

                                               **Sarah Elisabeth Whitman**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**MARK ADAMCHIK**                    represented by **James George Bartolotto**
*In his individual capacity and official*              (See above for address)
*capacity as Incident Commander of the*                *LEAD ATTORNEY*
*United States Park Police*                             *ATTORNEY TO BE NOTICED*
*TERMINATED: 04/14/2022*

                                               **Sarah Elisabeth Whitman**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**FNU SEBERLING**                    represented by **James George Bartolotto**
*In his individual capacity and official*              (See above for address)
*capacity as an officer of the United States*          *LEAD ATTORNEY*
*Park Police*                                          *ATTORNEY TO BE NOTICED*
*TERMINATED: 04/14/2022*

                                               **Sarah Elisabeth Whitman**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**PETER NEWSHAM**                    represented by **Richard P. Sobiecki**
*In his official capacity as Chief of the*             OFFICE OF THE ATTORNEY
*Metropolitan Police Department of the*                GENERAL FOR THE DISTRICT OF
*District of Columbia*                                 COLUMBIA
                                               400 Sixth Street, NW
                                               Suite 10100
                                               Washington, DC 20001
                                               202-805-7512
                                               Email: richard.sobiecki@dc.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Brendan Russell Heath**
                                               OFFICE OF THE ATTORNEY
                                               GENERAL FOR THE DISTRICT OF
                                               COLUMBIA
                                               Public Interest, Equity
                                               400 Sixth Street, N.W.
                                               Suite 10100
                                               Washington, DC 20001
                                               202-442-9880
                                               Email: Brendan.Heath@dc.gov
                                               *ATTORNEY TO BE NOTICED*

**JA52**

Duane Gordon Blackman
CALEBANDONIAN PLLC
1100 H Street, N.W.
Suite 315
Washington, DC 20005
202-953-9854
Email: duane@calebandonian.com
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFERY CARROLL**                                 represented by   **Richard P. Sobiecki**
*In his individual capacity and official*                            (See above for address)
*Capacity as Assistant Chief of*                                     *LEAD ATTORNEY*
*Metropolitan Police Department of the*                              *ATTORNEY TO BE NOTICED*
*District of Columbia*

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANTHONY ALIOTO**                                 represented by   **Richard P. Sobiecki**
*In his individual capacity and official*                            (See above for address)
*Capacity as an officer of Metropolitan*                             *LEAD ATTORNEY*
*Police Department of the District of*                               *ATTORNEY TO BE NOTICED*
*Columbia*

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**S. BUCHANAN**                                    represented by   **Richard P. Sobiecki**
*In his individual capacity and official*                            (See above for address)
*capacity as an officer of Metropolitan*                             *LEAD ATTORNEY*
*Police Department of the District of*                               *ATTORNEY TO BE NOTICED*
*Columbia*

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)

*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**FNU HARGROVE**
*In his individual capacity and official*
*capacity as an officer of Metropolitan*
*Police Department of the District of*
*Columbia*

represented by **Richard P. Sobiecki**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**C.W MEYER**
*In his individual capacity and official*
*capacity as an officer of Metropolitan*
*Police Department of the District of*
*Columbia*

represented by **Richard P. Sobiecki**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CLIFTON MURPHY**
*In his individual capacity and official*
*capacity as an officer of Metropolitan*
*Police Department of the District of*
*Columbia*

represented by **Richard P. Sobiecki**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**THOMAS PAYNE**
*In his individual capacity and official*
*capacity as an officer of Metropolitan*

represented by **Richard P. Sobiecki**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Police Department of the District of*
*Columbia*

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **FNU TAYLOR**<br>*In his individual capacity and official*<br>*capacity as an officer of Metropolitan*<br>*Police Department of the District of*<br>*Columbia* | represented by | **Richard P. Sobiecki**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **DANIEL THAU**<br>*In his individual capacity and official*<br>*capacity as an officer of Metropolitan*<br>*Police Department of the District of*<br>*Columbia* | represented by | **Richard P. Sobiecki**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)
*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **ANTHONY A. WILLIS**<br>*In his individual capacity and official*<br>*capacity as an officer of Metropolitan*<br>*Police Department of the District of*<br>*Columbia* | represented by | **Richard P. Sobiecki**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Brendan Russell Heath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duane Gordon Blackman**
(See above for address)

**JA55**

*TERMINATED: 09/09/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**WAYNE VINCENT**
*In his individual capacity and official capacity as a captain of the Arlington County Police Department*

represented by **MinhChau Nguyen Corr**
OFFICE OF THE COUNTY ATTORNEY
2100 Clarendon Blvd.
Suite 403
Arlington, VA 22201
571-882-4617
Email: mcorr@arlingtonva.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Carson Samuel**
OFFICE OF THE COUNTY ATTORNEY
2100 Clarendon Blvd.
Suite 403
Arlington, VA 22201
703-228-3100
Fax: 703-228-7106
Email: rsamuel@arlingtonva.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RYAN BLACK**
*In his individual capacity and official capacity as an officer of the Arlington County Police Department*

represented by **MinhChau Nguyen Corr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Carson Samuel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RYAN ALLEN**
*In his individual capacity and official capacity as an officer of the Arlington County Police Department*

represented by **MinhChau Nguyen Corr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Carson Samuel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN & JANE POES 1-50**

**Defendant**

**JOHN & JANE ROES 1-50**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/11/2020 | 1 | COMPLAINT against WILLIAM P. BARR, JOHN & JANE 1-50 DOES, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER with Jury Demand ( Filing fee $ 400 receipt number ADCDC-7220930) filed by LINDSAY FIELD, ANN DAGRIN, RADIYA BUCHANAN. (Attachments: # 1 Civil Cover Sheet, # 2 Summons - U.S. Attorney General, D.C., # 3 Summons - William P. Barr - individual capacity, # 4 Summons - William P. Barr - official capacity, # 5 Summons - Mark T. Esper - individual capacity, # 6 Summons - Mark T. Esper - official capacity, # 7 Summons - Gregory T. Monahan - individual capacity, # 8 Summons - Gregory T. Monahan -official capacity, # 9 Summons - James M. Murray - individual capacity, # 10 Summons - James M. Murray - official capacity, # 11 Summons - Donald J. Trump - official capacity, # 12 Summons - William J. Walker - individual capacity, # 13 Summons - William J. Walker - official capacity)(Williams, Greta) (Entered: 06/11/2020) |
| 06/11/2020 | 2 | NOTICE OF RELATED CASE by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. Case related to Case No. Black Lives Matter, D.C., et al. v. Donald J. Trump, et al., 1:20-cv-01469-DLF. (Williams, Greta) (Entered: 06/11/2020) |
| 06/11/2020 | 3 | NOTICE OF RELATED CASE by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. Case related to Case No. Padilla v. Bernhardt, et al., 1:20-cv-01517. (Williams, Greta) (Entered: 06/11/2020) |
| 06/12/2020 | | Case assigned to Judge Dabney L. Friedrich. (zmc) (Entered: 06/12/2020) |
| 06/15/2020 | 4 | SUMMONS (7) Issued Electronically as to WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER, and U.S. Attorney (Attachment: # 1 Notice and Consent)(zmc) (Entered: 06/15/2020) |
| 06/16/2020 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- ANNE CHAMPION, Filing fee $ 100, receipt number ADCDC-7236885. Fee Status: Fee Paid. by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Declaration of Anne Champion, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 06/16/2020) |
| 06/16/2020 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- AMANDA LeSAVAGE, Filing fee $ 100, receipt number ADCDC-7236902. Fee Status: Fee Paid. by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Declaration of Amanda LeSavage, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 06/16/2020) |
| 06/16/2020 | 7 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- KATHERINE MARQUART, Filing fee $ 100, receipt number ADCDC-7236907. Fee Status: Fee Paid. by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Declaration of Katherine Marquart, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 06/16/2020) |
| 06/16/2020 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- LEE CRAIN, Filing fee $ 100, receipt number ADCDC-7236909. Fee Status: Fee Paid. by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Declaration of Lee Crain, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 06/16/2020) |
| 06/16/2020 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- MYLAN DENERSTEIN, Filing fee $ 100, receipt number ADCDC-7236915. Fee Status: Fee Paid. by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: |

| | | # 1 Declaration of Mylan Denerstein, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 06/16/2020) |
|---|---|---|
| 06/16/2020 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- ORIN SNYDER, Filing fee $ 100, receipt number ADCDC-7236919. Fee Status: Fee Paid. by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Declaration of Orin Snyder, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 06/16/2020) |
| 06/16/2020 | 11 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- RANDY M. MASTRO, Filing fee $ 100, receipt number ADCDC-7236924. Fee Status: Fee Paid. by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Declaration of Randy M. Mastro, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 06/16/2020) |
| 06/18/2020 | | MINUTE ORDER granting 5 Motion for Leave for Attorney Anne Champion to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. So Ordered by Judge Dabney L. Friedrich on June 18, 2020. (lcdlf1) (Entered: 06/18/2020) |
| 06/18/2020 | | MINUTE ORDER granting 6 Motion for Leave for Attorney Amanda LeSavage to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. So Ordered by Judge Dabney L. Friedrich on June 18, 2020. (lcdlf1) (lcdlf1, ) (Entered: 06/18/2020) |
| 06/18/2020 | | MINUTE ORDER granting 7 Motion for Leave for Attorney Katherine Marquart to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. So Ordered by Judge Dabney L. Friedrich on June 18, 2020. (lcdlf1) (Entered: 06/18/2020) |
| 06/18/2020 | | MINUTE ORDER granting 8 Motion for Leave for Attorney Lee Crain to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. So Ordered by Judge Dabney L. Friedrich on June 18, 2020. (lcdlf1) (Entered: 06/18/2020) |
| 06/18/2020 | | MINUTE ORDER granting 9 Motion for Leave for Attorney Mylan Denerstein to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. So Ordered by Judge Dabney L. Friedrich on June 18, 2020. (lcdlf1) (Entered: 06/18/2020) |
| 06/18/2020 | | MINUTE ORDER granting 10 Motion for Leave for Attorney Orin Snyder to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. So Ordered by Judge Dabney L. Friedrich on June 18, 2020. (lcdlf1) (Entered: 06/18/2020) |
| 06/18/2020 | | MINUTE ORDER granting 11 Motion for Leave for Attorney Randy M. Mastro to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. So Ordered by Judge Dabney L. Friedrich on June 18, 2020. (lcdlf1) (Entered: 06/18/2020) |
| 06/23/2020 | 12 | NOTICE of Appearance by Orin Samuel Snyder on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Snyder, Orin) (Entered: 06/23/2020) |
| 06/23/2020 | 13 | NOTICE of Appearance by Randy M. Mastro on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Mastro, Randy) (Entered: 06/23/2020) |
| 06/23/2020 | 14 | NOTICE of Appearance by Katherine Michelle Marquart on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Marquart, Katherine) (Entered: 06/23/2020) |

| 06/23/2020 | 15 | NOTICE of Appearance by Mylan L. Denerstein on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Denerstein, Mylan) (Entered: 06/23/2020) |
|---|---|---|
| 06/23/2020 | 16 | NOTICE of Appearance by Anne M. Champion on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Champion, Anne) (Entered: 06/23/2020) |
| 06/23/2020 | 17 | NOTICE of Appearance by Amanda LeSavage on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (LeSavage, Amanda) (Entered: 06/23/2020) |
| 06/23/2020 | 18 | NOTICE of Appearance by Lee Ross Crain on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Crain, Lee) (Entered: 06/23/2020) |
| 07/14/2020 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 06/19/2020., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 6/19/2020. ( Answer due for ALL FEDERAL DEFENDANTS by 8/18/2020.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILLIAM P. BARR served on 6/19/2020; MARK T. ESPER served on 6/19/2020; GREGORY T. MONAHAN served on 6/19/2020; JAMES M. MURRAY served on 6/19/2020; DONALD J. TRUMP served on 6/19/2020; WILLIAM J. WALKER served on 6/19/2020 (Williams, Greta) (Entered: 07/14/2020) |
| 08/13/2020 | 20 | NOTICE of Appearance by James George Bartolotto on behalf of WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, WILLIAM J. WALKER (Bartolotto, James) (Entered: 08/13/2020) |
| 08/13/2020 | 21 | NOTICE of Appearance by Sarah Elisabeth Whitman on behalf of WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, WILLIAM J. WALKER (Whitman, Sarah) (Entered: 08/13/2020) |
| 08/13/2020 | 22 | NOTICE of Appearance by Christopher Charles Hair on behalf of WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Hair, Christopher) (Entered: 08/13/2020) |
| 08/14/2020 | 23 | Joint MOTION for Briefing Schedule by WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Hair, Christopher) (Entered: 08/14/2020) |
| 08/14/2020 | 24 | Joint MOTION for Briefing Schedule *(corrected to include text of proposed order)* by WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 08/14/2020) |
| 08/17/2020 |  | MINUTE ORDER. Upon consideration of the parties' 23 Joint Motion for Briefing Schedule, it is ORDERED that the motion is GRANTED. Accordingly, the following schedule shall govern further proceedings: all defendants shall file their motions to dismiss on or before October 1, 2020; the plaintiffs shall file their oppositions to the defendants' motions to dismiss on or before November 19, 2020; and all defendants shall reply to the plaintiffs' oppositions on or before December 17, 2020. So Ordered by Judge Dabney L. Friedrich on August 17, 2020. (lcdlf2) (Entered: 08/17/2020) |
| 08/17/2020 |  | Set/Reset Deadlines: Dispositive Motions due by 10/1/2020. Response to Dispositive Motions due by 11/19/2020. Reply to Dispositive Motions due by 12/17/2020. (zjch) (Entered: 08/17/2020) |
| 08/19/2020 |  | MINUTE ORDER. Given that cases 20-cv-1469 and 20-cv-1542 appear to raise common questions of law and fact, the Court directs the parties in both cases to confer and file, on or before August 24, 2020, a proposed consolidated briefing schedule, or |

| | | |
|---|---|---|
| | | explain to the Court why briefing schedules should not be consolidated pursuant to Federal Rule of Civil Procedure 42(a). Signed by Judge Dabney L. Friedrich on August 19, 2020. (lcdlf2) (Entered: 08/19/2020) |
| 08/19/2020 | | Set/Reset Deadlines: Proposed Briefing Schedule due by 8/24/2020 (zjch) (Entered: 08/19/2020) |
| 08/24/2020 | 25 | RESPONSE TO ORDER OF THE COURT re Order, *(Joint Response to the Court's August 19, 2020 Order)* filed by WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 08/24/2020) |
| 08/24/2020 | | MINUTE ORDER. Upon consideration of the parties' 25 Response to the Court's August 19, 2020 Order, it is ORDERED that the plaintiffs shall file any motion to amend the complaint on or before September 1, 2020. Signed by Judge Dabney L. Friedrich on August 24, 2020. (lcdlf2) (Entered: 08/24/2020) |
| 08/24/2020 | | Set/Reset Deadlines: Motions due by 9/1/2020. (zjch) (Entered: 08/25/2020) |
| 09/01/2020 | 26 | Unopposed MOTION for Leave to File *Amended Complaint* by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - First Amended Complaint, # 3 Exhibit B - Redline First Amended Complaint, # 4 Text of Proposed Order)(Williams, Greta) (Entered: 09/01/2020) |
| 09/01/2020 | 27 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Brittany Raia, Filing fee $ 100, receipt number ADCDC-7538000. Fee Status: Fee Paid. by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Exhibit A- Declaration of Brittany Raia, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 09/01/2020) |
| 09/01/2020 | 28 | NOTICE of Appearance by Matthew Guice Aiken on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Aiken, Matthew) (Entered: 09/01/2020) |
| 09/02/2020 | | MINUTE ORDER granting 27 Motion for Pro Hac Vice Admission of attorney Brittney Raia. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Dabney L. Friedrich on September 2, 2020. (lcdlf2) (Entered: 09/02/2020) |
| 09/03/2020 | | MINUTE ORDER. Upon consideration of the plaintiffs' 26 Unopposed Motion for Leave to File Amended Complaint, it is ORDERED that the motion is GRANTED. The plaintiffs' [26-2] First Amended Complaint shall be accepted for filing. Signed by Judge Dabney L. Friedrich on September 3, 2020. (lcdlf2) (Entered: 09/03/2020) |
| 09/03/2020 | 29 | AMENDED COMPLAINT against All Defendants with Jury Demand filed by ANN DAGRIN, RADIYA BUCHANAN, LINDSAY FIELD.(eg) (Entered: 09/03/2020) |
| 09/04/2020 | 30 | REQUEST FOR SUMMONS TO ISSUE re 29 Amended Complaint filed by ANN DAGRIN, RADIYA BUCHANAN, LINDSAY FIELD. Related document: 29 Amended Complaint filed by LINDSAY FIELD, ANN DAGRIN, RADIYA BUCHANAN. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Summons, # 18 Summons, # 19 Summons, # 20 Summons, # 21 Summons, # 22 Summons, # 23 Summons, # 24 Summons, # 25 Summons, # 26 Summons, # 27 Summons, # 28 Summons, # 29 Summons, # 30 Summons, # 31 Summons, # 32 Summons, # 33 Summons)(Williams, Greta) (Entered: 09/04/2020) |

| 09/08/2020 | 31 | SUMMONS (34) Issued Electronically as to MARK ADAMCHIK, ANTHONY ALIOTO, RYAN ALLEN, RYAN BLACK, S. BUCHANAN, JEFFERY CARROLL, MICHAEL CARVAJAL, RUSSELL FENNELLY, FNU HARGROVE, C.W MEYER, CLIFTON MURPHY, PETER NEWSHAM, THOMAS PAYNE, FNU SEBERLING, FNU TAYLOR, DANIEL THAU, WAYNE VINCENT, ANTHONY A. WILLIS. (Attachment: # 1 Notice and Consent)(eg) (Entered: 09/08/2020) |
|---|---|---|
| 09/09/2020 | 32 | STANDARD ORDER for Civil Cases. See text for details. Signed by Judge Dabney L. Friedrich on September 9, 2020. (lcdlf2) (Entered: 09/09/2020) |
| 10/01/2020 | 33 | NOTICE of Appearance by Sean Patrick Mahard on behalf of WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Mahard, Sean) (Entered: 10/01/2020) |
| 10/01/2020 | 34 | MOTION to Dismiss *All Individual-Capacity Claims* by WILLIAM P. BARR, GREGORY T. MONAHAN (Attachments: # 1 Text of Proposed Order)(Whitman, Sarah) (Entered: 10/01/2020) |
| 10/01/2020 | 35 | MOTION to Dismiss *All Official-Capacity Claims* by WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Mahard, Sean) (Entered: 10/01/2020) |
| 10/02/2020 | 36 | MOTION to Dismiss by RYAN ALLEN, RYAN BLACK, WAYNE VINCENT (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration, # 4 Exhibit, # 5 Exhibit)(Samuel, Ryan) (Entered: 10/02/2020) |
| 10/06/2020 | 37 | NOTICE of Appearance by Richard P. Sobiecki on behalf of ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FNU HARGROVE, C.W MEYER, CLIFTON MURPHY, PETER NEWSHAM, THOMAS PAYNE, FNU TAYLOR, DANIEL THAU, ANTHONY A. WILLIS (Sobiecki, Richard) (Entered: 10/06/2020) |
| 10/09/2020 | 38 | Consent MOTION and Statement of Points and Authorities for Briefing Schedule by RADIYA BUCHANAN, ANN DAGRIN (Attachments: # 1 Text of Proposed Order) (Williams, Greta) (Entered: 10/09/2020) |
| 10/12/2020 | | MINUTE ORDER granting the plaintiffs' 38 Consent Motion to Set a Briefing Schedule. Accordingly, plaintiffs shall file their opposition to the Arlington County defendants' motion to dismiss on or before November 19, 2020. The Arlington County defendants shall reply to plaintiffs' opposition on or before December 17, 2020. So ordered by Judge Dabney L. Friedrich on October 12, 2020. (lcdlf3) (Entered: 10/12/2020) |
| 10/12/2020 | 39 | Joint MOTION for Briefing Schedule by ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FNU HARGROVE, C.W MEYER, CLIFTON MURPHY, PETER NEWSHAM, THOMAS PAYNE, FNU TAYLOR, DANIEL THAU, ANTHONY A. WILLIS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Sobiecki, Richard) (Entered: 10/12/2020) |
| 10/13/2020 | | MINUTE ORDER granting the parties' 39 Joint Motion for Briefing Schedule. Accordingly, the following schedule shall govern further proceedings: the district defendants shall file their motion to dismiss on or before December 1, 2020; plaintiffs shall file their opposition to the motion on or before January 22, 2021; and the district defendants shall reply to plaintiffs' opposition on or before February 22, 2021. So ordered by Judge Dabney L. Friedrich on October 13, 2020. (lcdlf3) (Entered: 10/13/2020) |
| 10/27/2020 | 40 | NOTICE of Appearance by James George Bartolotto on behalf of MARK |

| | | |
|---|---|---|
| | | ADAMCHIK, RUSSELL FENNELLY, FNU SEBERLING (Bartolotto, James) (Entered: 10/27/2020) |
| 11/02/2020 | [41](#) | NOTICE of Appearance by Sarah Elisabeth Whitman on behalf of MARK ADAMCHIK, RUSSELL FENNELLY, FNU SEBERLING (Whitman, Sarah) (Entered: 11/02/2020) |
| 11/06/2020 | [42](#) | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 9/14/2020. ( Answer due for ALL FEDERAL DEFENDANTS by 11/13/2020.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 09/18/2020., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on the Mayor of the District of Columbia. Date of Service Upon the Mayor for the District of Columbia on 09/18/2020., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARK ADAMCHIK served on 9/16/2020; ANTHONY ALIOTO served on 9/21/2020; S. BUCHANAN served on 9/21/2020; JEFFERY CARROLL served on 9/21/2020; MICHAEL CARVAJAL served on 9/16/2020; RUSSELL FENNELLY served on 9/16/2020; FNU HARGROVE served on 9/21/2020; C.W MEYER served on 9/21/2020; CLIFTON MURPHY served on 9/21/2020; PETER NEWSHAM served on 9/21/2020; THOMAS PAYNE served on 9/21/2020; FNU SEBERLING served on 9/16/2020; FNU TAYLOR served on 9/21/2020; DANIEL THAU served on 9/21/2020; ANTHONY A. WILLIS served on 9/21/2020, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARK ADAMCHIK served on 9/16/2020; ANTHONY ALIOTO served on 9/21/2020; S. BUCHANAN served on 9/21/2020; JEFFERY CARROLL served on 9/21/2020; MICHAEL CARVAJAL served on 9/16/2020; RUSSELL FENNELLY served on 9/16/2020; FNU HARGROVE served on 9/21/2020; C.W MEYER served on 9/21/2020; CLIFTON MURPHY served on 9/21/2020; PETER NEWSHAM served on 9/21/2020; THOMAS PAYNE served on 9/21/2020; FNU SEBERLING served on 9/16/2020; FNU TAYLOR served on 9/21/2020; DANIEL THAU served on 9/21/2020; ANTHONY A. WILLIS served on 9/21/2020, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 9/14/2020. ( Answer due for ALL D.C. DEFENDANTS by 10/12/2020.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARK ADAMCHIK served on 9/16/2020; ANTHONY ALIOTO served on 9/21/2020; S. BUCHANAN served on 9/21/2020; JEFFERY CARROLL served on 9/21/2020; MICHAEL CARVAJAL served on 9/16/2020; RUSSELL FENNELLY served on 9/16/2020; FNU HARGROVE served on 9/21/2020; C.W MEYER served on 9/21/2020; CLIFTON MURPHY served on 9/21/2020; PETER NEWSHAM served on 9/21/2020; THOMAS PAYNE served on 9/21/2020; FNU SEBERLING served on 9/16/2020; FNU TAYLOR served on 9/21/2020; DANIEL THAU served on 9/21/2020; ANTHONY A. WILLIS served on 9/21/2020 (Williams, Greta) (Entered: 11/06/2020) |
| 11/06/2020 | [43](#) | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ANTHONY ALIOTO served on 9/17/2020; CLIFTON MURPHY served on 9/16/2020; DANIEL THAU served on 9/16/2020; ANTHONY A. WILLIS served on 9/14/2020 (Williams, Greta) (Entered: 11/06/2020) |
| 11/06/2020 | [44](#) | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RYAN ALLEN served on 9/11/2020; RYAN BLACK served on 9/11/2020; WAYNE VINCENT served on 9/14/2020 (Williams, Greta) (Entered: 11/06/2020) |
| 11/06/2020 | [45](#) | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RYAN ALLEN served on 9/14/2020, answer due 10/5/2020; |

| | | RYAN BLACK served on 9/14/2020, answer due 10/5/2020 (Williams, Greta) Modified on 11/10/2020 (eg). (Entered: 11/06/2020) |
|---|---|---|
| 11/06/2020 | 46 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARK ADAMCHIK served on 10/24/2020, answer due 11/14/2020 (Williams, Greta) (Entered: 11/06/2020) |
| 11/06/2020 | 47 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RUSSELL FENNELLY served on 10/26/2020, answer due 11/16/2020 (Williams, Greta) (Entered: 11/06/2020) |
| 11/06/2020 | 48 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FNU SEBERLING served on 10/26/2020, answer due 11/16/2020 (Williams, Greta) (Entered: 11/06/2020) |
| 11/10/2020 | | NOTICE OF CORRECTED DOCKET ENTRY: re 45 Summons Returned Executed was entered in error as a duplicate to Docket Entry 44 . (eg) (Entered: 11/10/2020) |
| 11/10/2020 | 49 | Unopposed MOTION for Leave to File Excess Pages / *PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE OVERLENGTH BRIEF IN OPPOSITION TO FEDERAL DEFENDANTS' MOTIONS TO DISMISS* by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Text of Proposed Order)(Williams, Greta) (Entered: 11/10/2020) |
| 11/12/2020 | | MINUTE ORDER granting the plaintiffs' 49 Unopposed Motion for Leave to File Excess Pages. Accordingly, in responding to the two motions to dismiss, plaintiffs are granted leave to file, in lieu of two separate briefs, a single omnibus brief of no more than 90 pages. So ordered by Judge Dabney L. Friedrich on November 12, 2020. (lcdlf3) (Entered: 11/12/2020) |
| 11/19/2020 | 50 | Memorandum in opposition to re 36 MOTION to Dismiss filed by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Williams, Greta) (Entered: 11/19/2020) |
| 11/19/2020 | 51 | Memorandum in opposition to re 35 MOTION to Dismiss *All Official-Capacity Claims*, 34 MOTION to Dismiss *All Individual-Capacity Claims* filed by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Williams, Greta) (Entered: 11/19/2020) |
| 11/19/2020 | 52 | NOTICE of Appearance by Naima Lillian Farrell on behalf of RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Farrell, Naima) (Entered: 11/19/2020) |
| 12/01/2020 | 53 | NOTICE of Appearance by Brendan Russell Heath on behalf of ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FNU HARGROVE, C.W MEYER, CLIFTON MURPHY, PETER NEWSHAM, THOMAS PAYNE, FNU TAYLOR, DANIEL THAU, ANTHONY A. WILLIS (Heath, Brendan) (Entered: 12/01/2020) |
| 12/01/2020 | 54 | MOTION to Dismiss by ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FNU HARGROVE, C.W MEYER, CLIFTON MURPHY, PETER NEWSHAM, THOMAS PAYNE, FNU TAYLOR, DANIEL THAU, ANTHONY A. WILLIS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Blackman, Duane) (Entered: 12/01/2020) |
| 12/02/2020 | 55 | Joint MOTION for Briefing Schedule by MARK ADAMCHIK, RUSSELL FENNELLY, FNU SEBERLING (Attachments: # 1 Text of Proposed Order)(Whitman, Sarah) (Entered: 12/02/2020) |
| 12/03/2020 | | MINUTE ORDER. Upon consideration of the 55 Joint Motion to Set Briefing Schedule, it is ORDERED that the motion is GRANTED. Accordingly, on or before January 11, |

| | | |
|---|---|---|
| | | 2021, defendants Adamchik, Fennelly, and Seiberling shall file their single, consolidated Motion to Dismiss; on or before February 8, 2021, the plaintiffs shall file their opposition; and on or before March 8, 2021, defendants Adamchik, Fennelly, and Seiberling shall file their reply. So ordered by Judge Dabney L. Friedrich on December 3, 2020. (lcdlf3) (Entered: 12/03/2020) |
| 12/17/2020 | 56 | REPLY to opposition to motion re 34 MOTION to Dismiss *All Individual-Capacity Claims* filed by WILLIAM P. BARR, GREGORY T. MONAHAN. (Whitman, Sarah) (Entered: 12/17/2020) |
| 12/17/2020 | 57 | REPLY to opposition to motion re 36 MOTION to Dismiss filed by RYAN ALLEN, RYAN BLACK, WAYNE VINCENT. (Samuel, Ryan) (Entered: 12/17/2020) |
| 12/17/2020 | 58 | REPLY to opposition to motion re 35 MOTION to Dismiss *All Official-Capacity Claims* filed by WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Mahard, Sean) (Entered: 12/17/2020) |
| 01/11/2021 | 59 | MOTION to Dismiss *All Individual-Capacity Claims* by MARK ADAMCHIK, RUSSELL FENNELLY, FNU SEBERLING (Attachments: # 1 Text of Proposed Order) (Whitman, Sarah) (Entered: 01/11/2021) |
| 01/12/2021 | 60 | NOTICE of Appearance by MinhChau Nguyen Corr on behalf of RYAN ALLEN, RYAN BLACK, WAYNE VINCENT (Corr, MinhChau) (Entered: 01/12/2021) |
| 01/22/2021 | 61 | Memorandum in opposition to re 54 MOTION to Dismiss filed by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Williams, Greta) (Entered: 01/22/2021) |
| 02/08/2021 | 62 | Memorandum in opposition to re 59 MOTION to Dismiss *All Individual-Capacity Claims* filed by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Williams, Greta) (Entered: 02/08/2021) |
| 02/22/2021 | 63 | REPLY to opposition to motion re 54 MOTION to Dismiss filed by ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FNU HARGROVE, C.W MEYER, CLIFTON MURPHY, PETER NEWSHAM, THOMAS PAYNE, FNU TAYLOR, DANIEL THAU, ANTHONY A. WILLIS. (Blackman, Duane) (Entered: 02/22/2021) |
| 03/08/2021 | 64 | REPLY to opposition to motion re 59 MOTION to Dismiss *All Individual-Capacity Claims* filed by MARK ADAMCHIK, RUSSELL FENNELLY, FNU SEBERLING. (Whitman, Sarah) (Entered: 03/08/2021) |
| 05/19/2021 | 65 | Unopposed MOTION for Leave to File *Supplemental Memorandum In Further Support of Motion to Dismiss* by WILLIAM P. BARR, MICHAEL CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Supplemental Memorandum)(Hair, Christopher) (Entered: 05/19/2021) |
| 05/20/2021 | | NOTICE of Hearing: Motion Hearing set for 5/28/2021 at 10:15 AM via Video before Judge Dabney L. Friedrich. (zjch) (Entered: 05/20/2021) |
| 05/26/2021 | 66 | RESPONSE *to United States' Supplemental Memorandum in Further Support of its Motion to Dismiss* filed by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Williams, Greta) (Entered: 05/26/2021) |
| 05/28/2021 | | Minute Entry for proceedings held before Judge Dabney L. Friedrich: Motion Hearing held on 5/28/2021 re (76 in 1:20-cv-01469-DLF) MOTION to Dismiss *All Individual Capacity Claims* filed by WILLIAM P. BARR, (21 in 1:20-cv-02163-DLF) MOTION to Dismiss *Plaintiff's Claims Against Official-Capacity Federal Defendants* filed by |

**JA64**

WILLIAM P. BARR, MARK T. ESPER, DONALD J. TRUMP, GREGORY T. MONAHAN, WILLIAM J. WALKER, JAMES M. MURRAY, JAMES C. MCCONVILLE, (143 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by THOMAS LOCASICO, (79 in 1:20-cv-01469-DLF) MOTION to Dismiss *Plaintiffs' Claims Against Official Capacity Federal Defendants* filed by MARK T. ESPER, WILLIAM P. BARR, DONALD J. TRUMP, MICHAEL D. CARVAJAL, GREGORY T. MONAHAN, WILLIAM J. WALKER, JAMES M. MURRAY, (19 in 1:20-cv-01622-DLF) MOTION to Dismiss *Plaintiff's Claims Against Official-Capacity Federal Defendants* filed by MARK T. ESPER, WILLIAM P. BARR, DONALD J. TRUMP, GREGORY T. MONAHAN, WILLIAM J. WALKER, JAMES M. MURRAY, JAMES C. MCCONVILLE, (142 in 1:20-cv-01469-DLF) MOTION to Dismiss *All Individual-Capacity Claims* filed by SEAN KELLENBERGER, (146 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by LAWRENCE SINACORE, SEAN COX, JONATHAN DANIELS, LUIS FELICIANO, JEFFREY HENDRICKSON, NICHOLAS JARMUZEWSKI, CARA SEIBERLING, BRYAN MCDONALD, (97 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by MARK ADAMCHIK, (54 in 1:20-cv-01542-DLF) MOTION to Dismiss filed by FNU TAYLOR, FNU HARGROVE, ANTHONY A. WILLIS, PETER NEWSHAM, S. BUCHANAN, ANTHONY ALIOTO, DANIEL THAU, JEFFERY CARROLL, C.W MEYER, CLIFTON MURPHY, THOMAS PAYNE, (59 in 1:20-cv-01542-DLF) MOTION to Dismiss *All Individual-Capacity Claims* filed by RUSSELL FENNELLY, FNU SEBERLING, MARK ADAMCHIK, (80 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by ANTHONY A. WILLIS, PETER NEWSHAM, S. BUCHANAN, ANTHONY ALIOTO, T.C. PAYNE, C.J. MURPHY, FIRST NAME UNKNOWN HARGROVE, JEFFERY CARROLL, DANIEL M. THAU, FIRST NAME UNKNOWN TAYLOR, C.W. MEYER, (83 in 1:20-cv-01469-DLF) MOTION to Dismiss filed by WAYNE VINCENT, (20 in 1:20-cv-01622-DLF) MOTION to Dismiss *Plaintiff's Claims Against Attorney General William P. Barr in his Individual Capacity* filed by WILLIAM P. BARR, (34 in 1:20-cv-01542-DLF) MOTION to Dismiss *All Individual-Capacity Claims* filed by GREGORY T. MONAHAN, WILLIAM P. BARR, (36 in 1:20-cv-01542-DLF) MOTION to Dismiss filed by RYAN ALLEN, RYAN BLACK, WAYNE VINCENT, (22 in 1:20-cv-02163-DLF) MOTION to Dismiss *Plaintiff's Claims Against Attorney General William P. Barr in his Individual Capacity* filed by WILLIAM P. BARR. Court Reporter Sara Wick. (zjch) (Entered: 05/28/2021)

| 06/15/2021 | 67 | MOTION for Leave to File *Supplemental Memorandum in Further Opposition to Defendants' Motion to Dismiss* by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Attachments: # 1 Supplemental Memorandum, # 2 Exhibit A to Supplemental Memorandum)(Williams, Greta) (Entered: 06/15/2021) |
| 06/15/2021 | | MINUTE ORDER. Upon consideration of the plaintiffs' 67 Motion for Leave to File Supplemental Memorandum, the motion is DENIED. So ordered by Judge Dabney L. Friedrich on June 15, 2021. (lcdlf3) (Entered: 06/15/2021) |
| 06/21/2021 | 68 | ORDER regarding the defendants' Motions to Dismiss. See text for details. Signed by Judge Dabney L. Friedrich on June 21, 2021. (lcdlf3) (Entered: 06/21/2021) |
| 06/21/2021 | 69 | MEMORANDUM OPINION regarding the defendants' Motions to Dismiss. See text for details. Signed by Judge Dabney L. Friedrich on June 21, 2021. (lcdlf3) (Main Document 69 replaced on 8/26/2021) (zjch, ). (Entered: 06/21/2021) |
| 06/21/2021 | | Set/Reset Deadlines: Responses due by 7/21/2021 (zjch) (Entered: 06/21/2021) |
| 07/02/2021 | 70 | Consent MOTION for Extension of Time to File Answer re 29 Amended Complaint *(for all Defendants)* by WILLIAM P. BARR, MICHAEL CARVAJAL, MARK T. ESPER, |

| | | |
|---|---|---|
| | | GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Hair, Christopher) (Entered: 07/02/2021) |
| 07/06/2021 | | MINUTE ORDER granting the defendants' 70 Consent Motion for Extension of Time. Accordingly, the defendants shall file an answer or otherwise respond to the Complaint on or before August 5, 2021. So Ordered by Judge Dabney L. Friedrich on July 6, 2021. (lcdlf3) (Entered: 07/06/2021) |
| 07/06/2021 | | Set/Reset Deadlines: Answer due by 8/5/2021, (zjch) (Entered: 07/07/2021) |
| 07/14/2021 | 71 | Joint MOTION to Stay by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Attachments: # 1 Text of Proposed Order)(Williams, Greta) (Entered: 07/14/2021) |
| 07/14/2021 | | MINUTE ORDER granting the parties' 71 Joint Motion to Stay the case and all pretrial deadlines pending ongoing settlement negotiations. The stay shall remain in effect until September 12, 2021. The parties shall file, on or before September 13, 2021, a joint status report proposing a schedule for any further proceedings. So Ordered by Judge Dabney L. Friedrich on July 14, 2021. (lcdlf3) (Entered: 07/14/2021) |
| 07/14/2021 | | Set/Reset Deadlines: Status Report due by 9/13/2021 (zjch) (Entered: 07/15/2021) |
| 08/25/2021 | 72 | ORDER. In the 69 Memorandum Opinion of June 21, 2021, the Court noted that this opinion would be updated to include citations to the final hearing transcript from the May 28, 2021 motions hearing once it became available. The Court is now in receipt of that transcript. Accordingly, attached is an updated version of the 69 Memorandum Opinion that includes those citations. The Clerk of Court is directed to update the docket accordingly. So Ordered by Judge Dabney L. Friedrich on August 25, 2021. (Entered: 08/25/2021) |
| 09/09/2021 | 73 | NOTICE OF WITHDRAWAL OF APPEARANCE as to ANTHONY ALIOTO, S. BUCHANAN, JEFFERY CARROLL, FNU HARGROVE, C.W MEYER, CLIFTON MURPHY, PETER NEWSHAM, THOMAS PAYNE, FNU TAYLOR, DANIEL THAU, ANTHONY A. WILLIS. Attorney Duane Gordon Blackman terminated. (Blackman, Duane) (Entered: 09/09/2021) |
| 09/13/2021 | 74 | Joint MOTION to Stay *and Status Report* by WILLIAM P. BARR, MICHAEL CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 09/13/2021) |
| 09/13/2021 | | MINUTE ORDER granting the parties' 74 Joint Motion to Stay the case pending ongoing settlement negotiations. The stay shall remain in effect until November 15, 2021. The parties shall file, on or before November 15, 2021, a joint status report proposing a schedule for any further proceedings. So Ordered by Judge Dabney L. Friedrich on September 13, 2021. (lcdlf3) (Entered: 09/13/2021) |
| 09/13/2021 | 75 | STATUS REPORT by WILLIAM P. BARR, MICHAEL CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (See Docket Entry 74 to view document). (znmw) (Entered: 09/15/2021) |
| 09/24/2021 | 76 | Joint MOTION for Protective Order *(Stipulation and Proposed Protective Order)* by WILLIAM P. BARR, MICHAEL CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Hair, Christopher) (Entered: 09/24/2021) |
| 10/01/2021 | | MINUTE ORDER. Upon consideration of the parties' 76 Joint Motion for Protective Order, it is hereby ORDERED that the motion is GRANTED. So Ordered by Judge Dabney L. Friedrich on October 1, 2021. (lcdlf3) (Entered: 10/01/2021) |

| 11/15/2021 | 77 | Joint MOTION to Stay *and Status Report* by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Attachments: # 1 Text of Proposed Order)(Williams, Greta) (Entered: 11/15/2021) |
|---|---|---|
| 11/15/2021 | | MINUTE ORDER. Upon consideration of the parties' 77 Joint Motion to Stay and Status Report, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until January 14, 2022. The parties shall file, on or before January 13, 2022, another joint status report proposing a schedule for any further proceedings, if a stipulation of dismissal is not filed before then. So Ordered by Judge Dabney L. Friedrich on November 15, 2021. (lcdlf3) (Entered: 11/15/2021) |
| 11/15/2021 | 78 | Joint STATUS REPORT by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (See Docket Entry 77 to view document). (znmw) (Entered: 12/02/2021) |
| 01/10/2022 | 79 | NOTICE OF WITHDRAWAL OF APPEARANCE as to RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. Attorney Mylan L. Denerstein terminated. (Denerstein, Mylan) (Entered: 01/10/2022) |
| 01/13/2022 | 80 | Joint MOTION to Stay *and Status Report* by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Attachments: # 1 Text of Proposed Order)(Williams, Greta) (Entered: 01/13/2022) |
| 01/13/2022 | | MINUTE ORDER. Upon consideration of the parties' 80 Joint Motion to Stay and Status Report, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until February 14, 2022. The parties shall file, on or before February 14, 2022, another joint status report proposing a schedule for any further proceedings, if a stipulation of dismissal is not filed before then. So Ordered by Judge Dabney L. Friedrich on January 13, 2022. (lcdlf3) (Entered: 01/13/2022) |
| 01/13/2022 | 81 | STATUS REPORT by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (See Docket Entry 80 to view document). (zeg) (Entered: 01/14/2022) |
| 02/14/2022 | 82 | Joint MOTION to Stay *and Status Report* by WILLIAM P. BARR, MICHAEL CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 02/14/2022) |
| 02/14/2022 | | MINUTE ORDER. Upon consideration of the parties' 82 Joint Motion to Stay and Status Report, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until February 28, 2022. The parties shall file, on or before February 28, 2022, another joint status report proposing a schedule for any further proceedings, if a stipulation of dismissal is not filed before then. So Ordered by Judge Dabney L. Friedrich on February 14, 2022. (lcdlf3) (Entered: 02/14/2022) |
| 02/14/2022 | 83 | STATUS REPORT by WILLIAM P. BARR, MICHAEL CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (See Docket Entry 82 to view document) (zeg) (Entered: 02/17/2022) |
| 02/28/2022 | 84 | Joint MOTION to Stay *and Status Report* by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Attachments: # 1 Text of Proposed Order)(Williams, Greta) (Entered: 02/28/2022) |
| 02/28/2022 | | MINUTE ORDER. Upon consideration of the parties' 84 Joint Motion to Stay and Status Report, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until March 30, 2022. The parties shall file on or before March 30, 2022, (1) a stipulation of dismissal as to the settling defendants and (2) a joint scheduling motion with the remaining defendants informing the Court how they would |

| | | |
|---|---|---|
| | | like to proceed in this matter. So Ordered by Judge Dabney L. Friedrich on February 28, 2022. (lcdlf3) (Entered: 02/28/2022) |
| 03/30/2022 | 85 | Joint MOTION to Stay *For Additional Two Weeks* by WILLIAM P. BARR, MICHAEL CARVAJAL, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, DONALD J. TRUMP, WILLIAM J. WALKER. (Attachments: # 1 Text of Proposed Order)(Hair, Christopher) (Entered: 03/30/2022) |
| 03/30/2022 | | MINUTE ORDER. Upon consideration of the parties' 85 Joint Motion to Stay, it is hereby ORDERED that the motion is GRANTED. The stay shall remain in effect until April 13, 2022. The parties shall file, on or before April 13, 2022, (1) a stipulation of dismissal as to the settling defendants and (2) a joint scheduling report proposing a schedule for further proceedings. So Ordered by Judge Dabney L. Friedrich on March 30, 2022. (lcdlf3) (Entered: 03/30/2022) |
| 04/13/2022 | 86 | NOTICE of Settlement by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD (Attachments: # 1 Settlement Agreement)(Williams, Greta) (Entered: 04/13/2022) |
| 04/13/2022 | 87 | STIPULATION of Dismissal by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Williams, Greta) (Entered: 04/13/2022) |
| 04/13/2022 | 88 | Consent STATUS REPORT */ Scheduling Report with Proposed Order* by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Attachments: # 1 Text of Proposed Order)(Williams, Greta) (Entered: 04/13/2022) |
| 04/14/2022 | | MINUTE ORDER. Upon consideration of the 87 Stipulation of Dismissal, it is hereby ORDERED that all claims against DONALD J. TRUMP, WILLIAM P. BARR, MARK T. ESPER, GREGORY T. MONAHAN, JAMES M. MURRAY, WILLIAM J. WALKER, and MICHAEL D. CARVAJAL, in their official capacities, are dismissed with prejudice. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii).<br><br>Furthermore, upon consideration of the parties' 88 Scheduling Report, it is hereby ORDERED that the plaintiffs shall file their Motion for Entry of Partial Final Judgment or for Certification of Interlocutory Appeal on or before April 20, 2022; any opposition shall be filed on or before May 11, 2022; and any replies in support of the motion shall be filed on or before May 25, 2022. So Ordered by Judge Dabney L. Friedrich on April 14, 2022. (lcdlf3) (Entered: 04/14/2022) |
| 04/20/2022 | 89 | MOTION for Entry of Final Judgment */ PLAINTIFFS' UNOPPOSED MOTION FOR ENTRY OF RULE 54(B) FINAL JUDGMENT, OR, IN THE ALTERNATIVE, TO CERTIFY ORDER AND JUDGMENT FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(B) AND TO STAY CASE PENDING APPEAL* by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Williams, Greta) (Entered: 04/20/2022) |
| 05/16/2022 | 90 | ORDER granting plaintiffs' 89 Unopposed Motion for Entry of Partial Final Judgment. Signed by Judge Dabney L. Friedrich on May 16, 2022. (lcdlf3) (Entered: 05/16/2022) |
| 05/16/2022 | 91 | PARTIAL FINAL JUDGMENT in favor of defendants WILLIAM P. BARR, MARK ADAMCHICK, GREGORY MONAHAN, RUSSELL FENNELLY, and CARA SEIBERLING against plaintiffs. See text for details. Signed by Judge Dabney L. Friedrich on May 16, 2022. (lcdlf3) (Entered: 05/16/2022) |
| 05/16/2022 | 92 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 68 Order on Motion for Leave to File, 69 Memorandum & Opinion, 90 Order on Motion for Entry of Final Judgment by RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. Filing fee $ 505, receipt number ADCDC-9241116. Fee Status: Fee Paid. Parties have been notified. (Williams, Greta) (Entered: 05/16/2022) |

**JA68**

| 05/17/2022 | 93 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 92 Notice of Appeal to DC Circuit Court,. (zeg) (Entered: 05/17/2022) |
| 05/20/2022 | | USCA Case Number 22-5133 for 92 Notice of Appeal to DC Circuit Court, filed by LINDSAY FIELD, ANN DAGRIN, RADIYA BUCHANAN. (zeg) (Entered: 05/23/2022) |
| 07/14/2022 | 94 | NOTICE OF WITHDRAWAL OF APPEARANCE as to RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. Attorney Amanda LeSavage terminated. (LeSavage, Amanda) (Entered: 07/14/2022) |
| 08/19/2022 | 95 | NOTICE OF WITHDRAWAL OF APPEARANCE as to RADIYA BUCHANAN, ANN DAGRIN, LINDSAY FIELD. Attorney Randy M. Mastro terminated. (Mastro, Randy) (Entered: 08/19/2022) |

**JA69**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BLACK LIVES MATTER D.C.
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

and

TONI SANDERS
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

J.N.C., through his mother Demetria Bright,
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

KISHON MCDONALD
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

GARRETT BOND
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

KEARA SCALLAN
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

LIA POTEET
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

Case No. 1:20-cv-01469-DLF

**THIRD AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

1

**JA70**

DUSTIN FOLEY
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

and

E.X.F., through her father, Dustin Foley
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

on behalf of themselves and all others similarly
situated,

            *Plaintiffs*,

      v.

DONALD J. TRUMP
   President of the United States of America
   1600 Pennsylvania Avenue, N.W.
   Washington, D.C. 20500,

WILLIAM P. BARR
   Attorney General of the United States
   950 Pennsylvania Avenue, N.W.
   Washington, D.C. 20530,

MARK ESPER
   Secretary of Defense of the United States
   1000 Defense Pentagon
   Washington, D.C. 20301-1000,

GREGORY T. MONAHAN
   Acting Chief of the U.S. Park Police
   1100 Ohio Drive, S.W.
   Washington, D.C. 20242,

JAMES M. MURRAY
   Director, U.S. Secret Service
   950 H Street, NW, Suite 7800
   Washington, D.C. 20223,

**JA71**

MAJOR GENERAL WILLIAM J. WALKER
  Commanding General of the District of
  Columbia National Guard
  2001 E. Capitol Street, S.E.
  Washington, D.C. 20003,

MICHAEL CARVAJAL
  Director, Federal Bureau of Prisons
  320 First Street, N.W.
  Washington, D.C. 20534,

PETER NEWSHAM
  Chief of the Metropolitan Police Department of
  the District of Columbia
  300 Indiana Avenue, N.W., Room 5059
  Washington, D.C. 20001,

MARK ADAMCHIK,
[FIRST NAME UNKNOWN] SEBERLING,
HELMET NUMBER A702,
HELMET NUMBER A704,
HELMET NUMBER A706,
HELMET NUMBER B714,
HELMET NUMBER C723,
HELMET NUMBER S735,
ARM PATCH NUMBER JD97,
ARM PATCH NUMBER LP71,
ARM PATCH NUMBER SK10
  Officers, U.S. Park Police
  1100 Ohio Drive, S.W.
  Washington, D.C. 20242,

JEFFERY CARROLL,
ANTHONY ALIOTO,
S. BUCHANAN,
[FIRST NAME UNKNOWN] HARGROVE,
C.W. MEYER,
C.I. MURPHY,
T.C. PAYNE,
[FIRST NAME UNKNOWN] TAYLOR,
DANIEL M. THAU,
ANTHONY A. WILLIS,
  Officers, D.C. Metropolitan Police Department
  c/o Office of the Attorney General
  441 4th Street, N.W.
  Washington, D.C. 20001,

WAYNE VINCENT
   Captain, Arlington County Policy Department
   1425 N Courthouse Rd,
   Arlington, VA 22201,

JOHN DOES 1–100,

JOHN POES 1–20,

and

JOHN ROES 1–50,

                    *Defendants*.

## THIRD AMENDED CLASS ACTION COMPLAINT

**(for injunctive relief and damages; violation of First Amendment rights, Fourth Amendment rights, and conspiracy to violate civil rights)**

1.      This case is about the President and Attorney General of the United States ordering the use of violence against peaceful demonstrators who were speaking out against discriminatory police brutality targeted at Black people.

2.      Just after 8:00 pm on May 25, 2020, George Floyd, a 46-year-old father, son, brother, and African American man, was accused of a non-violent offense and arrested by the Minneapolis police. In the process of his arrest, Mr. Floyd was handcuffed and fell to the pavement. Less than ten minutes after the police arrived, a police officer who participated in Mr. Floyd's arrest placed his knee and the weight of his body on Mr. Floyd's neck as Mr. Floyd lay on the ground. For eight minutes and forty-six seconds, the officer held his knee on Mr. Floyd's neck as Mr. Floyd pleaded for relief. Other officers held his legs or stood by and watched while he died. Among Mr. Floyd's final words were "please, please, please, I can't breathe." These words are reminiscent of the words spoken by Eric Garner before he was killed

4

**JA73**

by a New York City police officer in 2014, which have since become a tragic rallying cry for people seeking to address racial inequities and reform the American criminal justice system. These are some of the words that a group of peaceful demonstrators chanted on June 1, 2020, in Lafayette Square, across the street from the White House in Washington, D.C.

3.      On June 1, 2020, a group of demonstrators, including Plaintiffs, gathered peacefully in Lafayette Square to protest the gross, systemic injustices perpetrated by law enforcement against Black people in the United States, exemplified by the recent brutal murders of George Floyd and Breonna Taylor, a Black woman who was shot eight times and killed in March 2020 by three Louisville police officers who entered her home in the middle of the night without knocking. This was a continuation of protests in Washington, D.C. and elsewhere since Mr. Floyd's killing. Without provocation, the federal and Arlington County Defendants fired (or ordered to be fired) tear gas, pepper spray capsules, rubber bullets, and flash bangs into the crowd and physically charged at the protestors to shatter the peaceful gathering, forcing demonstrators to flee the area. Demonstrators who fled west away from the Square quickly encountered a formation of Defendant officers of the District of Columbia Metropolitan Police Department, who likewise fired tear gas at demonstrators as they fled. Many peaceful demonstrators were injured, some severely, by this coordinated and unprovoked attack.

4.      Defendants had no legitimate basis to destroy the peaceable gathering. Defendants' professed purpose—to clear the area to permit the President to walk to a photo opportunity at a nearby church—was a wholly illegal reason for abridging the constitutional rights of Plaintiffs and the others assembled in Lafayette Square. Indeed, the President has consistently demonstrated hostility towards viewpoints different than his own, and in the days

and moments leading up to the attack expressed his intent to violently attack protesters and "dominate" them.

5.     The Department of Justice has officially acknowledged that Defendant Barr ordered Lafayette Square cleared minutes before the assault started. Defendant Barr issued this order following a series of statements from Defendant Trump in the days and hours leading up to this attack in which he clearly threatened to use and encouraged violence against protesters.

6.     The police violence that Plaintiffs and other lawful, peaceful demonstrators were met with on June 1, 2020 is a continuation of an unlawful history of oppression of civil rights activists. The peaceful assembly of people seeking systemic change in the criminal justice system, like the assembly of Plaintiffs and others on June 1, 2020 in Lafayette Square, is based on a decades-old history of civil rights activism in this nation. Following the long tradition of those who marched for voting rights on Sunday, March 7, 1965, in Selma, Alabama,[1] Plaintiffs seek to address racial inequities. But like that "Bloody Sunday" fifty-five years ago, Plaintiffs' peaceful, lawful assembly was met by police violence.

7.     For Defendants to describe their actions as "domination" is telling. To dominate is to establish supremacy by subjugation of others. It is precisely such domination—in the form of centuries of white supremacy and subjugation of Black lives—that was the core focus of the

---

[1] Ronald J. Krotoszynski, Jr., *Celebrating Selma: The Importance of Context in Public Forum Analysis*, 104 Yale L.J. 1411 (1995).

6

**JA75**

peaceful demonstration in Lafayette Square. Just as in Tulsa,[2] Scottsboro,[3] Anniston,[4]

Birmingham,[5] Selma,[6] Philadelphia,[7] Los Angeles,[8] Ferguson,[9] New York City,[10] Baltimore,[11]

Minneapolis,[12] and countless other times in our nation's bloody history, the Lafayette Square

assault was violence against Black people and their supporters committed by state actors. What

differentiates the actions here from the others is that the President and Attorney General of the

United States ordered the violence.

       8.     Defendants' actions to shut down the Lafayette Square demonstration is the

manifestation of the very despotism against which the First Amendment was intended to protect.

On behalf of themselves and all others similarly situated, Plaintiffs seek to uphold, against

---

[2] Alicia Lee and Sara Sidner, *99 years ago today, America was shaken by one of its deadliest acts of racial violence*, CNN, June 1, 2020, https://www.cnn.com/2020/06/01/us/tulsa-race-massacre-1921-99th-anniversary-trnd/index.html.

[3] N. Jeremi Duru, *The Central Park Five, the Scottsboro Boys, and the Myth of the Bestial Black Man*, 25 Cardozo L. Rev. 1315, 1334 (2004) (describing state violence against nine black boys accused of raping two white women in 1931; while the women eventually recanted and confessed to making up the story, the "Scottsboro boys" spent years in prison).

[4] Terri Gross, *Get On the Bus: The Freedom Riders of 1961*, NPR, Jan. 12, 2006, https://www.npr.org/2006/01/12/5149667/get-on-the-bus-the-freedom-riders-of-1961 (describing a white mob's attack on a bus of freedom riders in 1961, while the city government remained unresponsive).

[5] Steven H. Hobbs, *Alabama's Mirror: The People's Crusade for Civil Rights*, 6 Ala. C.R. & C.L. L. Rev. 1, 2 (2014) (describing the 1963 attack on African American children who were marching peacefully for civil rights by Birmingham Commissioner of Public Safety Eugene "Bull" Connor).

[6] J. Gerald Hebert & Renata E. B. Strause, *The Future of the Voting Rights Act*, 64 Rutgers L. Rev. 953, 953–54 (2012) (describing how police attacked civil rights activists calling for equal voting rights in Selma, Alabama in 1965).

[7] Lindsey Norward, *The day Philadelphia bombed its own people*, Vox, Aug. 15, 2019, https://www.vox.com/the-highlight/2019/8/8/20747198/philadelphia-bombing-1985-move.

[8] Cydney Adams, *March 3, 1991: Rodney King beating caught on video*, CBS News, Mar. 3, 2016, https://www.cbsnews.com/news/march-3rd-1991-rodney-king-lapd-beating-caught-on-video/.

[9] Dep't of Justice,  Report Regarding the Criminal Investigation Into the Shooting Death of Michael Brown by Ferguson, Missouri Police Officer Darren Wilson, Mar. 4, 2015, https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/doj_report_on_shooting_of_michael_brown_1.pdf.

[10] Joseph Goldstein & Marc Santora, *Staten Island Man Dies From Chokehold During Arrest, Autopsy Finds*,  N.Y. Times, Aug. 1, 2014, https://www.nytimes.com/2014/08/02/nyregion/staten-island-man-died-from-officers-chokehold-autopsy-finds.html.

[11] Leah Donnella, *Reflecting on the Death of Freddie Gray, One Year Later*, NPR, Apr. 20, 2016, https://www.npr.org/sections/codeswitch/2016/04/20/474668796/reflecting-on-the-death-of-freddie-gray-one-year-later.

[12] Chris McGreal, *Dispatch from Minneapolis: The Night the City Cracked Down on George Floyd Protests*, The Guardian, May 31, 2020, https://www.theguardian.com/us-news/2020/may/31/minneapolis-george-floyd-protests-saturday-crackdown.

uncivil, unwarranted, unjust, and blatantly unlawful attack, cherished rights enshrined in the First and Fourth Amendment to the Constitution and foundational to our Democracy: the rights to peaceful assembly, petition for redress of grievances, freedom of speech, freedom of the press, and freedom from unwarranted seizures by the government.

## PARTIES

9.    Plaintiff Black Lives Matter D.C. ("BLMDC") is a District of Columbia limited liability corporation. As the local chapter of the nationwide "Black Lives Matter" movement, BLMDC organizes against systemic racism—in particular the racially disproportionate use of state-sanctioned violence against the Black community—through protests, public accountability campaigns, coalition-building, and other programming. Members of BLMDC were demonstrating in Lafayette Square on June 1, 2020. Other members of BLMDC were engaged in cop-watch activities and in providing aid to demonstrators.

10.    Plaintiff Toni Sanders is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020 with her 9-year-old stepson, Plaintiff J.N.C., who proceeds here through his mother and next friend Demetria Bright.

11.    Plaintiff Kishon McDonald is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020.

12.    Plaintiff Garrett Bond is a resident of Maryland who was demonstrating peaceably in Lafayette Square on June 1, 2020.

13.    Plaintiff Keara Scallan is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020.

14.    Plaintiff Lia Poteet is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020.

JA77

15.    Plaintiffs Dustin Foley and his 15-year-old daughter Plaintiff E.X.F., who proceeds here through her father and next friend Mr. Foley, are residents of Virginia who were demonstrating peaceably in Lafayette Square on June 1, 2020.

16.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. He was personally responsible for the actions complained of in this lawsuit.

17.    Defendant William P. Barr is the Attorney General of the United States. He is sued in his individual and official capacity. He personally issued the order that resulted in the unlawful actions complained of in this lawsuit.

18.    Defendant Mark Esper is the U.S. Secretary of Defense. He is sued in his official capacity. In that capacity, he is responsible for the actions of the U.S. armed forces.

19.    Defendant Gregory T. Monahan is the Acting Chief of the United States Park Police. He is sued in his official capacity. In that capacity, he is responsible for the actions of the U.S. Park Police officers.

20.    Defendant Mark Adamchik is a Major in the United States Park Police. He is sued in his individual capacity. Defendant Adamchik was the incident commander at Lafayette Square on the evening of June 1, 2020, and gave the immediate order for the law enforcement officers at the Square to attack the peaceably assembled protesters at approximately 6:30 pm.

21.    Defendant U.S. Park Police Officer Helmet Number S735 (hereinafter "Defendant USPP S735") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

22.    Defendant U.S. Park Police Officer [First Name Unknown] Seberling is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. She is sued in her individual capacity.

23.     Defendant U.S. Park Police Officer Arm Patch Number SK10 (hereinafter "Defendant USPP SK10") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

24.     Defendant U.S. Park Police Officer Helmet Number C723 (hereinafter "Defendant USPP C723") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

25.     Defendant U.S. Park Police Officer Helmet Number A702 (hereinafter "Defendant USPP A702") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

26.     Defendant U.S. Park Police Officer Helmet Number A704 (hereinafter "Defendant USPP A704") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

27.     Defendant U.S. Park Police Officer Helmet Number A706 (hereinafter "Defendant USPP A706") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

28.     Defendant U.S. Park Police Officer Helmet Number B714 (hereinafter "Defendant USPP B714") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

29.     Defendant U.S. Park Police Officer Arm Patch Number JD97 (hereinafter "Defendant USPP JD97") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

30.    Defendant U.S. Park Police Officer Arm Patch Number LP71 (hereinafter "Defendant USPP LP71") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

31.    Defendant James M. Murray is the Director of the U.S. Secret Service. He is sued in his official capacity. In that capacity, he is responsible for the actions of Secret Service agents.

32.    Defendant Major General William J. Walker is the Commanding General of the District of Columbia National Guard. He is sued in his official capacity. In that capacity, he is responsible for the actions of the D.C. National Guard troops.

33.    Defendant Michael Carvajal is the Director of the Federal Bureau of Prisons. He is sued in his official capacity. In that capacity, he is responsible for the actions of Federal Bureau of Prisons officers.

34.    Defendant Peter Newsham is the Chief of the District of Columbia Metropolitan Police Department (MPD). He is sued in his official capacity. In that capacity, he is responsible for the actions of the officers of MPD.

35.    Defendant Jeffery Carroll is an Assistant Chief of the MPD who manages its Homeland Security Bureau and who supervised, directed, or ordered the conduct of other MPD officers as described below. He is sued in his individual capacity.

36.    Defendant Anthony Alioto is a sworn member of the MPD who supervised, directed, or ordered the conduct of other MPD officers as described below. He is sued in his individual capacity.

37.    Defendant C. Murphy (badge number S800) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

38.    Defendant C. Meyer (badge number 4895) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

39.    Defendant Daniel Thau (badge number S580) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

40.    Defendant [First Name Unknown] Hargrove (badge number 3176) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

41.    Defendant S. Buchanan (badge number 4790) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

42.    Defendant T.C. Payne (helmet number 5751) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. She is sued in her individual capacity.

43.    Defendant [First Name Unknown] Taylor (helmet number 5705) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

44.    Defendant Anthony A. Willis (helmet number 5453) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

45.    Defendant Wayne Vincent is a Captain in the Arlington County Police Department ("ACPD"). He is sued in his individual capacity. Defendant Vincent represented

**JA81**

ACPD at the Joint Operations Command Center at Lafayette Square on June 1, 2020, and assisted in coordinating the actions of the ACPD officers present at the Square with the federal defendants before and during the attack on the peaceably assembled protesters.

46.    Defendants John Does 1–100 are officers of the U.S. Park Police, agents of the U.S. Secret Service, members of the U.S. Armed Forces, agents of the Federal Bureau of Prisons, officers of other federal law enforcement agencies, and other federal government officials who authorized, planned, or participated in the attack on peaceful protesters in and near Lafayette Square on June 1, 2020. They are sued in their individual capacities.

47.    Defendants John Poes 1–20 are officers of the ACPD and other non-federal law enforcement officials from jurisdictions other than the District of Columbia who participated in the attack on peaceful protesters in and near Lafayette Square on June 1, 2020. They are sued in their individual capacities.

48.    Defendants John Roes 1–50 are officers of MPD who participated in the attack on peaceful protesters near Lafayette Square on June 1, 2020. They are sued in their individual capacities.

## JURISDICTION AND VENUE

49.    The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because this action presents federal questions and seeks to redress the deprivation of rights under the First and Fourth Amendments to the U.S. Constitution, and under 28 U.S.C. § 1343 because this action seeks to redress the deprivation of rights pursuant to 42 U.S.C. §§ 1985 and 1986.

50.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because all of the events giving rise to the claims took place in this District of Columbia.

**FACTUAL BACKGROUND**

51.    Beginning on May 29, 2020, demonstrators began to gather daily in Lafayette

Square to protest police brutality against Black people in the United States of America, and

specifically the recent murders of George Floyd, a Black man killed by police officers, and

Breonna Taylor, a Black woman killed by police officers who broke into her home and shot her

without provocation or reason. Lafayette Square is located directly across Pennsylvania Avenue

from the White House and is a public venue frequently and historically used by activists to

protest and exercise First Amendment rights. As a public park, and as *the* public park closest to

the White House, Lafayette Square is a traditional public forum where First Amendment rights

are at their apex.

52.    From May 29, 2020 through May 31, 2020, large crowds of thousands of people

gathered in front of the White House in Lafayette Square. Multiple federal police forces gathered

to respond to the protests including, at least, the Secret Service and D.C.'s Metropolitan Police

Force. Over the course of these three days, law enforcement tactics escalated: they arrested

protesters, used riot shields, released tear gas, increased the presence of federal police presence,

and used flash bangs and rubber bullets.

**President Trump Has Made Clear His Intent to Infringe on Demonstrators' Constitutional
and Civil Rights**

53.    In the days and hours leading up to the events of June 1, 2020, President Trump

repeatedly advocated the use of force against Black demonstrators and civil rights activists who

were protesting in D.C. and around the nation.

54.    On May 29, President Trump posted on social media about the protests, stating

that "when the looting starts, the shooting starts," which is a racist slogan used by a former

Miami police chief Walter Headley in 1967 to advocate for police brutality and discriminatory

14

**JA83**

practices targeting African Americans.[13] On the same day, President Trump issued a tweet describing all protesters as "THUGS."

55.    On May 31, President Trump tweeted, "These people [civil rights protesters] are ANARCHISTS. Call in our National Guard NOW."

56.    On May 31, after a series of tweets about the protests, President Trump retweeted a tweet stating that "This isn't going to stop until the good guys are willing to use overwhelming force against the bad guys."

57.    On June 1, prior to the violent attack on the demonstrators, President Trump had a conference call with governors. On this call, he urged the governors to take much harsher action, "dominate your city and your state." He then issued an ominous warning of what was to come in a few short hours: "In Washington we're going to do something people haven't seen before."

58.    During the call, in the context of a discussion about arrests, when South Carolina Governor Henry McMaster stated that "I think we have to be careful, but we've got to be tough," President Trump corrected him, stating that "You don't have to be too careful."

59.    On the call with governors, Secretary of Defense Esper said that governors needed to "dominate the battle space," where the so-called "battle space" is the streets of the United States of America where people had gathered to peaceably protest.

60.    On the same day, President Trump told senior advisors that they had to show that they could control the streets of Washington and the area around the White House. A Justice Department spokesperson said that President Trump directed Attorney General Barr to personally lead the response to the unrest. That day, Attorney General Barr directed the Federal

---

[13] Barbara Sprunt, *The History Behind 'When the Looting Starts, The Shooting Starts'*, NPR, May 29, 2020, https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-looting-starts-the-shooting-starts.

Bureau of Prisons and other federal law enforcement agencies to send "riot teams" and other specialized agents to control the protests in Washington, D.C.[14]

61.     At the same time law enforcement officers were violently attacking demonstrators in Lafayette Square, President Trump gave remarks in the White House Rose Garden. He painted all the demonstrators as violent and vowed to take immediate action against them, stating "I have strongly recommended to every governor to deploy the National Guard in sufficient numbers that we dominate the streets," and "[if] a city or a state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them."[15]

62.     President Trump's statements about Black demonstrators and civil rights activists were markedly different from his comments about other demonstrators. President Trump has routinely been sympathetic to protesters whose views align with his own.

63.     For example, just over one month ago, President Trump expressed support when heavily armed and predominantly white demonstrators threatened lawmakers and stormed statehouses to object to coronavirus stay-at-home rules. On April 17, President Trump posted a series of tweets encouraging these armed and predominantly white demonstrators, including "LIBERATE MICHIGAN!"; "LIBERATE MINNESOTA!"; and "LIBERATE VIRGINIA, and save your great 2nd Amendment. It is under siege!" Similarly, in response to the 2017 white nationalist Unite the Right rally in Charlottesville, Virginia, President Trump said, "You had very fine people, on both sides."

_____

[14] Ryan Lucas, *Attorney General Steps Up Federal Law Enforcement Response to Protests*, NPR, June 1, 2020, https://www.npr.org/2020/06/01/867059312/attorney-general-steps-up-federal-law-enforcement-response-to-protests.
[15] Statement by the President, Whitehouse.gov, June 1, 2020 6:43 PM, https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/.

16

**JA85**

64.     President Trump is even happy to have demonstrators in Lafayette Square so long as their message aligns with his views. On May 30, while criticizing the protesters outside the White House, he specifically encouraged his supporters to engage in a counter-demonstration, tweeting: "The professionally managed so-called 'protesters' at the White House had little to do with the memory of George Floyd. The @SecretService handled them easily. Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???"

**Violent Attacks on Demonstrators in Lafayette Square**

65.     On June 1, 2020, Plaintiffs and other civil rights activists assembled in Lafayette Square in Washington, D.C. to protest police brutality against Black people. Members and supporters of Plaintiff Black Lives Matter D.C., Plaintiffs Sanders, J.N.C., McDonald, Bond, Scallan, Poteet, Foley, E.X.F., and other class members assembled peacefully in Lafayette Square. People present in Lafayette Square, including Plaintiffs, chanted "I can't breathe" in remembrance of George Floyd's last words, knelt, raised their hands up, and engaged in other legal activities to protest police brutality against Black people.

66.     Plaintiffs and other class members were exercising their First Amendment rights to assemble, speak, and petition the government in Lafayette Square. Plaintiffs and other class members were engaging in political speech to address, through the exercise of their constitutional rights, the infection of overt and systemic racism in the American criminal justice system. Black people are arrested at twice the rate of their population, detained pretrial at a rate three-and-a-half times higher than white people, and imprisoned at a rate of almost six times that of white people. Black people are three times more likely to be killed by the police than white people. This is part of the system that Plaintiffs seek to change.

67.     Law enforcement officers from local and federal law enforcement agencies and the military surrounded Plaintiffs and other civil rights activists assembled in Lafayette Square.

17

**JA86**

This included, at least, U.S. Park Police, ACPD, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons.

68.    The law enforcement officers who surrounded Plaintiffs and class members at Lafayette Park are largely unidentifiable to Plaintiffs.  Many such officers took steps to deliberately conceal their identities.

69.    Some officers displayed no identifying information, concealing both the agency they are associated with and their identification.

70.    Other officers did not wear name tags or badge numbers.

71.    Other officers wore name tags or badge numbers, but this identifying information was partially or mostly obstructed.

72.    MPD officers took up a position one block west, in a formation lining the north and west sides of the intersection of 17th and H Streets NW.

73.    Defendant Alioto was among the officers who supervised MPD officers in establishing a blockade on 17th Street, facing south.

74.    Defendants Murphy, Meyer, Thau, Hargrove, Buchanan, Payne, Taylor, and Willis formed part of the 17th Street NW MPD blockade.

75.    Defendants Alioto, Murphy, Meyer, Thau, Hargrove, Buchanan, Payne, Taylor, and Willis were wearing gas masks in preparation for the assault on the demonstrators.

76.    By 5:30 pm, Defendant Vincent was present at the Joint Operations Command Center and was coordinating the actions of the ACPD officers present at the Square with the federal defendants, under the command of the U.S. Park Police.

77.    At 6:03 pm, approximately 30 minutes before attacking the assembled demonstrators, law enforcement officers in and around Lafayette Square donned gas masks in

18

**JA87**

preparation for their deployment of tear gas, smoke canisters, and/or pepper spray and pepper balls against Plaintiffs and other class members.

78.    At approximately 6:08 pm, Defendant Barr entered Lafayette Square.

79.    At 6:10 pm, Defendant Barr was behind the law enforcement officials in Lafayette Square pointing north towards St. John's Church. The Department of Justice subsequently acknowledged that Defendant Barr personally ordered that Lafayette Square be cleared.

80.    At approximately the same time, White House Deputy Chief of Operations Tony Ornato contacted the Secret Service to notify them that President Trump planned to make an appearance outside St. John's Church. The Secret Service requested other law enforcement agencies to assist clearing the area.

81.    Additional law enforcement officers, including Defendant USPP C723, appeared at the demonstration and began to stand in double lines, wearing shields and other riot gear.

82.    At approximately 6:30 pm, without warning or provocation, Defendant Adamchik ordered the law enforcement officers present at Lafayette Square to attack the peaceably assembled protesters.

83.    Immediately thereafter, law enforcement officers, including Defendants USPP A702, USPP A704, USPP A706, and USPP C723, rushed forward and attacked the assembled protesters without warning or provocation. In doing so, law enforcement officials assaulted Plaintiffs Sanders, J.N.C., Bond, McDonald, Scallan, Poteet, Foley, E.X.F, and the other demonstrators present.

84.    Plaintiffs did not hear law enforcement officers asking the demonstrators to disperse or leave Lafayette Square.

19

**JA88**

85.    Plaintiffs did not hear law enforcement officers issue any warnings before using force to remove demonstrators from Lafayette Square.

86.    At the time of Defendant Barr's and Defendant Adamchik's orders concerning the attack and at the time of the attack itself, the Plaintiffs and the members of the Plaintiff class were not engaging in unlawful conduct.

87.    At the time of Defendant Barr's and Defendant Adamchik's orders concerning the attack and at the time of the attack itself, the Plaintiffs and the members of the Plaintiff class were not engaging in any conduct that posed a threat of violence against any person, property, or public safety generally.

88.    Law enforcement officers used force to disrupt the protest and drive Plaintiffs and other class members out of Lafayette Square and its vicinity. Officers fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd.[16]

89.    Although the U.S. Park Police initially denied that the agency used "tear gas" on the crowd, an agency spokesperson subsequently clarified that it used "an irritant derived from pepper plants. 'I'm not saying it's not a tear gas, but I'm just saying we use a pepper ball that shoots a powder.'"[17] MPD officers also deployed tear gas cannisters directly at the fleeing demonstrators. Police canisters gathered after the demonstration confirm that officers used tear

---

[16] *See* Ashley Parker, Josh Dawsey & Rebecca Tan, *Inside the Push to Teargas Protesters Ahead of a Trump Photo Op*, Wash. Post, June 1, 2020, https://www.washingtonpost.com/politics/inside-the-push-to-tear-gas-protesters-ahead-of-a-trump-photo-op/2020/06/01/4b0f7b50-a46c-11ea-bb20-ebf0921f3bbd_story.html; Reuters, *Graphic Warning: Peaceful Protesters Fired at with Tear Gas, Rubber Bullets by U.S. Military Police*, YouTube, June 1, 2020, https://www.youtube.com/watch?v=UrMoqSPZym0; Dan Zak et al., *'This Can't Be Happening': An Oral History of 48 Surreal, Violent, Biblical Minutes in Washington*, Wash. Post, June 2, 2020, https://www.washingtonpost.com/lifestyle/style/this-cant-be-happening-an-oral-history-of-48-surreal-violent-biblical-minutes-in-washington/2020/06/02/6683d36e-a4e3-11ea-b619-3f9133bbb482_story.html.
[17] Alex Ward, *US Park Police said using "tear gas" in a statement was a "mistake." It just used the term again*, Vox, June 5, 2020, https://www.vox.com/2020/6/5/21281604/lafayette-square-white-house-tear-gas-protest.

gas, including CS tear gas. Nathan Baca, a reporter with WUSA9, tweeted on June 4, 2020:

"Breaking: police canisters gathered by @wusa9 crews Monday night show federal police DID

use artificial CS tear gas in addition to natural OC gas on #BlackLivesMatter." These

photographs accompanied the tweet:

  

*[Image description: three silver canisters with labels identifying them as "SPEDE-HEAT CS
Long Range 150 YD"; serial numbers; and "SKAT SHELL."]*

90.    The officers hit, punched, shoved, and otherwise assaulted the demonstrators with

their fists, feet, batons, and shields, including demonstrators whose backs were turned from the

police and who were trying to flee the officers. Officers mounted on horseback, including

Defendant Seberling, pushed protesters west down H Street toward 17th, and other officers

assaulted protesters as they tried to escape. Many demonstrators were knocked to the ground.

The police action "injected danger into what had been a calm protest as those in the street fled

mounted police to avoid being trampled, struck by projectiles or gassed."[18]

91.    One protester was holding a bandage to his face and walking down H Street

toward 17th Street alongside the U.S. Park Police officers on horseback. Defendant USPP S735

and a group of other Park Police officers rushed him from behind and slammed him against the

---

[18] Jonathan Allen, Dartunorro Clark & Rebecca Shabad, *Police, National Guard Clash with Protesters to Clear Streets Before Trump Photo Op*, NBC News, June 1, 2020, https://www.nbcnews.com/politics/politics-news/after-night-significant-damage-d-c-mayor-bowser-imposes-earlier-n1221126.

wall of a building. The protester tried to run away, but Defendant USPP S735 chased him down and beat him with his baton.

92.     Defendant USPP LP71 joined in the initial charge. When one of the protesters scrambled to get out of the way of the charging line and crossed Defendant USPP LP71's path, Defendant USPP LP71 leaned his weight behind his shield and bashed the protester.

93.     Defendant USPP B714 formed part of the line of officers advancing down H Street NW and charged after the protesters who continued fleeing from the officers' attack down H Street NW.

94.     Law enforcement officers attacked the civil rights activists with no warning, forcefully ejected them from Lafayette Square, and pursued them for several blocks thereafter.

95.     Defendant USPP LP71 continued his charge and pursued protesters westward down H Street NW as they retreated. While fleeing other officers, one protester bumped into Defendant USPP LP71. Defendant USPP LP71 subsequently lashed out with his shield, causing that protester to stumble.

96.     Law enforcement officers also made unprovoked assaults on journalists in Lafayette Square who were reporting on the protests.

97.     For example, Defendant USPP SK10 beat Australian news correspondent Amelia Brace in the back with his baton as she was fleeing with her cameraman.

98.     A journalist holding a microphone in her hand was also among the group of people assembled on the sidewalk of H Street NW. As the journalist attempted to flee alongside the protesters, Defendant USPP JD97 charged into them, shoving the journalist aside.

99.    In coordination with the federal defendants, ACPD officers participated in the attack against the protesters, including by surging up 16th Street NW to drive protesters north of Lafayette Square past St. John's Church.

100.    As some demonstrators attempted to flee west, a formation of MPD officers stationed one block west of the Square attacked these demonstrators, including with tear gas.

101.    Defendant Thau discharged a tear gas grenade launcher into the crowd of fleeing protesters.

102.    MPD officers, including Defendants Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau and Willis, chased demonstrators south down 17th Street NW, further driving them away from Lafayette Square.

103.    Defendants Carroll and Alioto directed and oversaw the launching of tear gas by MPD officers and the officers' pursuit of the demonstrators down 17th Street NW.

104.    Defendants began their attack on the Lafayette Square demonstrators, both at and in the vicinity of the Square, well before the 7:00 pm curfew.

105.    MPD regularly acts in coordination with federal law enforcement to police major demonstrations.

106.    Approximately 30 minutes before the attack began at Lafayette Square on June 1, an MPD supervisory officer met and conferred with U.S. military officers in the presence of the Army Chief of Staff on 16th Street NW less than two blocks north of Lafayette Square.

107.    The actions of federal officers and MPD and other non-federal officers were coordinated and reflect a concerted plan to drive demonstrators away from Lafayette Square and its vicinity by force.  Both the officers stationed at Lafayette Square and those stationed a block

23

**JA92**

west of the Square attacked demonstrators and physically drove them away from Lafayette

Square without warning or justification.

108.    At no time before or during the attack on the demonstrators did any of the

Defendants give any indication that Plaintiffs or any demonstrators would be permitted to

resume their demonstration nearby—either at a prescribed location or after having moved a

prescribed distance away from Lafayette Square.

109.    None of the Defendants otherwise provided any alternative means or space for the

demonstration that they had forcibly terminated.

110.    MPD has a history of using unjustified, excessive force to attack and interfere

with demonstrators.  For example, MPD used unconstitutionally pepper-sprayed and

unconstitutionally detained demonstrators and others exercising their First Amendment rights

(including, for instance, a clearly designated legal observer and a journalist) during the 2017

Inauguration Day protests; this conduct is the subject of two pending lawsuits that survived

motions to dismiss, *see Horse v. District of Columbia*, No. 1:17-cv-01216 (D.D.C., motion to

dismiss denied Sept. 27, 2019); *Schultz v. District of Columbia*, No. 1:18-cv-00120, (D.D.C.,

motion to dismiss denied Sept. 27, 2019). MPD's latest use of excessive force against

demonstrators follows a long history of similar incidents where excessive force was deployed,

including when MPD:

     a.    used excessive force against and unconstitutionally detained demonstrators during

          the counter-inaugural demonstrations in Adams Morgan in January 2005; the

          pepper-spraying and arrest of numerous peaceful demonstrators led to lawsuits

          resolved by large settlement payments to victims of MPD violence;

JA93

b.    used excessive force against demonstrators during the counter-inaugural

demonstrations near the White House in January 2005 after other demonstrators

had removed a portion of security fencing; the pepper-spraying of law-abiding

demonstrators led to a lawsuit resolved by large settlement payments to victims of

MPD violence;

c.    used excessive force against and unconstitutionally detained demonstrators during

the World Bank protests in Pershing Park in September 2002; the mass arrests and

hogtying of protestors led to lawsuits resolved by large settlement payments to

victims of MPD violence;

d.    used excessive force against and unconstitutionally detained anti-globalization

demonstrators in April 2000; the kettling, use of pepper spray, and denial food

and water to detainees led to lawsuits resolved by large settlement payments to

victims of MPD violence.

111.    The improper use of chemical irritants, and the resulting harm to persons, was so

foreseeable that the District of Columbia Council prohibited their use to disperse a demonstration

"unless the assembly participants or others are committing acts of public disobedience

endangering public safety and security," as determined by a commanding officer at the scene.

D.C. Code § 5-331.16(b)(2).

112.    MPD has continued to use unjustified, excessive force to attack and discourage

demonstrators.

113.    For example, on the evening of June 1, 2020, after attacking the demonstrators

fleeing Lafayette Square, MPD officers deployed tear gas against demonstrators on Swann Street

NW.

114.    In the weeks following the June 1, 2020 attack, MPD officers repeatedly engaged in excessive force and unwarranted destruction of property against demonstrators in Black Lives Matter Plaza, including:

a.    the unjustified and excessive use of batons and chemical irritants causing significant physical injuries;

b.    unjustified arrests and detentions;

c.    the destruction of tents and supplies set up for the purposes of supporting the health and safety needs of the people protesting;

d.    the destruction of protest signs and cultural material; and

e.    the destruction of equipment for the preparation of food.

115.    The actions of Defendants Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John Roes 1–50 near Lafayette Square on June 1 resulted from the District of Columbia's deliberately indifferent failure to train and/or supervise these officers regarding the appropriate circumstances in which to deploy chemical irritants. The prior incidents of excessive force during demonstrations, many of which involved chemical irritants and related to Presidential events, made the need for training so obvious and the violation of Plaintiffs' rights so likely, that the District was deliberately indifferent to the risk of constitutional violations.

116.    By the morning of June 3, 2020, federal law enforcement officers blocked access to Lafayette Square entirely, setting up a perimeter on I Street NW between 15th Street NW and 17th Street NW that remained in place for more than a week. During this time, there was no place for demonstrators to gather within sight of the White House.

**Defendants' Illegal Actions Caused and Are Causing Injuries to Plaintiffs**

***Plaintiff Black Lives Matter D.C.***

117.    Plaintiff Black Lives Matter D.C.'s mission is to end systemic racism, in particular the racially disproportionate use of state-sanctioned violence against the Black community. BLMDC achieves this mission through protests, public accountability campaigns, coalition-building, and other programming.

118.    BLMDC pursued its mission in the days since the death of George Floyd by directing members and individuals affiliated with the organization to attend protests throughout D.C. The organization sponsored an event on May 30, 2020 in which a caravan of cars drove through D.C. and protesters held signs and made statements raising awareness of police violence and racial justice issues. BLMDC has also provided first aid supplies, snacks, and water to demonstrations arranged by other organizations, while also assisting those organizations by coordinating with them to ensure that, at the events, there are legal observers and individuals prepared to record police officers who commit unlawful actions.

119.    On June 1, 2020, BLMDC provided snacks, masks, waters, and fliers that were disseminated at the Lafayette Square demonstration. BLMDC also dispatched members to record any officer misconduct and ensured that the demonstration had legal observers present.

120.    Multiple members of BLMDC were standing in or near Lafayette Square at the time law enforcement used force to disrupt the protest on June 1, 2020 and experienced Defendants' use of force and chemical irritants.

121.    Defendants' actions have frustrated the mission of BLMDC to fight racial injustice by chilling BLM members and supporters from exercising their rights to demonstrate and by creating fear when they do.

**JA96**

122.    Members of BLMDC felt so traumatized by law enforcement's violence at Lafayette Square that they had to take time off from organizing work and skipped calls with coalition members as well as calls with people who participated in social actions.

123.    BLMDC leaders and members fear that law enforcement will meet future protests with extreme violence.

124.    Since the Lafayette Square attack, BLMDC has chosen to refrain from participating in multiple demonstrations organized by the Movement 4 Black Lives between June 2 and June 3, 2020. This was done to protect BLMDC members from feared harm at the hands of law enforcement.

125.    April Goggans, a leader of BLMDC, has noticed a significant reduction in the number of people attending in-person protests since June 1, 2020. People who ordinarily attend in-person protests have informed Ms. Goggans that they are afraid to do so because of the violence that occurred at Lafayette Square.

126.    In response to Defendants' actions, BLMDC has been forced to:

a.    divert resources to assessing and planning for potential violence by police, including increased needs for medical support and supplies to counteract the effects of chemical agents. For example, the organization has purchased goggles to protect demonstrators from chemical irritants and paid for mental health services for a member who was present when Defendants forcibly expelled protesters from Lafayette Square, and suffered trauma as a result;

b.    enhance efforts to educate members and supporters regarding the potential dangers of police violence, how to protect themselves, and what to do if there is another assault like the one in Lafayette Square;

28

**JA97**

    c.     engage in a communications campaign about the events in Lafayette Square to reduce the deterrent effects of Defendants' actions on the participation of their members or supporters;

    d.     arrange for transportation from the demonstration for persons injured by Defendants' conduct; and

    e.     facilitate medical care for persons injured by Defendants' actions.

127.    The time and effort BLMDC has expended due to Defendants' conduct has reduced its capacity to plan events and programming consistent with its mission. For example, the time BLMDC has spent on assessing safety considerations has prevented it from organizing trainings, including a know-your-rights training. This is curtailing the organization's capacity to fulfill its mission by effecting community change through peaceful demonstrations.

***Plaintiffs Toni Sanders and J.N.C.***

128.    Toni Sanders is a Black resident of Southeast Washington, D.C.

129.    Ms. Sanders has joined multiple demonstrations at the White House beginning on Friday, May 29, 2020. She intends to continue protesting at the White House every day that the demonstrations continue.

130.    Ms. Sanders chooses to demonstrate at the White House because she wants to stop the murder of Black people at the hands of law enforcement. She believes that the White House is the best place to demonstrate because it can help convince President Trump to take action to combat racism in policing. She believes that protesting at the White House is a powerful symbol and is much more impactful than protesting in another part of the District.

131.    On the afternoon of June 1, Ms. Sanders traveled to Lafayette Square to demonstrate with her wife, Demetria Bright, and Ms. Bright's nine-year-old son, J.N.C.

Ms. Sanders had explained to her stepson about what had happened to George Floyd and wanted him to learn about peaceful protesting.

132.    When Ms. Sanders and her family arrived at Lafayette Square they stood between St. John's Church and the fence that surrounded the park. They arrived around 4:30 that afternoon.

133.    Ms. Sanders viewed the mood of the demonstrators as peaceful. People were passing out water and it made her hopeful that there was a diverse crowd nonviolently fighting for racial justice. The only aggressive behavior she witnessed from the demonstrators was an occasional obscenity directed toward the President.

134.    After being at the protest for around two hours, a reporter from a local television affiliate approached Ms. Sanders for an on-camera interview. She was in the middle of giving that interview when she suddenly heard very loud pops and bangs.

135.    Ms. Sanders looked toward the fence and saw smoke. Federal law enforcement had released irritants into the air that were causing her to tear up. There had been no warning or announcement from law enforcement before the chaos started.

136.    Ms. Sanders and Ms. Bright grabbed J.N.C. and ran. Ms. Sanders was very concerned that J.N.C. would be injured by the police or in the crowd that was trying to get away. They ran until they reached their car, which was parked near Thomas Circle. They headed home from the protest.

137.    Ms. Sanders continues to protest because she believes that change is necessary, but J.N.C. is traumatized by having to escape the tear gas from the federal law enforcement officers. J.N.C. speaks about the incident frequently and now worries when Ms. Sanders leaves to go protest.

### *Plaintiff Kishon McDonald*

138.    Kishon McDonald is a resident of Washington, D.C. and former member of the U.S. Navy. As an African American man, he is keenly interested in issues of racial justice.

139.    Mr. McDonald participated in peaceful demonstrations protesting the murder of George Floyd on two occasions in the District of Columbia. The first demonstration that he attended was on the night of May 30, 2020 outside the United States Capitol. The second demonstration he attended was the June 1, 2020 demonstration outside the White House in Lafayette Square.

140.    Mr. McDonald arrived at Lafayette Square at approximately 6:00 pm on Monday, June 1. There was a large gathering of other demonstrators, peacefully protesting near a security barricade lined with police officers on the opposite side. Mr. McDonald did not witness any acts that were aggressive or dangerous that could be perceived as a threat by law enforcement.

141.    At approximately 6:25 pm, law enforcement officers, suddenly and without warning, began to charge the crowd of demonstrators. Mr. McDonald was repeatedly struck by the shields of multiple officers which left bruises on his body. Officers continued to physically strike Mr. McDonald even after he began to leave the site of the demonstration.

142.    Simultaneously, at approximately 6:25 pm, tear gas canisters and concussion grenades were fired into the crowd. Tear gas obscured Mr. McDonald's vision, stung his eyes, and caused him to severely cough. Mr. McDonald witnessed the concussion grenades exploding with enough force to put holes into the ground.

143.    The efforts of law enforcement forced Mr. McDonald to retreat to the intersection of 16th Street NW and I Street NW, one block away from Lafayette Square. As Mr. McDonald approached the intersection, he saw that police officers were arresting demonstrators. Soon after he left the scene of the protest, he was detained by a police officer, but the officer let him go.

31

**JA100**

144.    The day after the attack in Lafayette Square, Mr. McDonald still suffered symptoms related to inhaling tear gas, which included thick discharge from his nose. He also had bruising in several locations on his body.

145.    Mr. McDonald has protested against police violence towards African Americans in the past, and had planned to continue demonstrating in D.C. for George Floyd. However, the events of June 1, 2020 have discouraged him. He fears that he will suffer serious harm at the hands of law enforcement.

### Plaintiff Garrett Bond

146.    Garrett Bond is a white man who lives in Mount Rainier, Maryland.

147.    Mr. Bond participated in peaceful demonstrations protesting the murder of George Floyd on two occasions in Washington, D.C. The first demonstration he attended was as part of the car caravan throughout the District on May 30, 2020. The second demonstration he attended was the June 1, 2020 demonstration outside the White House in Lafayette Square.

148.    Mr. Bond is an Eagle Scout and trained in basic first aid methods. He brought a backpack containing first aid supplies with him to the June 1 demonstration. The supplies included gauze pads, band aids, water, sanitizer, and extra masks and gloves that he brought to protect himself and others from COVID-19 infection.

149.    Mr. Bond arrived at Lafayette Square at approximately 6:20 pm on Monday, June 1, 2020. As he arrived, he positioned himself near the security barrier, which was lined with demonstrators. He did not witness any acts that were aggressive or dangerous or that could be perceived as a threat by law enforcement.

150.    Mr. Bond heard an announcement made through a megaphone by law enforcement, reminding the demonstrators that the curfew would go into effect at 7:00 pm.

Almost simultaneously, Mr. Bond heard explosions from somewhere outside his field of vision. Demonstrators began to flee in all directions. He fled north toward St. John's Church.

151.    As Mr. Bond approached the church, he noticed an obviously injured demonstrator leaning against the wall. The victim was dazed and bleeding profusely. As Mr. Bond neared him, he noticed that victim had an object lodged in his face. At first, Mr. Bond thought it was his tooth, but upon closer inspection Mr. Bond saw it was a rubber bullet that had pierced his lower lip. Mr. Bond asked him to sit down and used gauze from his first aid kit to stem his bleeding. Almost immediately after Mr. Bond applied the gauze, someone yelled, "They're coming!" Mr. Bond then turned around to see several fully-armored police officers charging at him with batons and shields.

152.    Several nearby demonstrators helped him lift the injured man and carry him a block away where they found another medic to give the victim medical assistance.

153.    Mr. Bond left the demonstration area with his hands raised, avoiding further encounters with law enforcement.

154.    The events of June 1, 2020 were intimidating, but Mr. Bond intends to continue participating in demonstrations in the future.

### *Plaintiff Keara Scallan*

155.    Keara Scallan is a white resident of Northwest Washington, D.C.

156.    On June 1, 2020, Ms. Scallan decided to join the demonstrations near the White House with a friend. At approximately 6:20 pm, Ms. Scallan and her friend walked down 16th Street NW and arrived at fence surrounding Lafayette Square.

157.    Ms. Scallan witnessed law enforcement in riot gear when she arrived, all of whom were behind the fence.

33

**JA102**

158.    The crowd at Lafayette Square was non-violent and chanting. Ms. Scallan did not witness any demonstrators provoking law enforcement.

159.    Suddenly and without warning, Ms. Scallan felt the crowd begin to rush towards 17th Street NW. She was pushed against the fence as other demonstrators were running away, and she was briefly separated from her friend.

160.    Ms. Scallan was hit with rubber bullets and felt sudden pain in her face, arm, and leg.

161.    Ms. Scallan saw and heard three flash bang grenades and then noticed two tear gas canisters thrown at her and at other demonstrators.

162.    The irritants in the air made it very difficult to breathe. She had water and baking soda spray with her, but it did nothing to help her burning eyes. Ms. Scallan could hear other demonstrators retching.

163.    After fleeing the irritants in the air, Ms. Scallan reunited with her friend and they aided demonstrators as they got away from the White House. More law enforcement, including U.S. Drug Enforcement Administration ("DEA") vehicles, were blocking demonstrators from returning to Lafayette Square.

164.    Ms. Scallan received bruises on her arm and cuts on her lips and face, making it painful to use her arm and open her jaw for days. She has had difficulty eating and brushing her teeth because of her swollen lips and jaw.

### *Plaintiff Lia Poteet*

165.    Lia Poteet is a 28-year-old white woman who resides in Washington, D.C. She is a communications specialist.

166.    On June 1, 2020, Ms. Poteet participated in the peaceful demonstration in Lafayette Square protesting the murder of George Floyd.

167.    Ms. Poteet chose to demonstrate at the White House because she wanted to protest systemic racism and the Trump administration's role in contributing to race-based violence in the United States.

168.    Prior to June 1, 2020, Ms. Poteet had been out of town and had not attended any of the recent protests challenging systemic racism in Washington, D.C. She has, however, attended protests outside the White House in Lafayette Square for other causes, and they have been peaceful.

169.    On June 1, 2020, Ms. Poteet arrived in the northeast corner of Lafayette Square around 6:15 pm. She perceived the protest as peaceful and did not observe any acts of violence from the protesters around her.

170.    After she arrived in Lafayette Square, Ms. Poteet moved to the front row against the security barricade in front of the statue of Andrew Jackson. Law enforcement officers stood in a line on the opposite side of the barricade. Officers wore all black uniforms or green military uniforms, and held large riot shields and batons.

171.    Shortly before 6:30 pm, Ms. Poteet noticed the law enforcement officers in Lafayette Square begin to move forward in unison towards the protesters. She then heard flash bangs and people screaming. She continued standing with her hands up, holding a sign she had brought with her to the protest in one hand and her phone in the other.

172.    Approximately a minute later, Ms. Poteet saw a law enforcement officer charging directly at her. The officer pushed Ms. Poteet to the ground with his riot shield and the impact knocked her phone out of her hand. The officer began beating Ms. Poteet with his baton. He kicked and/or struck her in the stomach and knocked the wind out of her.

173.    Ms. Poteet attempted to crawl away from this officer and was able to briefly stand up. She made eye contact with him and pointed at the phone by her feet. The officer did not move so Ms. Poteet bent down to pick up her phone. He knocked her over again and started hitting her even harder. During this abuse, the officer kicked and/or struck Ms. Poteet's knee, where she previously had ACL surgery. Another protester eventually helped Ms. Poteet get away from the officer.

174.    Ms. Poteet limped away as quickly as she could, largely unable to inhale because of the officer's blow to her stomach and the surrounding smoke. A flash bang exploded at her right foot and then another one exploded at her left foot. The smoke from the flash bangs made it impossible to intake air without coughing. She went around the block and doubled over until she could breathe reliably again. She then limped to a friend's house and got a ride home from the protest.

175.    Two days after the attack in Lafayette Square, Ms. Poteet still had welts on her torso and bruises from the beating. Her knee continued to be bruised and swollen. Ms. Poteet was never able to locate or recover her phone, which the officer's initial assault had knocked out of her hand and which his continued abuse prevented her from picking up off the ground.

176.    Ms. Poteet continues to protest for George Floyd, but she is traumatized by the unprovoked violence committed against her by law enforcement officers. She no longer feels comfortable protesting if there is any sign of police movement near the protest and is therefore cautious about when and where she engages in such conduct. Although she has returned to the area near Lafayette Square since June 1, 2020, she has done so only briefly and with palpable concern and caution. She also is scared that she will be subjected to further violence by law enforcement at future protests.

### *Plaintiffs Dustin Foley and E.X.F.*

177.    Dustin Foley is a white man who lives in Falls Church, Virginia with his wife and daughter E.X.F.

178.    Mr. Foley worked in law enforcement as a community services officer for approximately a decade in California before moving to Virginia with his family and opening his own business.

179.    Mr. Foley and E.X.F. participated in peaceful demonstrations at the White House to protest the murder of George Floyd and the use of excessive force by law enforcement.

180.    On the afternoon of June 1, Mr. Foley and E.X.F. traveled to Lafayette Square to demonstrate and to distribute peanut butter and jelly sandwiches and water bottles to other protesters.  They parked several blocks west of Lafayette Square and brought the sandwiches and water with them from their car in a wagon.

181.    When Mr. Foley and E.X.F. arrived at Lafayette Square, they came upon a group near the northwest corner of Lafayette Square that had set up a food and beverage station. They decided to leave the wagon of sandwiches and water with this group for ease of access by fellow protesters.

182.    Mr. Foley and E.X.F. then stood near the security barricade on the north perimeter of Lafayette Square, which was lined with demonstrators.  Mr. Foley and E.X.F. perceived the demonstrators as peaceful.

183.    At approximately 6:00 pm, Mr. Foley and E.X.F. saw Defendant Barr enter Lafayette Square and approach law enforcement officials.  Mr. Foley and E.X.F. also saw additional officers in military uniforms begin to gather and join those already in the Square.

37

**JA106**

184.    Mr. Foley and E.X.F. decided to leave around this time because they were unsettled by the sight of the additional military and concerned about the actions that law enforcement might take against demonstrators.

185.    After a short walk, Mr. Foley and E.X.F. realized that they had forgotten to pick up their wagon, so they returned to food and beverage station at the northwest corner of Lafayette Square.

186.    Within minutes, the law enforcement officers gathered in Lafayette Square began to assault the assembled crowd, including Mr. Foley and E.X.F.

187.    Mr. Foley and E.X.F. heard flash bangs and witnessed people screaming and running frantically. Soon thereafter, Mr. Foley and E.X.F. began to feel the effects of chemical irritants that were wafting through the air, which made them cough.

188.    From the time they returned to the Square for their wagon until the deployment of force against the crowd of which they were a part, neither Mr. Foley nor E.X.F. heard saw any threatening or aggressive behavior by protestors or heard any warnings that they needed to leave the area or that force was about to be deployed against the crowd.

189.    As the officers from Lafayette Square pushed forward and forced demonstrators to retreat, Mr. Foley and E.X.F. hurried west on H Street NW to the intersection with 17th Street NW.

190.    At the intersection of 17th and H Streets NW, Mr. Foley and E.X.F. encountered a line of law enforcement officers wearing riot gear, standing shoulder-to-shoulder, blocking off H Street to the west and the 17th Street to the north.

191.    Mr. Foley and E.X.F. have since learned that these officers were with the Metropolitan Police Department.

192.    Mr. Foley and E.X.F. turned south down 17th Street NW and continued to leave the area by walking along the western sidewalk, which was covered by construction scaffolding.

193.    Shortly after they turned down 17th Street NW, the MPD officers began firing tear gas canisters at the demonstrators, including Mr. Foley and E.X.F., who were fleeing Lafayette Square down 17th Street NW.

194.    Both Mr. Foley and E.X.F. immediately felt the severe effects of the tear gas fired by the MPD officers, including burning eyes and difficulty breathing.  E.X.F. experienced significant symptoms, and had difficulty opening or seeing out of her eyes.

195.    As the street filled up with tear gas, Mr. Foley and E.X.F. attempted to take shelter at the south end of the scaffolding so E.X.F. could recover from the effects of the gas and to avoid additional tear gas that advancing MPD officers had fired further south on 17th Street NW. A fellow demonstrator attempted to help E.X.F. by pouring water into her eyes.

196.    As the MPD officers continued marching down 17th Street NW and deploying tear gas in Mr. Foley and E.X.F.'s direction, Mr. Foley announced to the officers (with hands raised) that his daughter had been injured and pleaded with the officers for medical attention.

197.    The MPD officers provided no assistance and instead yelled at Mr. Foley and E.X.F. to move, even though the only place to go was into the cloud of tear gas that had been deployed further down the street.

198.    Mr. Foley and E.X.F. obeyed the officers, and as a result fled into a cloud of tear gas that further exacerbated their symptoms.

199.    Mr. Foley and E.X.F. ultimately reached the car and drove home, with E.X.F. continuing to experience symptoms of the tear gas following the encounter with MPD.

JA108

200.    Mr. Foley and E.X.F. feel very afraid after this experience.  They have had difficulty sleeping because of the trauma and have struggled to come to terms with the unprovoked violence committed against them by the law enforcement officers, as well as the officers' failure to offer any medical attention or support.

201.    Mr. Foley and E.X.F. continue to protest the murder of George Floyd, but they are both scared of being subjected to further harm by law enforcement at future demonstrations.

**Involvement of the White House and the Attorney General in the Lafayette Square Attack**

202.    The actions described above occurred at least in substantial part at the behest of President Trump, Attorney General Barr, and/or other senior White House officials; Attorney General Barr personally ordered law enforcement officers to forcibly remove Plaintiffs and other class members from Lafayette Square and its vicinity.[19]

203.    Shortly after the attack on the demonstrators, the President and his senior advisors, including Attorney General Barr, Secretary of Defense Esper, White House Chief of Staff Mark Meadows, and Ivanka Trump, walked from the White House to St. John's Church, located across Lafayette Square from the White House. The President paused for a few minutes on the sidewalk outside the church for a photo opportunity, made brief remarks, and then walked back to the White House. The President did not enter St. John's Church.

204.    The President and his entourage lingered at the church and encouraged photographs from the press until at least 7:09 pm, nine minutes after the District's curfew went into effect.

---

[19] Carol D. Leoning et al., *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, Wash. Post, June 2, 2020, https://www.washingtonpost.com/politics/barr-personally-ordered-removal-of-protesters-near-white-house-leading-to-use-of-force-against-largely-peaceful-crowd/2020/06/02/0ca2417c-a4d5-11ea-b473-04905b1af82b_story.html.

**JA109**

205.    On Tuesday, June 2, President Trump praised the results of the prior evening's

law enforcement attack, tweeting that "D.C. had no problems last night. Many arrests. Great job

done by all. Overwhelming force. Domination."

### CLASS ACTION ALLEGATIONS

206.    Plaintiffs Sanders, McDonald, Bond, Scallan, Poteet, and Foley (collectively, the

"Representative Plaintiffs") bring this action on behalf of themselves and, under Federal Rules of

Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of classes defined as

follows:

> The Injunctive Relief Class: All individuals present at Lafayette Square, defined
> here as the area in Washington, D.C. between the north side of the White House
> and H Street NW and between Madison Place and Jefferson Place NW, or the
> streets or sidewalks adjacent to or surrounding Lafayette Square (including
> specifically:  H Street NW between 15th and 17th Streets NW, Vermont Avenue
> between H and I Streets NW, 16th Street between H and I Streets NW, 17th Street
> NW between H and G Streets NW, and Connecticut Avenue between H and I
> Streets NW), on June 1, 2020, at, around, or shortly after 6:30 pm, when the events
> described in paragraphs 43–64 above took place, who may attend or attempt to
> attend protests at this location in the future (hereinafter, "the Injunctive Relief
> Class").

> The Personal Injury Class: All individuals present at Lafayette Square, defined here
> as the area in Washington, D.C. between the north side of the White House and H
> Street NW and between Madison Place and Jefferson Place NW, or the streets or
> sidewalks adjacent to or surrounding Lafayette Square (including specifically: H
> Street NW between 15th and 17th Streets NW, Vermont Avenue between H and I
> Streets NW, 16th Street between H and I Streets NW, 17th Street NW between H
> and G Streets NW, and Connecticut Avenue between H and I Streets NW), on June
> 1, 2020, at, around, or shortly after 6:30 pm, when the events described in
> paragraphs 43–64 above took place, who incurred any injury, illness, or impairment
> as the result of Defendants' actions (hereinafter, "the Personal Injury Class").

207.    The following persons and entities are excluded from the proposed classes:

Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs,

successors and wholly or partly owned subsidiaries or affiliated companies; counsel and their

employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

208.    Plaintiffs McDonald, Bond, Sanders, Scallan, Poteet, and Foley are proposed as representatives of the Personal Injury Class.

209.    Plaintiffs Sanders, Bond, Poteet, and Foley are proposed as representatives of the Injunctive Relief Class.

210.    Each of the proposed classes meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4).

211.    The members of each class are so numerous that joinder is impracticable. The crowd assembled on June 1, 2020 at Lafayette Square and the streets and sidewalks around the Lafayette Square included hundreds, perhaps thousands of people. At approximately 6:30 pm, or shortly thereafter, Defendants used physical force, chemical irritants (i.e., tear gas, pepper spray, pepper balls, and/or other inhalants), and impact munitions to force these individuals to cease all protesting activity, disassemble, and leave Lafayette Square and the surrounding areas immediately or face arrest.

212.    Defendants dispersed these chemical irritants throughout the crowd and thereby assaulted a significant number of people. Moreover, there were hundreds of law enforcement officers in attendance, many wielding riot shields and batons, and many shooting rubber bullets or other impact munitions. The number of people assaulted by these individuals is therefore also numerous, particularly given the sudden and unannounced manner in which law enforcement overran and attacked the protesters.

213.    Representative Plaintiffs' claims are typical of the claims of all class members. Representative Plaintiffs' claims arise out of the same events and course of conduct that gives

rise to the claims of the other class members. Representative Plaintiffs and all class members had their constitutional rights violated and were harmed by the same wrongful conduct. Representative Plaintiffs and the Injunctive Relief Class are, additionally, subject to similar harm in the future.

214.   Representative Plaintiffs will fairly and adequately protect and represent the interests of the classes. Representative Plaintiffs' interests are coincident with, and not antagonistic to, those of the classes. In addition, Representative Plaintiffs are represented by counsel who are experienced and competent in the prosecution of civil rights litigation and have particular expertise with respect to class actions based on civil rights violations.

215.   Questions of law and fact common to the classes include:

a.     whether the Classes were entitled under the First Amendment to peacefully demonstrate at that time and location;

b.     whether and to what extent the use of force on the Classes was premeditated and planned in advance;

c.     whether law enforcement officers adequately informed protesters that they should disperse or leave Lafayette Square on June 1, 2020 before using force against them;

d.     whether law enforcement officers rushed and attacked the protesters who had assembled at Lafayette Square on June 1, 2020;

e.     whether and to what extent law enforcement officers' conduct was justified by a government interest and appropriately tailored to that interest;

f.     what the rules of engagement issued to law enforcement officers were and who authorized them;

g.     who authorized the use of flash-bang shells, tear gas, smoke canisters, pepper balls, other chemical irritants, rubber bullets and/or other projectiles on the crowd;

h.     whether and to what extent law enforcement officers fired flash-bang shells, tear gas, smoke canisters, pepper balls, and/or rubber bullets into the crowd;

i.     whether and to what extent the law enforcement officers' use of force on the Classes was related to the President's photo opportunity at St. John's Church immediately after these events;

j.  whether Defendants encouraged the use of force to remove protesters, such as those included within the Classes, from Lafayette Square;

k.  whether and to what extent the use of force to overrun and disperse the peaceful protest at Lafayette Square violated the First Amendment rights of the Class members to assemble, speak and petition the government;

l.  whether and to what extent the use of physical force to overrun and disperse a peaceful protest violated the rights of the Class members under the Fourth Amendment to be free from unreasonable seizures;

m.  whether Defendants acted in reckless or callous indifference to the rights of the Class members;

n.  whether Defendants, including but not limited to the President and Attorney General Barr, acted because of the viewpoints being expressed by the protesters;

o.  whether the acts of Defendants targeted Black people and their supporters in violation of 42 U.S.C. § 1985(3);

p.  whether the failure of law enforcement officers to stop Defendants' violations of 42 U.S.C. § 1985(3) violated 42 U.S.C. § 1986;

q.  whether and to what extent Defendants' actions may impair or threaten future activities protected by the First Amendment; and

r.  what equitable and injunctive relief for the Injunctive Relief Class is warranted.

216.  Questions of law and fact common to members of each class will predominate over any questions that may affect only individual class members because Defendants have acted on grounds generally applicable to members of the classes.

217.  Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in the same forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that

44

**JA113**

might not be practicable to pursue individually, substantially outweigh any difficulties that may

arise in the management of this class action.

218.    Class treatment is also manageable, and Plaintiffs know of no management

difficulties that would preclude class certification in this case.

219.    Representative Plaintiffs reserve the right to seek to certify common questions

related to Defendants' knowledge, intent, and actions.

## CLAIMS FOR RELIEF

### CLAIM 1:
### VIOLATION OF FIRST AMENDMENT RIGHTS TO SPEECH, ASSEMBLY, AND PETITION/*BIVENS*

**(Plaintiffs Sanders, J.N.C., McDonald, Bond, Scallan, Poteet, Foley, and E.X.F., and the Personal Injury Class, against Defendants Barr, Adamchik, Seberling, USPP A702, USPP A704, USPP A706, USPP B714, USPP C723, USPP S735, USPP JD97, USPP LP71, USPP SK10, and John Does 1–100)**

220.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury

Class.

221.    The actions of Defendants Seberling, USPP A702, USPP A704, USPP A706,

USPP B714, USPP C723, USPP S735, USPP JD97, USPP LP71, USPP SK10, and John Does 1–

100—namely, the suppression of a peaceful demonstration and the viewpoint it represented—

and the actions of Defendants Barr and Adamchik in ordering such suppression, deprived

Plaintiffs and the Personal Injury Class of their rights under the First Amendment to the United

States Constitution to freedom of speech, freedom of assembly, and freedom to petition the

government for a redress of grievances.

222.    Defendants deliberately violated well-established protections for the exercise of

speech and assembly in public places.

223.    Defendants' actions were based on and/or taken in retaliation for the viewpoint being expressed by the demonstrators.

224.    Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' and the Personal Injury Class's First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest. Even assuming, arguendo, that there was a government interest in clearing Lafayette Square of demonstrators, Defendants' actions were not narrowly tailored to serve that government interest in a lawful manner.

225.    Defendants are jointly and severally liable to Plaintiffs and the Personal Injury Class pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for this violation of their rights.

226.    Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

**CLAIM 2:**
**VIOLATION OF FOURTH AMENDMENT RIGHT TO FREEDOM FROM**
**UNREASONABLE SEIZURE/*BIVENS***

**(Plaintiffs Sanders, J.N.C., McDonald, Bond, Scallan, Poteet, Foley, and E.X.F., and the Personal Injury Class, against Defendants Barr, Adamchik, Seberling, USPP A702, USPP A704, USPP A706, USPP B714, USPP C723, USPP S735, USPP JD97, USPP LP71, USPP SK10 and John Does 1–100)**

227.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury Class.

228.    The actions of Defendants Seberling, USPP A702, USPP A704, USPP A706, USPP B714, USPP C723, USPP S735, USPP JD97, USPP LP71, USPP SK10, and John Does 1–100—namely, the use of physical force, including but not limited to chemical agents, frightening loud munitions, batons and shields, and a physical charge at Plaintiffs themselves in order to

forcibly cause their movement to halt or force them to move from the area in and around

Lafayette Square, without a warrant or probable cause—and the actions of Defendants Barr and

Adamchik, in ordering such uses of force, violated the rights of Plaintiffs and the Personal Injury

Class under the Fourth Amendment to the United States Constitution to be free from

unreasonable seizures.

229.    Defendants are jointly and severally liable to Plaintiffs and the Personal Injury

Class pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403

U.S. 388 (1971), for this violation of their rights.

230.    Defendants acted with reckless or callous indifference to the federally protected

rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

**CLAIM 3:**
**FIRST AMENDMENT/THREATENED VIOLATION OF FREEDOMS OF SPEECH,**
**ASSEMBLY, AND PETITION**

**(Plaintiffs Black Lives Matter D.C., Sanders, Bond, Poteet, Foley, and E.X.F., and the**
**Injunctive Relief Class against Defendants Trump, Barr, Esper, Monahan, Murray,**
**Walker, and Carvajal)**

231.    Plaintiffs bring this claim on their own behalf and on behalf of the Injunctive

Relief Class.

232.    Defendants' practice of deploying physical force against demonstrators to remove

them from places in which they have gathered with others to express their political opinions, as

manifested by their actions against Plaintiffs and class members in and around Lafayette Square

on June 1, 2020, by their repeated threats to deploy violence against protesters demonstrating

against racial injustice generally and in D.C. specifically, and by President Trump's statements at

¶¶ 53–64, threatens Plaintiffs and the Injunctive Relief Class with violations of their First

Amendment rights to freedom of speech and assembly when they carry out their stated intention

to return to Lafayette Square to express their political views.

47

**JA116**

233.    By depriving Plaintiffs and the Injunctive Relief Class of the opportunity to express their views on such future occasions, Defendants will impose irreparable harm upon Plaintiffs and the Injunctive Relief Class.

234.    Plaintiff Black Lives Matter D.C. also faces the continuing harm of diverting resources to protect its members' and supporters' ability to engage in free speech and assembly, in response to Defendants' practices. Its effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by Defendants' threats of unjustified violence.

235.    The Court has inherent equitable power to enjoin violations of federal law by federal officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

**CLAIM 4:**
**FOURTH AMENDMENT/THREATENED UNREASONABLE SEIZURE**

**(Plaintiffs Black Lives Matter D.C., Sanders, Bond, Poteet, Foley, and E.X.F., and the Injunctive Relief Class against Defendants Trump, Barr, Esper, Monahan, Murray, Walker, and Carvajal)**

236.    Plaintiffs bring this claim on their own behalf and on behalf of the Injunctive Relief Class.

237.    Defendants' practice of deploying physical force without provocation, warning, or legal grounds to do so, against demonstrators to force them to halt or to move, as manifested by their actions against Plaintiffs and class members in and around Lafayette Square on June 1, 2020, by their repeated threats to deploy violence against protesters demonstrating against racial injustice generally and in D.C. specifically, and by President Trump's statements at ¶¶ 53–64, threatens Plaintiffs and the Injunctive Relief Class with unreasonable seizures in violation of their Fourth Amendment rights when they carry out their stated intent to return to Lafayette Square when it is again open to the public to express their political views.

238.    By subjecting Plaintiffs and the Injunctive Relief Class to such unreasonable seizures, Defendants will impose irreparable harm upon Plaintiffs and the Injunctive Relief Class.

239.    Plaintiff Black Lives Matter D.C. also faces imminently the continuing harm of diverting resources to protect its members and supporters from unreasonable seizures in responses to Defendants' practices. Its effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by Defendants' threats of unjustified violence.

240.    The Court has inherent equitable power to enjoin violations of federal law by federal officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

## CLAIM 5:
## VIOLATION OF 42 U.S.C. § 1985(3) (CONSPIRACY TO DEPRIVE RIGHTS)

### (all Plaintiffs, including both Classes, against all Defendants)

241.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury and Injunctive Relief Classes.

242.    Defendants conspired together to deprive Plaintiffs and all class members of their civil rights in violation of 42 U.S.C. § 1985(3).

243.    The conspiracy included those involved with law enforcement actions in and around Lafayette Square on June 1, 2020 between 6:00 and 7:00 pm including all Defendants.

244.    The conspirators engaged in overt acts in furtherance of the conspiracy, including but not limited to using violent force against civil rights activists in and around Lafayette Square.

245.    This conspiracy targeted Black people and their supporters. Both groups are protected classes under 42 U.S.C. § 1985(3).

49

**JA118**

246.    President Trump, Defendant Barr, and Defendant Esper directed the conspiracy to take these actions because of their adverse effects upon an identifiable group—namely, Black activists and their supporters.

247.    The remaining Defendants participated in, advised, supported, and/or helped advance the conspiracy.

248.    The conspiracy targeted protected rights of Plaintiffs and all class members, who are civil rights activists.

249.    The conspiracy targeted Plaintiffs' and all class members' protected First Amendment activities because Defendants do not like Plaintiffs' and the Personal Injury Class members' viewpoints. The violent actions of the conspirators directly and unlawfully interfered with these activities.

250.    The conspiracy targeted Plaintiffs' and all class members' right to be free from unreasonable seizures under the Fourth Amendment. The violent actions of the conspirators directly and unlawfully interfered with these rights.

251.    The conspiracy targeted and violently interfered with Plaintiffs' and all class members' right to use public accommodations, and therefore their right to be free from the badges and incidents of slavery. Lafayette Square and its environs are a place of public accommodation.

252.    The conspiracy targeted and violently interfered with Plaintiffs' and all class members' right to be free from racial violence, as protected by the Thirteenth Amendment of the United States Constitution.

253.    The individual-capacity Defendants are liable under § 1985(3) for damages, and the official-capacity Defendants should be enjoined from further violations.

254.    The individual-capacity Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and class members and therefore are liable for punitive damages.

**CLAIM 6:**
**VIOLATION OF 42 U.S.C. § 1986 (FAILURE TO PREVENT A CONSPIRACY TO DEPRIVE RIGHTS)**

**(all Plaintiffs, including both Classes, against all Defendants)**

255.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury and Injunctive Relief Classes.

256.    Defendants violated 42 U.S.C. § 1986 by failing to meet their duty to prevent or aid in preventing conspiracies to deprive civil rights. Defendants knew that a Section 1985 violation was about to occur or was occurring, had the power to prevent or aid in preventing it, and neglected or refused to prevent or aid in preventing it.

257.    Law enforcement's failure to stop unlawful violence by a Section 1985(3) conspiracy when they know it is about to occur is a quintessential Section 1986 violation.

258.    As discussed above, the Section 1985 conspiracy consisted of using violence against peaceful civil rights activists. Defendants knew that such violence was planned and could have taken actions to stop or limit that violence. Defendants willfully or negligently took no such action.

259.    Defendants could and should have refused to comply with unlawful orders, refused to use force when clearing Lafayette Square and the surrounding area, refused to order or allow officers or soldiers under their command to carry out unlawful acts, affirmatively ordered officers or soldiers under their command to shield the demonstrators from unlawful acts, or attempted to appeal to superiors to take a different course of action.

**JA120**

260.    As a result of Defendants' failure to prevent or aid in preventing the Section 1985 conspiracy, Plaintiffs and all class members were injured, and their rights were violated.

261.    The individual-capacity Defendants are liable under § 1985(3) for damages, and the official-capacity Defendants should be enjoined from further violations.

262.    The individual-capacity Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and class members and therefore are liable for punitive damages.

**CLAIM 7:**
**VIOLATION OF FIRST AMENDMENT RIGHTS TO SPEECH, ASSEMBLY, AND PETITION/42 U.S.C. § 1983**

**(Plaintiffs Foley and E.X.F., and the Personal Injury Class, against Defendants Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John Roes 1–50)**

263.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury Class.

264.    The actions of Defendants Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John Roes 1–50—namely, the suppression of a peaceful demonstration and the viewpoint it represented—and the actions of Defendants Carroll and Alioto in directing and overseeing these actions, deprived Plaintiffs and the Personal Injury Class of their rights under the First Amendment to the United States Constitution to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

265.    Defendants deliberately violated well-established protections for the exercise of speech and assembly in public places.

266.    Defendants' actions were based on and/or taken in retaliation for the viewpoint being expressed by the demonstrators.

52

**JA121**

267.    Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' and the Personal Injury Class's First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest. Even assuming, arguendo, that there was a government interest in clearing Lafayette Square and its vicinity of demonstrators, Defendants' actions were not narrowly tailored to serve that government interest in a lawful manner.

268.    Defendants are jointly and severally liable to Plaintiffs and the Personal Injury Class pursuant to 42 U.S.C. § 1983 for this violation of their rights.

269.    Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

## CLAIM 8:
## VIOLATION OF FOURTH AMENDMENT RIGHT TO FREEDOM FROM UNREASONABLE SEIZURE/42 U.S.C. § 1983

**(Plaintiffs Foley and E.X.F., and the Personal Injury Class, against Defendants Carroll, Alioto, Thau and John Roes 1–50)**

270.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury Class.

271.    The actions of Defendants Thau and John Roes 1–50—namely, the use of physical force, including but not limited to chemical agents in order to forcibly cause Plaintiffs' and Personal Injury Class members' movement to halt or to force them to move from the area around Lafayette Square, without a warrant or probable cause—and the actions of Defendants Carroll and Alioto in directing and overseeing these actions, violated the rights of Plaintiffs and the Personal Injury Class under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures.

272.    Defendants are jointly and severally liable to Plaintiffs and the Personal Injury

Class pursuant to 42 U.S.C. § 1983 for this violation of their rights.

273.    Defendants acted with reckless or callous indifference to the federally protected

rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

**CLAIM 9:**
**FIRST AMENDMENT/THREATENED VIOLATION OF FREEDOMS OF SPEECH,
ASSEMBLY, AND PETITION/42 U.S.C. § 1983**

**(Plaintiffs Black Lives Matter D.C., Sanders, Bond, Poteet, and Foley, and the Injunctive
Relief Class, against Defendant Newsham)**

274.    Plaintiffs bring this claim on their own behalf and on behalf of the Injunctive

Relief Class.

275.    The actions of Defendants Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy,

Payne, Taylor, Thau, Willis, and John Roes 1–50 near Lafayette Square on June 1 resulted from

the District of Columbia's deliberately indifferent failure to train and/or supervise MPD officers

regarding the appropriate circumstances in which to deploy chemical irritants. The prior

incidents of MPD's use of excessive force during demonstrations, many of which involved

chemical irritants and were related to Presidential events, made the need for training so obvious

and the violation of Plaintiffs' rights so likely, that the District was deliberately indifferent to the

risk of constitutional violations.

276.    This failure to train or supervise, in conjunction with the regular coordination

between MPD and federal law enforcement, who, as discussed, have threatened to deploy

violence against protesters demonstrating against racial injustice generally and in D.C.

specifically, threatens Plaintiffs and the Injunctive Relief Class with violations of their First

Amendment rights to freedom of speech and assembly when they carry out their stated intention

to return to Lafayette Square and the surrounding area to express their political views.

277.    By depriving Plaintiffs and the Injunctive Relief Class of the opportunity to express their views on such future occasions, Defendant Newsham and MPD will impose irreparable harm upon Plaintiffs and the Injunctive Relief Class.

278.    Plaintiff Black Lives Matter D.C. also faces the continuing harm of diverting resources to protect its members' and supporters' ability to engage in free speech and assembly, in response to the threat of excessive force by MPD. Black Lives Matter D.C.'s effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by the threat of unjustified violence.

279.    Injunctive relief is authorized under 42 U.S.C. § 1983.

## CLAIM 10:
## FOURTH AMENDMENT/THREATENED UNREASONABLE SEIZURE/42 U.S.C. § 1983

**(Plaintiffs Black Lives Matter D.C., Sanders, Bond, Poteet, and Foley, and the Injunctive Relief Class, against Defendant Newsham)**

280.    Plaintiffs bring this claim on their own behalf and on behalf of the Injunctive Relief Class.

281.    The actions of Defendants Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John Roes 1–50 near Lafayette Square on June 1 resulted from the District of Columbia's deliberately indifferent failure to train and/or supervise MPD officers regarding the appropriate circumstances in which to deploy chemical irritants. The prior incidents of MPD's use of excessive force during demonstrations, many of which involved chemical irritants and were related to Presidential events, made the need for training so obvious and the violation of Plaintiffs' rights so likely, that the District was deliberately indifferent to the risk of constitutional violations.

55

**JA124**

282.    This failure to train or supervise, in conjunction with the regular coordination between MPD and federal law enforcement, who, as discussed, have threatened to deploy violence against protesters demonstrating against racial injustice generally and in D.C. specifically, threatens Plaintiffs and the Injunctive Relief Class with violations of their Fourth Amendment rights to be free from unreasonable seizures when they carry out their stated intention to return to Lafayette Square and the surrounding area to express their political views.

283.    By subjecting Plaintiffs and the Injunctive Relief Class to such unreasonable seizures, Defendant Newsham and MPD will impose irreparable harm upon Plaintiffs and the Injunctive Relief Class.

284.    Plaintiff Black Lives Matter D.C. also faces imminently the continuing harm of diverting resources to protect its members and supporters from unreasonable seizures in response to the threat of excessive force by MPD. Black Lives Matter D.C.'s effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by threats of unjustified violence.

285.    Injunctive relief is authorized under 42 U.S.C. § 1983.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully pray that the Court:

286.    Certify the case as a class action on behalf of the proposed Classes;

287.    Designate Plaintiffs McDonald, Bond, Sanders, Scallan, Poteet, and Foley as representatives of the Personal Injury Class;

288.    Designate Plaintiffs Sanders, Bond, Poteet, and Foley as representatives of the Injunctive Relief Class;

289.    Designate Plaintiffs' counsel as Class Counsel;

**JA125**

290.    Issue a judgment declaring that the acts of Defendants described herein violate the First Amendment, the Fourth Amendment, 42 U.S.C. §§ 1983, 1985, and 1986;

291.    Issue an injunction ordering Defendants Barr, Esper, Monahan, Murray, Walker, Carvajal, and Newsham to cease engaging in the unlawful acts described herein;

292.    Award compensatory and punitive damages to Plaintiffs and the Personal Injury Class according to proof at trial, including damages for pain and suffering;

293.    Award costs of suit and attorney's fees; and

294.    Provide such other and further relief as the Court may deem just, proper, and appropriate.

## JURY DEMAND

295.    Plaintiffs request a trial by jury on any and all issues raised by this Complaint which are triable by right of a jury.


Dated September 1, 2020                    Respectfully submitted,

                                           /s/ Kaitlin Banner
                                           _____

                                           Kaitlin Banner (D.C. Bar No. 1000436)
                                           Tristin Brown (D.C. Bar No. 1671642)
                                           Dennis Corkery (D.C. Bar No. 1016991)
                                           Hannah Lieberman (D.C. Bar No. 336776)
                                           Jonathan Smith (D.C. Bar No. 396578)
                                           WASHINGTON LAWYERS'
                                           COMMITTEE FOR CIVIL RIGHTS AND
                                           URBAN AFFAIRS
                                           700 14th Street, NW, Suite 400
                                           Washington, D.C. 20005
                                           Phone: (202) 319-1000
                                           Fax: (202) 319-1010
                                           kaitlin_banner@washlaw.org
                                           tristin_brown@washlaw.org
                                           dennis_corkery@washlaw.org
                                           hannah_lieberman@washlaw.org
                                           jonathan_smith@washlaw.org

**JA126**

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org
aspitzer@acludc.org
mperloff@acludc.org

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)*
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Noah Baron (D.C. Bar No. 1048319)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
aago@lawyerscommittee.org
dspence@lawyerscommittee.org
dbrody@lawyerscommittee.org
agordon@lawyerscommittee.org
nbaron@lawyerscommittee.org

*Application to this Court pending

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Thomas D. McSorley (D.C. Bar No. 1001890)
Sonia Tabriz (D.C. Bar No. 1025020)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com
David.Kouba@arnoldporter.com
Tom.McSorley@arnoldporter.com
Sonia.Tabriz@arnoldporter.com

**JA127**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RADIYA BUCHANAN
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

ANN DAGRIN
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

LINDSAY FIELD
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

*Plaintiffs*,

    v.

DONALD J. TRUMP,
In his official capacity as
President of the United States
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500;

WILLIAM P. BARR,
In his individual capacity and official capacity as
U.S. Attorney General
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530;

MARK T. ESPER,
In his official capacity as
U.S. Secretary of Defense
1400 Defense Pentagon
Washington, D.C. 20301;

MAJOR GENERAL WILLIAM J. WALKER
In his official capacity as
Commanding General of the District of
Columbia National Guard
2001 E. Capitol Street, S.E.
Washington, D.C. 20003;

**Case No. 20-cv-1542-DLF**

GREGORY T. MONAHAN
In his individual capacity and official capacity as
Acting Chief of the United States Park Police
1100 Ohio Drive, S.W.
Washington, D.C. 20242;

JAMES M. MURRAY
In his official capacity as
Director, U.S. Secret Service
950 H Street, N.W., Suite 7800
Washington, D.C. 20223;

MICHAEL CARVAJAL
In his official capacity as
Director of the Federal Bureau of Prisons
320 First Street, N.W.
Washington, D.C. 20534;

RUSSELL FENNELLY,
In his individual capacity and official capacity as
Captain of the United States Park Police,
1100 Ohio Drive, S.W.
Washington, D.C. 20242;

MARK ADAMCHIK,
In his individual capacity and official capacity as
Incident Commander of the United States Park
Police,
1100 Ohio Drive, S.W.
Washington, D.C. 20242;

FNU SEBERLING,
In his individual capacity and official capacity as an
officer of the United States Park Police,
c/o United States Park Police,
1100 Ohio Drive, S.W.
Washington, D.C. 20242;

PETER NEWSHAM
In his official capacity as
Chief of the Metropolitan Police Department of the
District of Columbia
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

1

**JA129**

JEFFERY CARROLL
In his individual capacity and official capacity as
Assistant Chief of Metropolitan Police Department of
the District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

ANTHONY ALIOTO
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

S. BUCHANAN
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

FNU HARGROVE
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

C. W. MEYER
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

CLIFTON MURPHY
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department

300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

THOMAS PAYNE
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

FNU TAYLOR
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

DANIEL THAU
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

ANTHONY A. WILLIS
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

WAYNE VINCENT
In his individual capacity and official capacity as a
captain of the Arlington County Police Department,
c/o Arlington County Police Department
1425 N Courthouse Rd,
Arlington, VA 22201

RYAN BLACK,
In his individual capacity and official capacity as an
officer of the Arlington County Police Department,
c/o Arlington County Police Department

3

**JA131**

1425 N Courthouse Rd,
Arlington, VA 22201

RYAN ALLEN,
In his individual capacity and official capacity as an
officer of the Arlington County Police Department,
c/o Arlington County Police Department
1425 N Courthouse Rd,
Arlington, VA 22201

JOHN & JANE DOES 1–50;

JOHN & JANE POES 1-50;

and

JOHN & JANE ROES 1-50,

*Defendants.*

## FIRST AMENDED COMPLAINT

1.      This case concerns a day that will live in infamy.  It's the day that our federal executive branch unleashed a military and paramilitary force on a band of peaceful protesters assembled in historic Lafayette Park across from the White House.  The officials, wielding batons, sprayed the crowd with tear gas, flash-bang grenades, smoke bombs, and rubber bullets, causing frightened protesters to flee, fearing for their lives and hobbled by their injuries.  And what prompted this military attack on peaceful civilian targets?  President Trump's desire to walk through the park a few minutes later to stage a photo-op publicity stunt holding a bible as a political prop in front of a nearby church.  It was a gross abuse of executive power that violated First Amendment free speech rights, Fourth Amendment protections against unreasonable force, Fifth Amendment due process rights, and long-standing federal law prohibiting use of such military force on domestic targets.  This must never happen again.

2.      On June 1, 2020, peaceful protesters gathered in Lafayette Park, a public park adjacent to the White House, to call for racial justice and police reform following the recent homicide of George Floyd and too many other black people at the hands of law enforcement.  The atmosphere in the park that day was peaceful, with some people singing, some dancing, and others kneeling in silence.  Some protesters had even brought their young children and pets.  They carried signs with messages like "Black Lives Matter" and "I Can't Breathe," and called on local police officers present to take a knee in solidarity with the protests.  Others questioned why the police wore militarized equipment, chanting "We don't see a riot here.  Why are you in riot gear?"

3.      Lafayette Park—the people's park—is situated at the White House's doorstep.  It provides a unique and important venue for protesters to have their grievances heard by the President of the United States and the nation's other most powerful leaders.  Although it was once used as a place to sell and house slaves, it has since been the site of many of the most influential protests in American history, including the Women's Suffrage Protests of the early 1900s, the Civil Rights Protests of the mid-1960s, and the Vietnam War Protests of the late 1960s and early 1970s.  Those protesters could not be ignored, peaceably assembling within earshot of Presidents and in plain view of the White House.  Lafayette Park is one of the few places in the country where the American people can speak to the executive branch directly.  It is for this reason that courts in this District have called Lafayette Park one of the "most conspicuous public for[a] in the nation," and a truly "unique situs for the exercise of First Amendment rights."  Thus, it came as no surprise that, as demands for racial justice recently swept the country, peaceful protesters once again made their way to Lafayette Park to speak directly to the President and the nation.

4.      As the peaceful protests that day continued into the early evening of June 1, 2020, President Trump, unbeknownst to the protesters, was preparing himself to cross through Lafayette

Park en route to a photo opportunity in front of nearby St. John's Episcopal Church across the street.  At that time, members of the United States Park Police, the United States Secret Service, the District of Columbia National Guard, the Bureau of Prisons, Metropolitan Police Department, Arlington County Police Department, and others who appeared to be military were already surrounding the protesters.  Indeed, the President had recently deployed active duty troops to Washington, D.C., in an effort to suppress protests.  Just minutes before the President arrived at Lafayette Park, Attorney General Barr, at the behest of the President, ordered these military and paramilitary forces to clear Lafayette Park.

5.      Suddenly and without warning, this military force launched a vicious attack on the protesters that one witness, a military veteran, described as "like being back in combat."  The police—wearing riot gear, wielding batons, carrying firearms, and displaying "Military Police" shields—released a gaseous chemical irritant that the federal government later claimed wasn't "tear gas," even though it caused tears.  The officers, some of whom were on horseback, fired rubber bullets into the crowd, as the bruises and welts all over protesters' bodies confirmed.  And the officers threw flash-bang grenades and smoke bombs into the crowd, filling the air with fire and smoke, and leaving protesters burned in their wake.  The scene was utter chaos, with many screaming as they ran for cover, others vomiting or blinded by the tear gas, and some trampled by horses and the crush of the fleeing crowd.

6.      The federal government's actions drew condemnation from across the political spectrum.  General James Mattis, President Trump's former Secretary of Defense, wrote that he never "dream[ed] that troops taking th[e] [] oath [to defend the United States Constitution] would be ordered under any circumstance to violate the Constitutional rights of their fellow citizens— much less to provide a bizarre photo op for the elected commander-in-chief, with military

leadership standing alongside." And the Right Reverend Mariann Budde, Bishop of the Episcopal Diocese of Washington, stated that she was "outraged" that she "was not given even a courtesy call that they would be clearing [Lafayette Park] with tear gas so they could use one of our churches as a prop, holding a Bible, one that declares that God is love and when everything [the President] has said and done is to inflame violence."

7.     For his part, President Trump has "no regrets"  about this attack on peaceful protesters in the shadow of the White House.  In fact, the next day, he lauded the "domination" and "overwhelming force" that was used on these peaceful protesters, and he congratulated himself in the third person for deploying it, tweeting ***"thank you President Trump***!" And on the very morning Plaintiffs filed this action (June 11, 2020), President Trump tweeted: "Our great National Guard Troops who took care of the area around the White House could hardly believe how easy it was.  'A walk in the park', one said.  The protesters, agitators, anarchists (ANTIFA), and others, were handled VERY easily by the Guard, D.C. Police, & S.S. GREAT JOB!"  Later that morning, though, General Mark Milley, the Chairman of the Joint Chiefs of Staff, publicly apologized for his role in the Lafayette Park incident: "I should not have been there.  My presence in that moment and in that environment created a perception of the military involved in domestic politics.  As a commissioned uniformed officer, it was a mistake that I have learned from, and I sincerely hope we all can learn from it."

8.     There was no justification, however, for this brutal attack on peaceful civilian targets.  In fact, Attorney General Barr has effectively conceded that the violence was unnecessary—admitting that "[t]his was not an operation to respond to that particular crowd."  The media and others captured on video the passionate but peaceful nature of this protest, followed by officers' assault on protesters.  Videos of the incident itself confirmed the timing; officers began

using munitions on peaceful protesters approximately 25 minutes *before* a curfew set by the District of Columbia was about to go into effect, meaning they could not have been enforcing any curfew violation, as the White House later claimed. Similarly, the other justifications that federal officials offered for their conduct—that, for instance, they wanted to expand the White House security perimeter, or that the President needed space to walk to his photo op in front of St. John's Episcopal Church—fail to explain or justify the violence used or the park's closing. Indeed, by that rationale, it seems these protesters were removed simply because they were there, impeding the President's path to his staged media event. But it also seems they were removed simply because they were offering a message of racial justice and equality different from the President's. Indeed, the President has described racial justice protesters as "thugs" who need to be "dominat[ed,]" while earlier characterizing neo-Nazi rallies in Charlottesville, Virginia, as the grievances of "very fine people" on both sides.

9.    A whistleblower—a National Guardsman who had been present at Lafayette Park on June 1—may have put it best when he testified before Congress in late July about the Defendants' attack on the peaceful protesters:

> Having served in a combat zone, and understanding how to assess threat environments, at no time did I feel threatened by the protesters or assess them to be violent. In addition, considering the principles of proportionality of force and the fundamental strategy of graduated responses specific to civil disturbance operations, it was my observation that the use of force against demonstrators in the clearing operation was an unnecessary escalation of the use of force. From my observation, those demonstrators—our fellow American citizens—were engaged in the peaceful expression of their First Amendment rights. Yet they were subjected to an unprovoked escalation and excessive use of force.

10.    The whistleblower is right. The decision to disperse these peaceful protesters in Lafayette Park so suddenly and violently was arbitrary, unlawful, and unconstitutional for many independent reasons. *First*, it violates the First Amendment's guarantees of free speech and

peaceable assembly.  It was an all-out assault on core democratic freedoms the Founders embedded into the Constitution.  And it was undertaken for no rational reason, let alone any compelling one, as the Constitution requires.  *Second*, the attack on protesters violates the Fourth Amendment's prohibition on unlawful seizures and the unreasonable use of force.  *Third*, this attack on protesters violates the Due Process Clause of the Fifth Amendment by depriving them of their First Amendment expressive liberty interests arbitrarily and through egregiously excessive force.  If ever there was a case that "shocks the conscience" sufficient to demonstrate a Due Process violation, this would be it.  *Fourth*, these federal officials' conduct was *ultra vires*, as the protesters were attacked by unlawfully deployed troops sent to Washington, D.C. in violation of the Posse Comitatus Act, 18 U.S.C. § 1385.

11.    "[P]eaceful opposition is guaranteed to [the American] people and is recognized as a symbol of independent thought containing the promise of progress."  *Stromberg v. People of State of Cal.*, 283 U.S. 359, 366 (1931).  That federal officials, including the President and the Attorney General, sanctioned an attack on a group of unarmed peaceful American protesters is tantamount to an attack on American democracy. They must be held accountable for these unconscionable acts.  And Lafayette Park, fenced off immediately after this horrifying incident, must remain open to the public, including those who want to peaceably assemble there.  To those who thought such an atrocity couldn't happen here, it now has.  But never again.

**PARTIES**

12.    Plaintiff Radiya Buchanan is a resident of Washington, D.C., who was demonstrating peaceably in Lafayette Park on June 1, 2020.

13.    Plaintiff Ann Dagrin is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Park on June 1, 2020.

14.    Plaintiff Lindsay Field is a resident of Washington, D.C., who was demonstrating peaceably in Lafayette Park on June 1, 2020.

15.    Defendant Donald J. Trump is the President of the United States.  He is sued his official capacity.

16.    Defendant William P. Barr is the Attorney General of the United States.  He is sued in his official capacity and his individual capacity.

17.    Defendant Mark T. Esper is the United States Secretary of Defense.  He is sued in his official capacity.

18.    Defendant William J. Walker is the Commanding General of the District of Columbia National Guard.  He is sued in his official capacity.

19.    Defendant Gregory Monahan is the Acting Chief of the United States Park Police. He is sued in his official capacity and his individual capacity.

20.    Defendant James M. Murray is the Director of the United States Secret Service.  He is sued in his official capacity.

21.    Defendant Michael Carvajal is the Director of the Federal Bureau of Prisons. He is sued in his official capacity.

22.    Defendant Peter Newsham is the Chief of the District of Columbia Metropolitan Police Department.  He is sued in his official capacity.

23.    Russell Fennelly is a Captain of the United States Park Police.  He is sued in his official capacity and his individual capacity.

24.    Defendant Mark Adamchik is the Incident Commander of the United States Park Police.  He is sued in his official capacity and his individual capacity.

25.    Defendant FNU (First Name Unknown) Seberling is an officer of the United States Park Police.  He is sued in his individual capacity and his official capacity.

26.    Defendant Anthony Alioto is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

27.    Defendant S. Buchanan (helmet number 4790) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

28.    Defendant Jeffery Carroll is an Assistant Chief of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

29.    Defendant FNU (First Name Unknown) Hargrove (helmet number 3176) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

30.    Defendant C. W. Meyer (helmet number 4895) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

31.    Defendant Clifton Murphy (helmet number S800) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

32.    Defendant Thomas Payne (helmet number 5751) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

33.    Defendant FNU (First Name Unknown) Taylor (helmet number 5705) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

34.    Defendant Daniel Thau is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

35.     Defendant Anthony A. Willis (helmet number 5453) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

36.     Defendant Wayne Vincent is a captain in the Arlington County Police Department. He is sued in his official capacity and his individual capacity.

37.     Defendant Ryan Black is an officer of the Arlington County Police Department. He is sued in his official capacity and his individual capacity.

38.     Defendant Ryan Allen is an officer of the Arlington County Police Department.  He is sued in his individual capacity and his official capacity.

39.     Defendants John and Jane Does Nos. 1–50 are members of the federal law enforcement agencies who were present in Lafayette Park on the evening of June 1, 2020, and authorized, planned, and participated in the violent attack on Plaintiffs and other protesters in the park.  On information and belief, included among John and Jane Does are United States Park Police Officers wearing helmet numbers A702, A704, A706, B714, C711, C723, and S735 and arm patch numbers BT09, JD97, and SK10, all of whom personally cleared protesters from Lafayette Park through means such as wielding shields and batons and charging protesters. They are sued in their official capacities and their individual capacities.

40.     Defendants John and Jane Poes Nos. 1–50 are members of non-federal law enforcement agencies from jurisdictions other than the District of Columbia, including the Arlington County Police Department, who were present in Lafayette Park on the evening of June 1, 2020, and authorized, planned, and participated in the violent attack on Plaintiffs and other protesters in the park.  They are sued in their official capacities and their individual capacities.

41.     Defendants John and Jane Roes Nos. 1–50 are members of the Metropolitan Police Department who were present in Lafayette Park on the evening of June 1, 2020, and authorized,

planned, and participated in the violent attack on Plaintiffs and other protesters in the park.  They are sued in their official capacities and their individual capacities.

## JURISDICTION AND VENUE

42.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

43.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).  A substantial part of the events giving rise to this claim occurred in this District, and Defendants are officers of the United States sued in their official and individual capacities.

## FACTS

### *Racially Motivated Killings of Black Americans Spark Peaceful National Protests.*

44.    On May 25, 2020, George Floyd, a black man, died after a Minneapolis Police Department officer kneeled on his neck for nearly nine minutes, despite his repeated cries explaining that he could not breathe.  The police officer who held his knee to Mr. Floyd's neck, and three other officers who were present, have all since been charged with second- and third-degree murder, second-degree manslaughter, and aiding and abetting the same.  Mr. Floyd's cruel death was captured on video, sparking widespread outrage and protests around the world.

45.    Mr. Floyd's death followed on the heels of several other racially charged killings of black Americans, including the fatal shootings of Ahmaud Arbery, who was shot while jogging near his home, and Breonna Taylor, who was shot by plain-clothed police officers executing a "no-knock" search warrant in Taylor's home.  And, of course, the deaths of Mr. Floyd, Mr. Arbery, and Ms. Taylor are not isolated incidents.  In recent years, Trayvon Martin, Eric Garner, Michael Brown, Sandra Bland, Tamir Rice, Philando Castile, Botham Jean, and countless others have suffered tragic and senseless deaths, sparking protests and demonstrations in their own right.

46.      Large protests against police brutality and the differential treatment of people of color broke out, first in Minneapolis, where Mr. Floyd was killed, then in communities across the country.  Although the overwhelming majority of demonstrations were peaceful, during this time period, some localities experienced rioting, looting, and property damage.

### *The President Urges Government to Crush These Peaceful Protests Violently.*

47.      President Trump responded to the unrest occurring in some localities by publicly urging an aggressive and violent law enforcement response.  On May 29, 2020, President Trump tweeted from his official account: "Either the very weak Radical Left Mayor, Jacob Frey, get his act together and bring the City [of Minneapolis] under control, or I will send in the National Guard & get the job done right . . . .  These THUGS are dishonoring the memory of George Floyd, and I won't let that happen.  Just spoke to Governor Tim Walz and told him that the Military is with him all the way.  Any difficulty and we will assume control but, ***when the looting starts, the shooting starts.***  Thank you!"

48.      The next day, May 30, 2020, President Trump tweeted about a protest outside the White House the previous night, stating, "Big crowd, professionally organized, but nobody came close to breaching the fence.  If they had they would . . . have been ***greeted with the most vicious dogs, and most ominous weapons, I have ever seen***.  That's when people would have been really badly hurt, at least.  Many Secret Service agents just waiting for action."  Later that day, President Trump tweeted, "Crossing State lines to incite violence is a FEDERAL CRIME!  Liberal Governors and Mayors must get MUCH tougher or the Federal Government will step in and do what has to be done, and ***that includes using the unlimited power of our Military*** and many arrests.  Thank you!"  The same day he also "retweeted" another account's statement that "[t]his isn't going to stop until the good guys are willing to ***use overwhelming force*** against the bad guys."

49.    On May 31, 2020, President Trump retweeted another account's statement that "The radical-left formally divorced itself from America last night.  ***They are domestic terrorists and enemies of the United States.  They should be treated as such.***"  Later that day, President Trump announced that "The United States of America will be designating ANTIFA as a Terrorist Organization."  And on June 5, 2020, President Trump retweeted yet another statement denigrating the protesters and their message, expressing feeling "sicken[ed]" by "[t]he fact that [George Floyd] has been held up as a martyr."

***Lafayette Park:  Peaceful Protests Are Met with Police Assaults on June 1, 2020.***

50.    Large protests in Washington, D.C. began by May 29, 2020, and continued to grow over the ensuing days.  Although most of the protests were peaceful, instances of looting and vandalism did occur, including a fire that broke out in the basement of the historic St. John's Episcopal Church, adjacent to Lafayette Park, on the night of May 31, 2020.  Ultimately, Mayor Muriel Bowser of the District of Columbia announced a citywide curfew beginning at 7:00 p.m. on June 1, 2020 and ending at 6:00 a.m. on June 2, 2020.

51.    On the morning of June 1, 2020, the President held a conference call with the nation's governors regarding the protests.  Rather than discussing the protesters' grievances, the heinous murders, or the need for racial justice and systematic reform, the President, according to media accounts, "berated [several of] the nation's governors," "describ[ing] them as 'weak' in the face of growing racial unrest and urg[ed] them to take an aggressive stand against unruly protests." The President explained, "***You have to dominate.  If you don't dominate, you're wasting your time*** . . . .  They're going to run over you.  You're going to look like a bunch of jerks."  He continued, "You have to do retribution . . . .  You can't do the deal where they get one week in jail. ***These are terrorists.  These are terrorists.***"  On the same conference call, Secretary of Defense

Mark Esper stated "*[W]e need to dominate the battle space* . . . .  I think the sooner that you . . . dominate the battle space, the quicker this dissipates and we can get back to the right normal."  In all of these discussions, the "terrorists" were American protesters exercising their First Amendment freedoms.  The "battle space[s]" were American cities and public fora.

52.    As the day continued, with large protests ongoing throughout Washington, D.C., numerous protesters gathered in Lafayette Park.  Lafayette Park is located directly north of the White House.  Because of this location, Lafayette Park has long been the sight of many influential protests—including for women's suffrage and civil rights, and against the Vietnam War—among many other causes, serving as "a focal point for the expression of American ideals."  Lafayette Park has a particularly salient history of hosting protests following the extrajudicial killing of black Americans, including a thousand-person rally in Lafayette Park in August 1946 to demand that the Truman administration prosecute recent "terroristic attacks on Negro citizens," and rallies throughout the 1960s to protest similar atrocities.  With the "White House as the[] valued audience," Lafayette Park is an invaluable "stage" upon which "citizens continue to exercise their rights of free speech"—"a safe place for congregation and the demonstration of grievances."[1]  Courts have long recognized Lafayette Park as a quintessential traditional public forum.  *See, e.g.*, *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992) ("[N]o one disputes that Lafayette Park is a 'quintessential public forum.'"); *United States v. Musser*, 873 F.2d 1513, 1517 (D.C. Cir. 1989) ("Lafayette Park . . . is the type of public place traditionally associated with [the exercise of First Amendment Rights.]"); *A Quaker Action Grp. v. Morton*, 516 F.2d 717, 736 (D.C. Cir. 1975) ("[T]he White House sidewalk and Lafayette Park are 'a unique situs for the exercise of First

---

[1]  *President's Park: A History of Protest at the White House*, WHITE HOUSE HISTORICAL ASS'N, https://www.whitehousehistory.org/presidents-park-a-history-of-protest-at-the-white-house (last visited June 10, 2020).

Amendment rights' . . . ."); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 64 (D.D.C. 1988) ("Lafayette Park . . . [is] possibly the most conspicuous public forum in the Nation.").

53.     By 6:00 p.m., a large crowd of peaceful demonstrators had gathered in Lafayette Park to protest against racial injustice and police brutality. Each of the Plaintiffs were included in that crowd. By all accounts, the gathering was calm and peaceful, and the crowd included children and pets. One report emphasized that "people [were] dancing and singing to a woman playing a guitar instead of knocking over barricades."

54.     At about 6:04 p.m., the White House communications office notified reporters that an event had been added to the President's calendar—a 6:15 p.m. news briefing in the Rose Garden. Four minutes later, Attorney General William Barr arrived at Lafayette Park from the White House and appeared behind the surrounding law enforcement barricade. President Trump had appointed Attorney General Barr to lead "federal law enforcement efforts to assist in the restoration of order to the District of Columbia."[2]

55.     Shortly thereafter, Barr personally ordered law enforcement personnel to extend the security perimeter around the White House and clear the streets around Lafayette Park—directing law enforcement to clear protesters from the park. Video shows Barr giving the order to, among others, Defendant United States Park Police Captain Russell Fennelly. Members of the District of Columbia National Guard, United States Park Police mounted on horses, the Unites States Secret Service, Bureau of Prisons "riot teams," and, on information and belief, the U.S. military were all present at the scene.[3] United States Park Police Major Mark Adamchik was the "incident

---

[2]  Reuters, *U.S. Justice Dept. Deploys Its Police Agencies in Washington to Quell Rioting,* U.S. NEWS (June 1, 2020), https://www.usnews.com/news/us/articles/2020-06-01/us-justice-dept-deploys-its-police-agencies-in-washington-to-quell-rioting.

[3]  Plaintiffs cannot presently identify each officer that attacked them and other peaceful protesters in Lafayette Park, as many officers did not wear badges or even clear agency markers. The Trump Administration has also been

commander" during this event and gave directives to and had authority over other officers present.

Major Adamchik also made changes to the United States Park Police's normal "rules of engagement" for the purpose of clearing the people assembled in Lafayette Park and briefed other commanders on the rules of engagement for that day.  Defendant Monahan, who was on site, personally "concurred with the[se] change[s]."

56.     According to federal officials, sometime between 6:23 p.m. and 6:30 p.m., an officer, began giving "warnings" to the people assembled in Lafayette Park.  Several officers knelt briefly as they donned gas masks.  While some officials claimed that three "warnings" were supposedly given in total, those warnings—if given at all—were futile and inadequate.  Among other things, the "warnings" were given via a megaphone from approximately 50 yards away from the closest protesters, with many protesters located much farther away.  According to a member of the D.C. National Guard standing only 30 yards from the officer with the megaphone, the "warnings" were barely audible even at his distance.[4]  In recent weeks, in fact, multiple witnesses

---

conspicuously opaque in discussing which agencies were involved in the dispersal of protesters at Lafayette Park, prompting the chairmen of four House committees to jointly demand an answer as to "[w]hich federal agencies had a physical presence at Lafayette Park?"  Letter from Jerrold Nadler, Chairman, House Comm. on the Judiciary et al. to Attorney Gen. William Barr et al. (June 3, 2020), https://judiciary.house.gov/uploadedfiles/2020-06-03_ ltr_to_barr_esper_bernhardt_wolf_regarding_lafayette_square.pdf.  *See also* Zolan Kanno-Youngs*, Unidentified Federal Police Prompt Fears Amidst Protests in Washington*, N.Y. TIMES (June 4, 2020), https://www.nytimes. com/2020/06/04/us/politics/unidentified-police-protests.html. Plaintiffs allege on information and belief that the U.S. Military was also involved in the vicious attack on protesters given the copious use of riot shields bearing the moniker "Military Police" and given that the Pentagon ordered national guard helicopters to accost protesters in Washington, D.C. on June 1.  Thomas Gibbons-Neff & Eric Schmitt, *Pentagon Ordered National Guard Helicopters' Aggressive Response in D.C.*, N.Y. TIMES (June 6, 2020), https://www.nytimes.com/2020/06/06/ us/politics/protests-trump-helicopters-national-guard.html.  The two helicopters (a Lakota and Black Hawk) flew as low as 45 feet above street level, causing strong gusts of wind that snapped tree branches and sent debris flying. Such tactics are typically used to frighten and disperse enemy combatants in a warzone.  Alex Horton, et al., *A low-flying 'show of force'*, WASH. POST (June 23, 2020), https://www.washingtonpost.com/graphics/2020/in vestigations/helicopter-protests-washington-dc-national-guard/.

[4]  This failure to ensure that the "warnings" were audible is separately a violation of a class settlement ordered by the Honorable Emmet G. Sullivan of this Court in a case against, among others, the Metropolitan Police Department and the U.S. Park Police.  *See Barham v. Ramsey*, No. 02-cv-2283-EGS (D.D.C.), ECF No. 1040 (July 7, 2015).

have testified under oath before Congress that they did not hear any "warning" or "instructions to move" before the police "began charging forward at a sprinting pace."

57.    Minutes later, at approximately 6:35 p.m., Defendants' attack on the protesters commenced on Major Adamchik's order.  Law enforcement officers, both on foot and mounted, rushed the protesters, began striking them with riot shields and batons, shooting them with rubber bullets, and firing canisters of tear gas, smoke bombs, and flash-bang grenades into the crowd in order to clear the park.  Joined by reinforcements on horseback, military and law enforcement officers began beating people with clubs and riot shields and shooting tear gas, "stinger" balls that shoot out rubber pellets, and flash-bang grenades into the crowd—all within the span of minutes— in order to clear Lafayette Park.  On information and belief, Metropolitan Police Department Assistant Chief Jeffery Carroll and Metropolitan Police Department Officers Anthony Alioto; S. Buchanan, wearing helmet number 4790; FNU Hargrove, wearing helmet number 3176; C. W. Meyer, wearing helmet number 4895; Clifton Murphy, wearing helmet number S800; Thomas Payne, wearing helmet number 5751; FNU Taylor, wearing helmet number 5705; Daniel Thau; and Anthony A. Willis, wearing helmet number 5453, were present in Lafayette Park and personally cleared protesters by using means that included deploying tear gas, wielding batons and shields, and charging protesters.  Specifically, Carroll and Alioto directed and oversaw the deployment of the tear gas down 17th Street NW by Metropolitan Police Department Officers. Meanwhile, United States Park Police Officers mounted on horseback, including FNU Seberling, charged protesters, who were trying to escape.  Arlington County Police Department Officers, including Ryan Black and Ryan Allen, wielding police batons, also participated in the attacks under the command of Arlington County Police Department Captain Wayne Vincent.

58.     The unprovoked violence caused what news reports described as a "blind panic" as the crowd attempted to flee westward.  Chemical gasses in the air caused people to cough and vomit as they fled the scene.  Rubber bullets hit protesters, causing immense pain and lasting injuries for some.  The violent law enforcement response was captured on video from many vantage points, some of which were broadcast on live, national television.[5]  In one video, a line of Metropolitan Police Department officers walking down 17th Street NW toward G Street deployed tear gas on peaceful protesters.  In another video, two United States Park Police officers can be seen beating two Australian journalists who were covering the protest with batons and riot shields, even after they repeatedly identified themselves as media.  One of those journalists, Amelia Brace, testified before the House Committee on Natural Resources that she felt terrified and trapped given the bottleneck created by the United States Park Police line,  and that she continued to be attacked by United States Park Police officers even as she was running away.  As of July 28, 2020, these two officers were the subject of an investigation by the United States Park Police Office of Professional Responsibility.

### *President Trump Poses for Photo Opportunity at St. John's Episcopal Church.*

59.     President Trump ordered law enforcement officers to take the actions described herein in order to forcibly drive protesters from Lafayette Park.   Indeed, President Trump all but stated as much.

60.     Around 6:43 p.m., even as protesters were still being shot at and gassed just across the street, President Trump began delivering prepared remarks in the Rose Garden, in which he vowed to "protect the rights of law-abiding Americans, including your Second Amendment

---

[5]     One such example, depicting the peaceful protest and the subsequent violent dispersal, can be found here: Reuters, *Graphic Warning: Peaceful Protesters Fired at with Tear Gas, Rubber Bullets by U.S. Military Police*, YOUTUBE (June 1, 2020), https://www.youtube.com/watch?v=UrMoqSPZym0.

rights." He urged "every governor to deploy the National Guard in sufficient numbers that we dominate the streets . . . [and] establish[] an overwhelming law enforcement presence until the violence has been quelled. If the city or state refuses to take the actions that are necessary to defend the life and property of their residence, then I will deploy the United States military and quickly solve the problem for them."

61.    President Trump continued by saying that "The following measures are going into effect immediately. First, we are ending the riots . . . . I am also taking swift and decisive action to protect our great capital, Washington, D.C. As we speak, I am dispatching thousands and thousands of heavily-armed soldiers, military personnel, and law enforcement officers, to stop the rioting, looting, vandalism, assaults, and the wanton destruction of property." He concluded his remarks by stating, "[N]ow I am going to pay my respects to a very, very special place."

62.    The "very, very special place" was the historic St. John's Episcopal Church, located across Lafayette Park from the White House, which had suffered some fire damage the night before. On information and belief, President Trump first raised the possibility of walking across the street from the White House to visit St. John's on the morning of June 1, 2020, "determined to show he was still in charge" after the demonstrations of the preceding days.[6] Although the decision to visit the church was made some hours before the Rose Garden address, members of the press and local law enforcement were not informed until shortly before the crackdown on demonstrators in Lafayette Park, if at all.

63.    At around 7:01 p.m., President Trump emerged from the White House, accompanied by security personnel and members of the administration, including Defendant Barr,

---

[6]    *See* Kevin Liptak et al., *60 Minutes of Mayhem: How Aggressive Politics and Policing Turned a Peaceful Protest into a Violent Confrontation*, CNN (June 2, 2020), https://www.cnn.com/2020/06/02/politics/trump-white-house-protest-police-church-photo-op/index.html.

and walked through the now-cleared Lafayette Park. The President arrived at St. John's at around 7:06 p.m., where he remained outside for approximately five minutes posing for photographs while holding a bible in front of the church. The President did not mention the protesters or the attack that law enforcement had just undertaken at his direction.

64.    The next morning, June 2, 2020, President Trump tweeted "D.C. had no problems last night. Many arrests. Great job done by all. ***Overwhelming force. Domination. . . . [T]hank you President Trump***!" On June 4, he tweeted a letter calling the protesters "terrorists." Days later, White House Press Secretary Kayleigh McEnany reaffirmed the President's view, noting that the White House "stand[s] by [the] actions" of the federal law enforcement officers who violently removed protesters from Lafayette Park on June 1 and has "***no regrets***" about the measures used.

*These Unlawful Acts Harmed Plaintiffs and Many Others.*

**Plaintiff Radiya Buchanan**

65.    Plaintiff Radiya Buchanan is a 27-year-old black woman who lives in Washington, D.C. Ms. Buchanan holds a bachelor's degree in sociology and psychology, and a master's degree in non-profit management. She recently relocated to Washington, D.C. to work for an education non-profit organization that aims to close the opportunity gap for middle school students in underserved communities. Ms. Buchanan participated in peaceful demonstrations protesting the murder of George Floyd, police brutality, and racism on Sunday, May 31, 2020 and Monday, June 1, 2020 in Washington, D.C. Ms. Buchanan has long been a passionate advocate for racial equality and social justice. For example, as an undergraduate at St. John's University in 2012, Ms. Buchanan and her teammates on the track and field team participated in a peaceful demonstration protesting the murder of Trayvon Martin.

66.     Ms. Buchanan felt particularly compelled to join the protests in Lafayette Park on May 31, 2020 and June 1, 2020 to protest the murder of George Floyd at the hands of the police because she herself has experienced police brutality firsthand.  When she was only 13 years old, just a few days after her eighth grade graduation, police arrested Ms. Buchanan after an older white man at a movie theater accused her of talking too loud before the movie began.  The manager kicked Ms. Buchanan and her young friends out of the theater and called the police.  As the girls waited outside for Ms. Buchanan's mother to pick them up, the police arrived and ordered Ms. Buchanan to get off the phone with her mother.  One of the officers shook his handcuffs in Ms. Buchanan's face and then lunged at her, knocking her to the ground and sitting on her pelvis as he tried to handcuff her.  Another officer came over, flipped Ms. Buchanan onto her stomach, and sat on her back while the officers handcuffed her, bruising her wrists.  The officers then pushed her into their car and brought her to the police station, where they made disparaging remarks about her and her upbringing.

67.     Based on this incident, Ms. Buchanan was charged with trespassing and assault on a police with a deadly weapon (i.e., her leg, which she purportedly had used to kick the officer when he threw her to the ground), even though she was the *victim* of the police's unwarranted attack.  The police report was riddled with inaccuracies, and Ms. Buchanan spent the next nine months attending court hearings to defend herself and refute the police officers' lies.  Eventually, the judge dismissed the case in its entirety.

68.     Ms. Buchanan therefore joined recent protests not only because she supports racial justice and sympathizes with victims of police violence, but because she can empathize directly with these victims' experiences.  Ms. Buchanan knows what it feels like to experience police brutality, and to have the police lie and insist you are guilty when you are in fact innocent.  She

feels deeply for those people who end up in these situations through no fault of their own—an officer decides they are guilty, so their innocence is taken away and their voice goes unheard. Ms. Buchanan believes that it is important for her in this moment to join everyone speaking out against this injustice and to have her voice heard and her presence known.

69.    On Monday, June 1, 2020, Ms. Buchanan and her roommate, Plaintiff Ann Dagrin, arrived at the protest at Lafayette Park before 6:00 p.m. The atmosphere felt very different from the demonstration that Ms. Buchanan and Ms. Dagrin had attended on Sunday, May 31, 2020, when protesters were more vocal and a few young kids in the crowd were agitating police officers by throwing things, though other protesters discouraged them from doing do. By contrast, on Monday, the demonstration was peaceful and organized. There was no violence whatsoever.

70.    That changed at about 6:30 p.m., when law enforcement suddenly began to shoot canisters of tear gas into the crowd, and officers on horses started to yell "Move!" and advanced forward into the crowd of protesters. There was no warning of the officers' attack—one minute people were protesting peacefully, and the next minute the air was filled with smoke and people were screaming and running away from the officers.

71.    Ms. Buchanan and Ms. Dagrin walked quickly down the street away from the officers. They tried not to run to avoid trampling others. When they got to a nearby street corner, officers began throwing flash-bang grenades and spraying more tear gas. Ms. Buchanan and Ms. Dagrin poured water on the washcloths they had packed and used them to shield their faces and protect their eyes. Nevertheless, they were still impacted by the gas and were coughing as they walked back to their car. They saw a lot of protesters limping and being carried away from the crowd, and many who needed a solution poured in their eyes to flush out the chemical irritants.

72.     Ms. Buchanan's experience at the protest has affected her profoundly both emotionally and psychologically.  She has a heightened level of anxiety and has had considerable difficulty sleeping.  She is haunted by recurring memories of the attack, particularly the startling noise of the tear gas canisters exploding.  She says that it felt kind of like being in a war zone.

73.     Despite her anxiety and fear, Ms. Buchanan is determined to continue protesting at Lafayette Park.  She has demonstrated near there almost every day since June 1, though the park itself was blocked by fencing for a substantial period of time in June.  The decision to return to Lafayette Park was not easy, as Ms. Buchanan worries that at any moment, law enforcement may decide that they do not want the protesters there and use violence to get rid of them and indeed has seen peaceful protesters attacked violently like she was throughout the country.  However, Ms. Buchanan believes that the cause of racial justice is too important for her to stay silent.

**Plaintiff Ann Dagrin**

74.     Ann Dagrin is a 26-year-old black woman who lives in Washington, D.C.  She currently teaches seventh grade reading and writing at KIPP DC Charter Schools.  She previously taught writing at another charter school in Providence, Rhode Island.  Ms. Dagrin is currently completing a master's program in education from Providence College and earned a Bachelor of Science degree in health care administration from St. John's University, where she participated in track and field.  Prior to May 31, 2020, Ms. Dagrin had not attended a large scale protest, but had attended smaller protests in Providence, Rhode Island, where she previously resided.  Ms. Dagrin participated in peaceful demonstrations at Lafayette Park protesting the murder of George Floyd, police brutality, and racism on Sunday, May 31, 2020 and Monday, June 1, 2020.

75.     On Monday, June 1, 2020, Ms. Dagrin arrived at Lafayette Park before 6:00 p.m. with three friends, including Plaintiff Radiya Buchanan.  She observed that the crowd consisted

mostly of young professionals but also included families with young children and pets. The atmosphere was peaceful and much calmer than the atmosphere in Lafayette Park the night before. Ms. Dagrin observed a large police and/or military presence at the park as soon as she arrived. Ms. Dagrin did not see projectiles being thrown by protesters at law enforcement personnel.

76.    Around 6:30 p.m., Ms. Dagrin heard a loud explosion. She saw law enforcement officers, both on foot and mounted on horses, charge towards the crowd and deploy tear gas and flash-bang grenades on protesters. Ms. Dagrin heard no warning before law enforcement charged at the protesters. Ms. Dagrin became overwhelmed with fear and began crying. One of her friends grabbed her and told her that they needed to go. She agreed, following closely behind her friends as they quickly retreated with the crowd. As she fled the scene, Ms. Dagrin continued to sob and began experiencing a panic attack. At one point, a smoke bomb exploded a few feet in front of her. While leaving the park, Ms. Dagrin observed two male protesters carrying another female protester who appeared to be injured.

77.    Ms. Dagrin saw law enforcement officers deploy tear gas in all directions, and continue pursuing protesters even as they fled from Lafayette Park. Shortly after Ms. Dagrin and her friends made it past I Street, approximately one block away from Lafayette Park, they were struck by a cloud of tear gas. As a result, Ms. Dagrin began coughing and experienced terrible pain in her throat, symptoms that persisted through the next day. Ms. Dagrin and her friends kept running until they finally reached a safe location.

78.    Ms. Dagrin has experienced significant emotional distress since law enforcement's unprovoked attack on her and other protesters. On June 2, 2020, Ms. Dagrin experienced a second panic attack shortly after she joined a protest outside of the fence surrounding Lafayette Park. Ms.

Dagrin had to leave the protest immediately. Ms. Dagrin has also had trouble sleeping and has felt jumpy and on-edge, which she believes may be early symptoms of Post-Traumatic Stress Disorder. For example, on June 2, 2020, Ms. Dagrin dropped to the floor in her bedroom after hearing a bottle drop into the trash can in her apartment. Ms. Dagrin feels that the unprovoked attack on June 1, 2020 was the most dehumanizing moment of her life.

79.    Ms. Dagrin also attended Black Lives Matter protests outside of the fence that had been surrounding Lafayette Park on June 3, 2020 and June 4, 2020. She plans to continue attending similar demonstrations outside of Lafayette Park in the future, though she has substantial fears that law enforcement could return and attack her and other peaceful protesters as they did on June 1 and have at peaceful protests throughout the country.

**Plaintiff Lindsay Field**

80.    Lindsay Field is a 32-year-old white woman who lives in Washington, D.C. She graduated from Pennsylvania State University in 2010 with a Bachelor of Science degree in human development and family studies and earned a Master of Education degree from Johns Hopkins University in 2019. Ms. Field grew up in Washington, D.C., and currently teaches kindergarten at Lafayette Elementary School, a D.C. public school. She previously taught kindergarten and first grade at charter schools in New Orleans, Louisiana. Ms. Field participated in peaceful demonstrations at Lafayette Park protesting the murder of George Floyd, police brutality, and racism on May 29, 2020 and June 1, 2020.

81.    Ms. Field attended Black Lives Matter demonstrations twice before to protest the murders of black men by police. In 2014, Ms. Field participated in peaceful demonstrations in Washington, D.C. protesting the murder of Michael Brown in Ferguson, Missouri. In 2016, she participated in peaceful demonstrations in New Orleans protesting the murders of Alton Sterling

in Baton Rouge, Louisiana and Philando Castile in St. Paul, Minnesota—both black men who were killed by police.

82.    On Monday, June 1, 2020, Ms. Field arrived at Lafayette Park around 4:45 p.m. with her brother and a coworker.  People were talking and chanting, and the atmosphere was passionate but peaceful.  Ms. Field did not see protesters throw a single thing at the police.  Around 6:00 p.m., Ms. Field noticed the police and military presence increasing significantly and moving closer towards the barricades.  Some of the officers were equipped with ammunition belts or spray canisters.  Several older white men in suits walked between the rows of police and military.  Protesters in the crowd tried to guess who they were, and Ms. Field thought that one of them resembled Attorney General Barr.  An officer made a muffled announcement over a megaphone.  Ms. Field thinks he told protesters to vacate the premises, but she could not really hear him, and it was well before the 7:00 p.m. curfew.

83.    Ms. Field and her brother were at that time standing in the second row of protesters behind the barricades.  But when she saw the officers suddenly begin to move forward, Ms. Field, her brother, and other white protesters moved to the front row to stand in between black protesters and the police and military.  Shortly after 6:30 p.m., Ms. Field heard loud noises and saw police or military officers on horseback and smoke coming up H Street from east to west.  Other officers were approaching the barricades and blowing whistles and spraying pepper spray or tear gas.  The crowd, including Ms. Field, began to move back.

84.    As Ms. Field walked away from the barricades, she felt something hit the back of her thigh, which stung and left a bruise.  Ms. Field's brother told her to keep moving, and she did.  A couple minutes later, the police stopped advancing towards the protesters, and some protesters began to move back towards the police.  Ms. Field saw a black man who had gone back towards

the police, and she went and stood between him and the police. The police then came into the crowd and began hitting people with night sticks. The police focused on one black protester, who was standing near the barricades, and beat him particularly hard until other protesters pulled him away.

85.    As Ms. Field continued to walk away from the police and military's attack, she came across a young black woman who had been sprayed in the eyes with pepper spray or tear gas. Ms. Field and the young woman took shelter behind an electrical box, and Ms. Field flushed the young woman's eyes out with a water bottle Ms. Field had brought to the protest. Other people came and helped flush the young woman's eyes out as well.

86.    Ms. Field and her brother then rejoined the crowd, reunited with Ms. Field's coworker, and left the protest. Ms. Field's coworker had been badly sprayed with pepper spray or tear gas and had to have her eyes flushed out at the protest. They all continued to cough on the way home, and Ms. Field and her brother continued to cough after they got back to her apartment.

87.    Ms. Field is deeply disturbed and shaken by the police's and military's unprovoked attack on her and other protesters. She feels like she is still processing the psychological and emotional impact of the events that night. Nevertheless, Ms. Field plans to continue to protest and make her voice heard. Ms. Field participated in Black Lives Matter demonstrations again on Saturday, June 6. She and friends walked along Independence Avenue to Freedom Plaza. She has continued to protest in the weeks since June 1, yet she fears that law enforcement may return to attack her and other peaceful protesters as law enforcement did on June 1 and have at peaceful protests throughout the country.

### *The Trump Administration's Cover-Up and Shifting Justifications Begin.*

88.    Defendants' explanations for their violence demonstrate that the attack cannot be justified under any constitutional scrutiny—even rational basis review.  Indeed, Defendants' own justifications started shifting almost immediately and are wildly inconsistent:

89.    ***The Curfew.***  The White House deputy press secretary initially put out a statement just hours after law enforcement attacked the protesters, explaining that law enforcement had done so because "[t]he perimeter was expanded to help enforce the 7 p.m. curfew."  Yet this explanation was almost immediately contradicted by the Mayor of Washington, D.C., who had ordered the curfew.  Mayor Bowser in fact condemned the attack on protesters, tweeting:  "***A full 25 minutes before the curfew & w/o provocation***, federal police used munitions on peaceful protesters in front of the White House, an act that will make the job of @DCPoliceDept officers more difficult. Shameful!"

90.    ***False Allegations of Violence.***  The next day, the United States Park Police put out a statement attributed to Defendant Monahan, Park Police acting chief, instead explaining that law enforcement acted "[t]o curtail the violence that was underway," claiming that by "approximately 6:33 pm [on June 1], violent protesters on H Street NW began throwing projectiles including bricks, frozen water bottles and caustic liquids."[7]  In a June 7, 2020 interview, Attorney General

---

[7]  According to the head of the Federal Public Defender's office for the Eastern District of Virginia, Acting Chief Gregory T. Monahan of the Park Police "had, by far, more cases thrown out because of police misconduct than any other officer [he had] ever dealt with."  Matthew Goldstein & Katie Benner, *Park Police Head Had Been Accused of Illegal Searches and Unreliable Testimony*, N.Y. TIMES (June 18, 2020), https://nytimes.com/2020/06/18/us/politics/park-police-gregory-monahan.html.  Among these cases is one where Monahan performed a cavity search on a black motorist in full view of a busy street.  *Id.*  In fact, Monahan has been investigated at least four additional times for conducting unlawful cavity searches.  *Id.*  Monahan also has such a long-standing reputation for lying under oath, in fact, that the same federal judge twice discounted Monahan's testimony against a defendant's.  In one case, Judge Gerald B. Lee specifically stated in an opinion that he found Monahan's statements "lack[ed] credibility."  *United States v. Ford*, 232 F.Supp. 2d 625, 629 (E.D. Va. 2002).  In a subsequent decision, Judge Lee referred to Monahan's "previous questionable veracity" in deciding to once again disregard Monahan's testimony.  Goldstein, *supra*.

Barr similarly insisted that "projectiles were being hurled at the police" by "a very rowdy and non-compliant crowd." In a June 8, 2020 press conference, the White House press secretary reiterated these claims and referred to the protesters as "rioters." This justification was blatantly false. Protesters present at Lafayette Park, including Plaintiffs, saw no such projectiles being thrown, an observation consistently corroborated by numerous media accounts, police radios, and clear video footage. Moreover, public reports suggest that none of the protesters who were violently dispersed was arrested.[8] Notably, on June 1, not a single law enforcement officer at or near Lafayette Park was reported to have been injured by a protester until *after* officers began forcibly clearing the Square.

91.    ***The Security Perimeter.*** Later on June 2, 2020, anonymous administration officials informed reporters that Defendant Barr had resolved either the day before or the morning of June 1, 2020 to extend the security perimeter around the White House, and was surprised when he arrived at Lafayette Park at approximately 6:08 p.m. on June 1 to see that law enforcement had failed to do so. Indeed, in a June 7, 2020 interview, Barr stated, "This was not an operation to respond to that particular crowd. It was an operation to move the perimeter one block."[9] And on July 29, 2020, Barr testified under oath that the decision to extend the security perimeter "was something conceived of long before and didn't turn on the nature of the crowd." Defendants, however, have never explained why the security perimeter needed to be expanded at the moment

---

[8]    *See, e.g.*, *Statement from United States Park Police acting Chief Gregory T. Monahan about the actions taken over the weekend to protect life and property,* NAT'L PARK SERVICE (June 4, 2020), https://www.nps.gov/subjects/uspp/6_2_20_statement_from_acting_chief_monahan.htm#:~:text=Throughout%20the%20demonstrations%2C%20the%20USPP,we%20are%20entrusted%20to%20protect.

[9]    *Transcript: Attorney General William Barr on "Face the Nation," June 7, 2020*, CBS NEWS (June 7, 2020), https://www.cbsnews.com/news/bill-barr-george-floyd-protests-blm-face-the-nation-transcript.

31
**JA159**

it was and in the violent manner undertaken.[10]  In fact, General Joseph L. Lengyel, Chief of the National Guard Bureau and a member of the Joint Chiefs of Staff, reported that while there were general discussions about expanding the security perimeter, he did not recall any discussion that the police would set up that perimeter through use of force or by a particular time.  As Former U.S. Capitol Police Chief Terrance Gainer observed: "There was no reason to use force and fight. If they wanted to clear the park, they could have done it in a very orderly way, giving people notice."

92.    More than a half-dozen law enforcement officials have contradicted Barr and the Trump administration's account of the operation to clear Lafayette Park.  Among them is D.C. Police Chief Peter Newsham, who said that the "perimeter" had not actually been extended until long after the protesters were forcibly removed "overnight."  Newsham reported that his agency learned through police communications that force was going to be used moments after he was told that President Trump intended to walk to the church: "We heard that there was going to be an unscheduled presidential movement. Just a few minutes later, our teams on the ground learned [chemical] munitions were going to be used. The munitions were deployed minutes later."  General Joseph L. Lengyel also reported that: "I never heard any plan, ever, that police of National Guard were going to push people out of Lafayette Square."

93.    In a July 28, 2020 hearing before the House Committee on Natural Resources, Defendant Monahan stated that the purpose of driving protesters out of Lafayette Park was to promptly build a perimeter fence around it.  But the material to erect the fence was not even brought

---

[10]    Although both White House and Justice Department officials had previously confirmed that Barr personally told law enforcement personnel at Lafayette Park that "we need[] to get going with moving that perimeter" and to "[g]et it done," after Barr was sued personally for damages arising out of this event by other plaintiffs, Barr subsequently claimed that law enforcement was already in the process of extending the security perimeter when he arrived at the park; that "I didn't just say to them, 'Go,'" although "my attitude was get it done"; and that the order for law enforcement to move in and clear the protesters was given by a Park Police "tactical commander." Notwithstanding Barr's comments, on June 8, 2020, the White House reiterated that "it was AG Barr who made the decision to move the perimeter."

to the Square until approximately 9:00 p.m., well over two and a half hours *after* officers attacked peaceful protesters.

94.     ***Protecting St. John's Episcopal Church.***  On June 8, 2020, the White House Press Secretary claimed that **"**the burning at St. John's [on May 31] is what prompted the decision to move the perimeter."   Yet the expanded security perimeter following June 1, 2020 did not encompass St. John's—a 10-foot tall fence that was erected on the south side of H Street, N.W., the opposite side of the street from St. John's.

95.     ***The President's Photo Op.***  Defendants have waffled as to whether the protesters were attacked simply to clear Lafayette Park for President's photo op.  On June 4, 2020, Defendant Barr denied there was any correlation between the decision to clear Lafayette Park—which occurred at approximately 6:30 p.m.—and the President's walk through the park to visit St. John's, which occurred at approximately 7:00 p.m., although he acknowledged that he knew of the President's plan to visit St. John's prior to giving the directive to law enforcement that evening. But the Attorney General also stated "I think the president is the head of the executive branch and the chief executive of the nation and should be able to walk outside the White House and walk across the street to the church of presidents . . . .  I think it was entirely appropriate for him to do," suggesting clearing the park *was* designed to facilitate the photo op.

96.     ***Political Propaganda.***  The purpose of the violent dispersal of peaceful protesters in Lafayette Park was made clear by June 2, 2020, when the White House published a 29-second video depicting President Trump walking across the street, through the now-cleared park, so he could stand in front of St. John's Episcopal Church in order to pose for pictures while holding aloft a bible.  The White House press secretary would later compare President Trump's walk across the street following the violent crackdown to Winston Churchill inspecting bombing damage during

World War II and President George W. Bush throwing out the first pitch at a Major League Baseball game after 9/11.

### *Defendants Mislead the Public About the Scope of the Violence Undertaken*

97.     In addition to attempting to obscure the improper and unlawful motives for their vicious attack on protesters, Defendants also sought to deny and downplay the violent means of their attack.

98.     For example, the United States Park Police statement denied using "tear gas" to disburse protesters, but acknowledged using pepper balls and smoke canisters—a formalistic and meaningless distinction, particularly given that these and related compounds plainly constitute tear gas pursuant to the federal Centers for Disease Control and Prevention's categorizations.  Indeed, the *Washington Post* and a local news team even reported found spent "CS canisters"[11] on the scene, evidencing that "tear gas" was used even under the government's own crimped definition of the phrase.  By June 4, 2020, the White House went further, denying that either tear gas or rubber bullets were used, and claiming instead—ignoring all video evidence to the contrary—that "bricks" and "frozen water bottles" were being thrown at law enforcement, and that law enforcement thus "had no other choice than to act."  Incredibly, Defendants stated that law enforcement had defended themselves "peaceably" during the attack on the peaceful protesters in Lafayette Park.  Attorney General Barr himself insisted on June 7, 2020 that "law enforcement officials with shields warn[ed] and mov[ed] a line slowly" and "mounted officers mov[ed] slowly, directing people to move," contrary to live television broadcasts depicting law enforcement charging at the protesters and the ensuing chaos.

---

[11]    *See* Carol D. Lenning, *Park Police spokesman acknowledges chemical agents used on Lafayette Square protesters are similar to tear gas*, WASH. POST (June 5, 2020), https://www.washingtonpost.com/politics/park-police-spokesman-acknowledges-chemical-agents-used-on-lafayette-square-protesters-are-similar-to-tear-gas/2020/06/05/971a8d78-a75a-11ea-b473-04905b1af82b_story.html.

99.     And in a June 5, 2020 interview, a United States Park Police spokesperson admitted that "it was a 'mistake' to insist in a statement on Tuesday that the agency didn't use tear gas the day before in a Washington, DC, park to disperse a crowd ahead of President Donald Trump's photo op, explicitly noting that pepper balls shot by officials irritate the eyes and cause tears." Yet just hours later, the United States Park Police switched course yet again, issuing a statement from Defendant Monahan "reiterating" that "United States Park Police officers and other assisting law enforcement partners did not use tear gas or OC Skat Shells to close the area at Lafayette Park in response to violent protesters." On June 7, 2020, Barr continued to deny that any tear gas or chemical irritants had been used in Lafayette Park on June 1, even as he acknowledged the use of "pepper balls," because "[p]epper spray is not a chemical irritant. It's not chemical."

### Defendants Close Lafayette Park—A Traditional Public Forum.

100.     By the morning of June 2, 2020, the United States Secret Service announced that all access to Lafayette Park would be blocked indefinitely "to ensure public safety," erecting a 10-foot-high fence around a square that has long served as a key gathering place for peaceful assembly in the nation's capital. They cited no ongoing threat to public safety, nor was there been any. Indeed, arrests in Washington, D.C. arising from the protests were minimal on June 2 (29 arrests), June 3 (0 arrests), June 4 (0 arrests), and June 5-7 (1 arrest each day).[12] But the fence blocked access to Lafayette Park entirely, and prevented anyone from assembling there to exercise their free speech rights, in "possibly the most conspicuous public forum in the Nation" directly in front of the White House. By June 4, 2020, the erection of additional security barriers

---

[12] *May-June 2020 Unrest-Related Arrests and Persons of Interest*, METROPOLITAN POLICE DEPT. (June 11, 2020), https://mpdc.dc.gov/page/may-june-2020-unrest-related-arrests-and-persons-interest.

around the White House and surrounding area had been "transformed into a veritable fortress" "resembl[ing] the monarchical palaces or authoritarian compounds of regimes in faraway lands"—"the physical manifestation of President Trump's vision of law-and-order 'domination' over the millions of Americans who have taken to the streets to protest racial injustice."[13]

101.    A few days later, after congressional leaders sent a letter to the White House demanding that the fences come down, news reports suggested that the fencing would come down on June 10, 2020.  On June 9, 2020, the United States Secret Service backtracked, advising that the fences would *not* be coming down and Lafayette Park would *not* reopen to the public in the near future.  Some fencing was removed on June 11, but other sections of fence remained after, reminding protesters that Defendants may attempt to seal off the Park at any time.

### *Americans Across the Political Spectrum Are Outraged Over the Attack of Unarmed Peaceful Protesters.*

102.    In response to this wanton violence against unarmed, peaceful protesters, Americans—already outraged over the continual and systematic abuse endured by communities of color at the hands of government—have grown even more incensed.

103.    Church leaders at St. John's Episcopal Church are infuriated.  Reverend Robert Fisher said he was never informed that President Trump planned to visit the church, describing the event as "surreal" and like "some alternative universe."  And the Right Reverend Mariann Budde stated "I am outraged . . . .  I am the bishop of the Episcopal Diocese of Washington and was not given even a courtesy call that they would be clearing with tear gas so they could use one of our churches as a prop, holding a Bible, one that declares that God is love and when everything he has

---

[13] Philip Rucker et al., *With White House Effectively a Fortress, Some See Trump's Strength — but Others See Weakness*, WASH. POST (June 4, 2020), https://www.washingtonpost.com/politics/with-his-white-house-effectively-a-fortress-trump-sees-strength--but-others-see-weakness/2020/06/04/3c70fa26-a672-11ea-b619-3f9133bbb482_story.html.

said and done is to inflame violence." Reverend Budde testified before the House Committee on Natural Resources that she was "horrified" to see the government carrying out the threats of force President Trump made in the Rose Garden by "tear gassing Americans engaged in peaceful protests." She testified that President Trump's actions were "a misappropriation of scripture, and a usurpation of our sacred space." And a former rector at St. John's Episcopal Church described her dismay at being "driven off of the patio at St. John's – a place of peace and respite and medical care throughout the day – so that man could have a photo opportunity in front of the church!!! People were hurt so that he could pose in front of the church with a bible!"

104.    Republican Senators also rebuked the attack on peacefully protesting American citizens and questioned the constitutionality of the order. Senator Ben Sasse of Nebraska said "there is a fundamental – a Constitutional – right to protest, and I'm against clearing out a peaceful protest for a photo op." Senator Tim Scott of South Carolina also criticized the President's actions: "[I]f your question is, should you use tear gas to clear a path so the president can go have a photo-op, the answer is no." Senator Susan Collins of Maine stated that it was "painful to watch peaceful protesters be subjected to tear gas in order for the president to go across the street to a church that I believe he's attended only once." Senator Thom Tillis denounced the Trump administration's treatment of protesters.[14] And Senator Lindsey Graham openly supported Gen. Milley's apology for his involvement in President Trump's photo op at St. John's.[15]

---

[14]  *Sen. Tillis says using military to push protesters out of Lafayette Square was inappropriate*, WASH. POST (June 16, 2020), https://www.washingtonpost.com/video/washington-post-live/wplive/sen-tillis-says-using-military-to-push-protesters-out-of-lafayette-square-was-inappropriate/2020/06/16/e821f7fc-c142-41a5-addc-96f1f5abc962_video.html?.

[15]  Caroline Kelly, *Lindsey Graham backs top general's apology for appearing with Trump after force used on protesters*, CNN (June 11, 2020), https://www.cnn.com/2020/06/11/politics/lindsey-graham-general-apologize-trump-protests/index.html.

105.    Even respected members of the military and former members of the Trump Administration spoke out against the actions taken in Lafayette Park.  Former Secretary of Defense James Mattis excoriated the decision to use tear gas on peaceful protesters stating: "When I joined the military, some 50 years ago, I swore an oath to support and defend the Constitution.  Never did I dream that troops taking that same oath would be ordered under any circumstance to violate the Constitutional rights of their fellow citizens—much less to provide a bizarre photo op for the elected commander-in-chief, with military leadership standing alongside."   In a June 5, 2020 interview, General John Kelly, former White House Chief of Staff for President Trump and former Secretary of Homeland Security, stated that he "agree[d]" with General Mattis's comments. Former Under Secretary of Defense James N. Miller resigned from the Defense Science Board and accused Secretary of Defense Esper of violating his oath of office because under his auspices "[l]aw-abiding protesters just outside the White House were dispersed using tear gas and rubber bullets – not for the sake of safety, but to clear a path for a presidential photo op."  Admiral Mike Mullen, former Chairman of the Joint Chiefs of Staff, wrote, "It sickened me yesterday to see security personnel—including members of the National Guard—forcibly and violently clear a path through Lafayette Park to accommodate the president's visit outside St. John's Church. . . . Whatever Trump's goal in conducting his visit, he laid bare his disdain for the rights of peaceful protest in this country, gave succor to the leaders of other countries who take comfort in our domestic strife, and risked further politicizing the men and women of our armed forces."

106.    Eighty-nine former Department of Defense officials, including four former Secretaries of Defense of both parties, published an open letter in the *Washington Post* decrying President Trump's use of "flash-bang grenades, pepper spray and . . . rubber bullets to drive lawful protesters, as well as members of the media and clergy, away from the historic St. John's Episcopal

Church[,] [a]ll so he could hold a politically motivated photo op" as a "betray[al]" of his oath "to support and defend the Constitution of the United States."   And General Mark Milley, the Chairman of the Joint Chiefs of Staff, has now publicly apologized for his role in the Lafayette Park incident: "I should not have been there.  My presence in that moment and in that environment created a perception of the military involved in domestic politics.  As a commissioned uniformed officer, it was a mistake that I have learned from, and I sincerely hope we all can learn from it."

107.   *Politico* subsequently published an article with interviews of National Guardsmen involved in the attack.[16]  One noted, "As a military officer, what I saw was more or less really f--ed up. . . .  The crowd was loud but peaceful, and at no point did I feel in danger, and I was standing right there in the front of the line."  The Guardsman concluded: "I believe I saw civil rights being violated in order for a photo op . . . .  I'm here to support and defend the Constitution of the United States and what I saw just goes against my oath and to see everyone try to cover up what really happened.  What I saw was just absolutely wrong."  Similarly, more than 1,250 Justice Department alumni signed an open letter calling on the department's inspector general to open an investigation into Attorney General Barr's actions on June 1, noting that "it is unclear under what purported authority" he "issued orders to officers of a variety of federal agencies, including United States Secret Service, United States Park Police, District of Columbia National Guard, and United States Military Police" and that "[b]ased on what we now know, these actions violated both the First Amendment of the United States Constitution, which protects freedom of speech and the press, and the right to assemble; and the Fourth Amendment, which prohibits unreasonable seizures, to include objectively unreasonable uses of force by law enforcement officers.  None of us would

---

[16]  Daniel Lippman, *'What I saw was just absolutely wrong': National Guardsmen struggle with their role in controlling protests*, POLITICO (June 10, 2020), https://www.politico.com/news/2020/06/09/national-guard-protests-309932.

ever have considered directing or engaging in such actions to be consistent with our oaths to support and defend the Constitution."[17]

108.    Facing this wave of criticism, Defendant Mark Esper, the Secretary of Defense and one of the attendees of President Trump's photo op, attempted to distance himself from the administration's rhetoric and President Trump's threat to deploy military force to enforce order, stating that "[w]e are not in one of those situations" where such force would be appropriate, and stating, "I do not support invoking the Insurrection Act."

109.    In addition, Arlington County police officers who had been deployed to support Park Police at Lafayette Park left after Arlington County officials realized they had been co-opted to participate in a "presidential publicity stunt."

110.    However, what still failed to come to pass is any acknowledgment by the Defendants that their actions were inappropriate, unlawful, and dangerous.  Furthermore, there has been no indication that these violent actions will not be undertaken again.  Indeed, on June 8, 2020, the White House Press Secretary reiterated that the President is not "sorry" about the events of June 1 and stated that critics of what happened in Lafayette Park "should go back and read the Constitution" and "I'd point [them] to the First Amendment, where it says you have the right to, quote, 'peaceably assemble.'"

111.    In the weeks following the June 1 attack on peaceful protesters, the President has only continued his violent rhetoric.  On Juneteenth 2020, the holiday commemorating the end of slavery in the United States, President Trump tweeted a warning to anyone who planned to protest at a re-election campaign rally he was about to hold in Tulsa, Oklahoma:  "***Any protesters,***

---

[17]    Matt Zapotosky, *More than 1,250 former Justice Dept. workers call for internal watchdog to probe Barr role in clearing demonstrators from Lafayette Square*, WASH. POST (June 10, 2020), https://www.washingtonpost.com/national-security/more-than-1250-former-justice-dept-workers-call-for-internal-watchdog-to-probe-barr-role-in-clearing-demonstrators-from-lafayette-square/2020/06/10/608827fe-aa73-11ea-9063-e69bd6520940_story.html.

anarchists, agitators, looters or lowlifes" who are going to Oklahoma please understand, you will not be treated like you have been in New York, Seattle, or Minneapolis. It will be a much different scene!"  Days later, on June 23, 2020, President Trump tweeted that protesters in Washington, D.C. who attempted to set up an autonomous zone in the nation's capital would be "met with serious force!".  Twitter flagged President Trump's tweet with a public interest notice explaining that the Tweet "violat[ed] Twitter's policy against abusive behavior, specifically the presence of a threat of harm against an identifiable group."

### Congress and Federal Agencies Launch Investigation of Excessive Use of Force against Protesters at Lafayette Park on June 1

112.    Following the events on June 1, 2020, the House Committee on Natural Resources requested that the Interior Department Office of the Inspector General launch an investigation into United States Park Police's actions in Lafayette Park that day.  On June 18, 2020, Interior Department Inspector General Mark Greenblatt confirmed that his office had "already begun collecting and reviewing information concerning the Park Police's activities," and "will make an initial determination of which agency had command and control of the law enforcement operation and conduct a review of Park Police actions accordingly."

113.    Since then, the House Committee on Natural Resources has held two oversight hearings, on June 29 and July 28, 2020, to examine the use of force against peaceful protesters at Lafayette Park on June 1, 2020.  The House Committee on Natural Resources  interviewed various witnesses including a civil rights activist, journalist, a major in the D.C. National Guard, and Acting Chief of the United States Park Police Gregory Monahan.  The House Judiciary Committee, in a separate hearing on July 28, 2020, also interviewed Attorney General Barr on his role in dispersing protesters in Lafayette Park on June 1, 2020.  Federal authorities continue to investigate

the facts and circumstances surrounding the Trump Administration's decision to use force against protesters in Lafayette Park.

114.    During these congressional hearings, a whistleblower with the National Guard confirmed the depravity of Defendants' conduct, testifying under oath:

> Having served in a combat zone, and understanding how to assess threat environments, at no time did I feel threatened by the protesters or assess them to be violent. In addition, considering the principles of proportionality of force and the fundamental strategy of graduated responses specific to civil disturbance operations, it was my observation that the use of force against demonstrators in the clearing operation was an unnecessary escalation of the use of force. From my observation, those demonstrators – our fellow American citizens -- were engaged in the peaceful expression of their First Amendment rights. Yet they were subjected to an unprovoked escalation and excessive use of force.
>
> As the late Representative John Lewis said, "When you see something that is not right, not just, not fair, you have a moral obligation to say something, to do something."
>
> The oath I swore as a military officer, to support and defend the Constitution of the United States, is a bedrock guiding principle and, for me, constitutes an individual moral commitment and ethical instruction. It is the foundation of the trust safely placed in the Armed Forces by the American people. And it compels me to say something – and do something – about what I witnessed on June 1 at Lafayette Square.[18]

---

[18] *Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protestors at Lafayette Square: Hearing Before the H. Committee on Natural Resources,* 116th Cong. (2020) (statement of Adam DeMarco), https://naturalresources.house.gov/imo/media/doc/Mr.%20Adam%20DeMarco%20-%20Written%20Testimony_.pdf.

## FIRST CAUSE OF ACTION
### Violation of the First Amendment

115.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

116.    Defendants' decision to forcibly disperse Plaintiffs by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets, violates the First Amendment in at least four ways: (i) as unconstitutional retaliation for expressive conduct protected under the First Amendment; (ii) as a violation of right to peaceably assemble; (iii) as an unconstitutional restriction to a traditional public forum; and (iv) as unconstitutional viewpoint discrimination.

117.    Plaintiffs' rights to assemble, protest, and demonstrate peaceably were all protected activities under the First Amendment of the United States Constitution.  As the Department of Justice itself stated mere weeks ago, "First Amendment protection is at its apex when citizens seek to engage in core political speech in a traditional public forum."

118.    Defendants deprived Plaintiffs of their rights to assemble, protest, and demonstrate peaceably by forcibly dispersing Plaintiffs' peaceful protest by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets.

119.    Defendants would not have attacked Plaintiffs but for their speech's content and their viewpoint, as evidenced by the fundamentally different approach the administration advances towards far right fringe groups, such as the "very fine" neo-Nazis who rallied in Charlottesville, Virginia, or the armed protesters who stormed the state capitol in Lansing, Michigan, as opposed to the peaceful protesters seeking racial justice in Lafayette Park.  Defendants' subsequent decision to erect a fence around Lafayette Park further infringed upon Plaintiffs' rights to assemble, protest, and demonstrate peaceably by blocking all available access points to the park.  Defendants'

conduct attempted to silence Plaintiffs' speech, depriving Plaintiffs of their right to command the attention of the President and the nation by assembling in sight of the White House to express their dissent.

120.    Defendants' conflicting explanations for impeding Plaintiffs' First Amendment rights are pretextual, disproved by the numerous videos of the June 1, 2020 event, and cannot justify their forcible dispersion of Plaintiffs' peaceful protest with the use of weapons, including, but not limited to, rubber bullets, tear gas, flash-bang grenades, smoke bombs, and rubber bullets. The videos of the June 1 event, which show that officers began using munitions on peaceful protesters approximately 30 minutes before the District of Columbia's curfew was set to take effect, confirms that the Defendants' actions were not aimed at enforcing the curfew, as the White House alleged, thus refuting the factual bases on which Defendants' decision was made. Consequently, the only reasonable inference from Defendants' conduct is that they forcibly dispersed protesters as a form of content- and viewpoint-based discrimination and in retaliation for Plaintiffs' exercise of protected First Amendment activity.

121.    None of the shifting justifications Defendants have offered to justify their violence satisfies the First Amendment.  Defendants' shifting, pretextual bases could not have authorized violence against unarmed protesters.

122.    As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable harm.

## SECOND CAUSE OF ACTION
### Violation of the Fourth Amendment

123.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

124.    Plaintiffs were seized by Defendants when Defendants' officers intentionally, through the use of force and threat of arrest, and by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets, terminated their freedom of movement.

125.    Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

126.    Plaintiffs did not commit a crime.

127.    Plaintiffs did not pose a threat to Defendants or any of their officers or agents or any other person.

128.    Plaintiffs' Fourth Amendment rights were violated when they were deliberately targeted and shot with tear gas, flash-bang grenades, smoke bombs, and rubber bullets, during the course of their lawful protest.

129.    Plaintiffs fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

## THIRD CAUSE OF ACTION
### Violation of the Fifth Amendment

130.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

131.    Defendants' decision to forcibly disperse Plaintiffs by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets, violates the Fifth Amendment right to due process.

132.    Plaintiffs have protected First Amendment liberty interests in the right to assemble, protest, and demonstrate peaceably.

133.    Plaintiffs have a right to not be subject to excessive force in the context of engaging in this expressive First Amendment activity.

134.    By violently attacking unarmed protesters engaged in expressive conduct, Defendants have engaged in conduct that was "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998), and therefore constitutes excessive force in violation of the Due Process Clause of the Fifth Amendment.

135.    As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

**FOURTH CAUSE OF ACTION**
**Damages Pursuant to *Bivens***
**(Against Defendants Barr, Monahan, Fennelly, Adamchik, Seberling, and John and Jane Does 1-50 in Their Individual Capacities)**

136.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

137.    Plaintiffs have constitutionally protected rights under the First, Fourth, and Fifth Amendments.  Defendants infringed upon those rights by forcibly dispersing Plaintiffs' peaceful protest by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets; by attempting to suppress and chill Plaintiffs' speech; and by engaging in excessive force as a means to deprive Plaintiffs of their First Amendment liberty interests.

138.    Defendants are federal actors who each acted under color of law in depriving Plaintiffs of their rights.

139.    Defendants were personally involved in the deprivation of Plaintiffs' constitutional rights and remain involved in the continued constitutional violations.  Defendants, including Defendant Barr, personally ordered law enforcement personnel to extend the security perimeter and clear the streets around Lafayette Park, personally supervised the execution of that order, and/or personally carried it out.

140.    Defendants are not immune from liability to remedy their patently unconstitutional conduct—conduct prohibited by clearly established governing law.

141.    Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial.

142.    Plaintiffs are therefore entitled to monetary damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Defendants Barr, Monahan, Fennelly, Adamchik, Seberling, and John and Jane Does 1-50 are jointly and severally liable to Plaintiffs.

### FIFTH CAUSE OF ACTION
### Ultra Vires Conduct in Violation of the Posse Comitatus Act

143.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

144.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful presidential action that is *ultra vires*.

145.    The Constitution grants Congress the power "[t]o provide for calling forth the militia to execute the laws of the union."  U.S. CONST. ART. I, § 8, cl. 15.

146.    The Posse Comitatus Act (the "PCA"), 18 U.S.C. § 1385, provides that "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act

47

**JA175**

of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise

to execute the laws shall be fined under this title or imprisoned not more than two years, or both."

147.    The "Army" consists of "the Regular Army, the Army National Guard of the United

States, the Army National Guard while in the service of the United States and the Army Reserve."

10 U.S.C. § 7062(c)(1).

148.    The PCA "'eliminate[s] the direct active use of Federal troops by civil law

authorities,' and 'prohibits Army and Air Force military personnel from participating in civilian

law enforcement activities.'"  *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (en

banc) (first quoting *United States v. Banks*, 539 F.2d 14, 16 (9th Cir. 1976); then quoting *United*

*States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000)).

149.    18 U.S.C. § 1385 does not provide authority to order members of the "Army" to

conduct law enforcement operations such as clearing a crowd of peaceful protesters exercising

their First Amendment rights.

150.    On information and belief, military police and National Guard members in service

of the United States were among the personnel who attacked the protesters on June 1, 2020, and

cleared Lafayette Park.

151.    Plaintiffs seek damages from the unlawful deployment of troops to Lafayette Park

as a posse comitatus, a declaration that such deployment was unlawful, and injunctive relief

prohibiting such further unlawful deployments.

**SIXTH CAUSE OF ACTION**
**Injunctive Relief and Damages Pursuant to 42 U.S.C. § 1983**
**(Against Defendants Allen, Alioto, Black, Buchanan, Carroll, Hargrove, Meyer, Murphy,**
**Newsham, Payne, Taylor, Thau, Vincent, Willis, John and Jane Poes 1-50, and John and**
**Jane Roes 1-50)**

152.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

153.    Plaintiffs have constitutionally protected rights under the First, Fourth, and Fifth Amendments.  Defendants Allen, Black, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, John and Jane Poes 1-50, and John and Jane Roes 1-50 deliberately deprived Plaintiffs of those rights by forcibly dispersing Plaintiffs' peaceful protest by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets; by attempting to suppress and chill Plaintiffs' speech; and by engaging in excessive force as a means to deprive Plaintiffs of their First Amendment liberty interests.  Defendants Carroll and Alioto directed and oversaw such actions by the Metropolitan Police Department Officers, and Defendant Vincent coordinated the actions of the Arlington Police Department Officers.  In doing so, Defendants Allen, Alioto, Black, Buchanan, Carroll, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Vincent, Willis, John and Jane Poes 1-50, and John and Jane Roes 1-50 acted with reckless or callous indifference to the Plaintiffs' constitutionally protected rights.

154.    The actions taken by Defendants Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John and Jane Roes 1-50 were a result of the District of Columbia deliberately indifferent failure to train and supervise John and Jane Roes 1-50 on the appropriate use of force, despite the fact that the number of times that Metropolitan Police Department officers

have used force has steadily increased since 2013, which warranted training.[19]  Several of these prior incidents involved excessive use of force against protesters.  For example, during the 2017 inauguration, police pinned hundreds of protesters into city blocks, used frequent flash-bang grenades, and heavily deployed tear gas.[20]  Defendant Newsham is the Chief of the Metropolitan Police Department.

155.    Defendants are state actors who each acted under color of law in depriving Plaintiffs of their rights.

156.    As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm and damages in an amount to be determined at trial.

157.    Plaintiffs are therefore entitled to injunctive relief and monetary and punitive damages against Defendants pursuant to 42 U.S.C. § 1983.

158.    Defendants are jointly and severally liable to Plaintiffs.

---

[19]  Peter Hermann, *Study finds D.C. police using more force*, WASH. POST (Jan. 23, 2018), https://www.washingtonpost.com/local/public-safety/report-finds-dc-police-using-more-force/2018/01/23/a858451e-0066-11e8-8acf-ad2991367d9d_story.html.

[20]  Kriston Capps, *Protesters Descend on D.C. for Day One of the Trump Era*, BLOOMBERG (Jan. 20, 2017), https://www.bloomberg.com/news/articles/2017-01-20/protesters-descend-on-d-c-for-trump-s-inauguration.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court order each of the following forms of relief:

a.     Injunctive relief so that Plaintiffs may continue to exercise their right to assemble, protest, and demonstrate peaceably without fearing retribution, including preliminary injunctive relief and/or a temporary restraining order requiring Defendants to restore access to Lafayette Park's traditional public forum and refrain from using excessive force on peaceful protesters;

b.     A declaration that the officers' forcible dispersion of peaceful protesters by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets, was and is unconstitutional and unlawful, in violation of the First Amendment, Fourth Amendment, the Due Process Clause of the Fifth Amendment, and the Posse Comitatus Act;

c.     Damages in an amount to be proved at trial, including, but not limited to, punitive damages; and

d.     An order granting Plaintiffs costs, fees, and disbursements incurred in connection with these proceedings and such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial.


Dated:    September 1, 2020                    Respectfully submitted,

                                              /s Greta B. Williams
                                              Greta B. Williams (D.C. Bar No. 1006968)
                                              Naima L. Farrell (D.C. Bar No. 1023230)
                                                  (*admission pending*)
                                              Brittany Raia (D.C. Bar No. 1044115)
                                                  (*pro hac vice forthcoming*)
                                              Matthew Guice Aiken (D.C. Bar No. 1616755)
                                              **GIBSON, DUNN & CRUTCHER LLP**
                                              1050 Connecticut Avenue, N.W.
                                              Washington, D.C. 20036-5306
                                              Tel:  202.955.8500
                                              GBWilliams@gibsondunn.com
                                              NFarrell@gibsondunn.com
                                              BRaia@gibsondunn.com
                                              MAiken@gibsondunn.com


                                              Randy M. Mastro (*pro hac vice*)
                                              Orin Snyder (*pro hac vice*)
                                              Mylan L. Denerstein (*pro hac vice*)
                                              Anne Champion (*pro hac vice*)
                                              Katherine Marquart (*pro hac vice*)
                                              Lee R. Crain (*pro hac vice*)
                                              Amanda L. LeSavage (*pro hac vice*)
                                              **GIBSON, DUNN & CRUTCHER LLP**
                                              200 Park Avenue
                                              New York, New York 10166-0193
                                              Tel:  212.351.4000
                                              RMastro@gibsondunn.com
                                              OSnyder@gibsondunn.com
                                              MDenerstein@gibsondunn.com
                                              AChampion@gibsondunn.com
                                              KMarquart@gibsondunn.com
                                              LCrain@gibsondunn.com
                                              ALeSavage@gibsondunn.com


                                              *Counsel for Plaintiffs Radiya Buchanan,*
                                              *Ann Dagrin, and Lindsay Field*

52

**JA180**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., et al.,

      *Plaintiffs*,

    v.

DONALD J. TRUMP, et al.

      *Defendants*.

No. 1:20-cv-01469-DLF

### PLAINTIFFS' MOTION TO AMEND THE DOCKET AND FOR ISSUANCE OF SUMMONSES

This is a technical motion to fill in a gap in the docket that, according to the Clerk's Office, is preventing the issuance of ten summonses in this case. All Defendants who have been appeared to date in this action have indicated, via counsel, that they take no position on this motion and do not plan to file oppositions to it.

In response to a prior motion by Plaintiffs to obtain the names of ten specific officer defendants whom Plaintiffs had identified in the Third Amended Complaint by surnames and/or identifying numbers, ECF 56, this Court issued a minute order on October 2, 2020 requiring Defendant Monahan to produce the requested names to Plaintiffs' counsel. He has done so.

However, the Clerk's Office informed undersigned counsel on October 14, 2020, that the Clerk's Office could not issue summonses to the newly identified defendants unless the *docket* in this case (but not the complaint) was amended to add the names of these individuals. The Clerk's Office further informed undersigned counsel that a motion was required to accomplish this result. Plaintiffs therefore move the Court to amend the docket and order the issuance of the ten summonses to the ten individual defendants recently identified by Defendant Monahan:

- Luis Feliciano, identified in the complaint as "Arm Patch LP71"
- Thomas Locasico, "Helmet Number A702"
- Nicholas Jarmuzewski, "Helmet Number A704"
- Jeffrey Hendrickson, "Helmet Number A706"
- Sean Cox, "Helmet Number B714"
- Bryan McDonald, "Helmet Number C723"
- Lawrence Sinacore, "Helmet Number S735"
- Jonathan Daniels, "Arm Patch Number JD97"
- Sean Kellenberger, "Arm Patch Number SK10," and
- Cara Seiberling (identified in the complaint only by surname)

The requested order should be granted because it is the most efficient, least obtrusive means of effectuating the objective of the Court's October 2 order, which was presumably to enable Plaintiffs to join the ten above-named defendants to this action so that Plaintiffs' claims could be tested on the merits. Plaintiffs are not seeking to file an amended *complaint* or to alter any deadlines in this case. The order to correct the docket and issue summonses, the Clerk's Office reports, will be sufficient. Defendants do not plan to file oppositions to this motion.

Therefore, Plaintiffs' motion should be granted. The ten requested summonses are attached as exhibits to this motion. A proposed order is also attached.


October 15, 2020                                    Respectfully submitted,

                                                   /s/ Scott Michelman
                                                   Scott Michelman (D.C. Bar No. 1006945)
                                                   AMERICAN CIVIL LIBERTIES UNION
                                                   FOUNDATION OF THE DISTRICT OF
                                                   COLUMBIA
                                                   915 15th Street NW, Second Floor
                                                   Washington, D.C. 20005
                                                   (202) 457-0800
                                                   smichelman@acludc.org

                                                   *Counsel for Plaintiffs*

**JA182**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C., *et al.*, | |
|  *Plaintiffs*, | |
| v. | No. 20-cv-1469 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
|  *Defendants*. | |
| | |
| RADIYA BUCHANAN, *et al.*, | |
|  *Plaintiffs*, | |
| v. | No. 20-cv-1542 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
|  *Defendants*. | |
| | |
| ISABELLA KAVANAGH, | |
|  *Plaintiff*, | |
| v. | No. 20-cv-2163 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
|  *Defendants*. | |
| | |
| RYAN ROTH, | |
|  *Plaintiff*, | |
| v. | No. 20-cv-1622 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
|  *Defendants*. | |

## <u>ORDER</u>

Upon consideration of the fifteen motions to dismiss in these four related cases:

### <u>In *Black Lives Matter v. Trump*, 20-cv-1469, it is:</u>

**ORDERED** that the individual-capacity federal defendants' Motion to Dismiss, Dkt. 76, is **GRANTED**.  It is further

**ORDERED** that the official-capacity federal defendants' Motion to Dismiss, Dkt. 79, is **GRANTED IN PART AND DENIED IN PART**.  It is further

**ORDERED** that the District of Columbia defendants' Motion to Dismiss, Dkt. 80, is **GRANTED IN PART AND DENIED IN PART**.  It is further

**ORDERED** that the Virginia defendants' Motion to Dismiss, Dkt. 83, is **GRANTED IN PART AND DENIED IN PART**.  It is further

**ORDERED** that Major Adamchik's Motion to Dismiss, Dkt. 97, is **GRANTED**.  It is further

**ORDERED** that Officer Kellenberger's Motion to Dismiss, Dkt. 142, is **GRANTED**. It is further

**ORDERED** that Sergeant LoCascio's Motion to Dismiss, Dkt. 143, is **GRANTED**. It is further

**ORDERED** that the Federal Line-Level defendants' Motion to Dismiss, Dkt. 146, is **GRANTED**.  It is further

**ORDERED** that, consistent with the Court's Minute Order of September 3, 2020, the Court will defer ruling on the Black Lives Matter plaintiffs' stayed motion for class certification at this time.  The opposing parties shall file any response to the pending motion on or before July 21, 2021.

**In *Buchanan v. Trump*, 20-cv-1542, it is:**

**ORDERED** that the individual-capacity federal defendants' Motion to Dismiss, Dkt. 34, is **GRANTED**.  It is further

**ORDERED** that the official-capacity federal defendants' Motion to Dismiss, Dkt. 35, is **GRANTED IN PART AND DENIED IN PART**.  It is further

**ORDERED** that the Virginia defendants' Motion to Dismiss, Dkt. 36, is **GRANTED IN PART AND DENIED IN PART**.  It is further

**ORDERED** that the District of Columbia defendants' Motion to Dismiss, Dkt. 54, is **GRANTED IN PART AND DENIED IN PART**.  It is further

**ORDERED** that Defendants Adamchik, Fennelly, and Seiberling's Motion to Dismiss, Dkt. 59, is **GRANTED**.

**In *Roth v. Trump*, 20-cv-1622 and *Kavanagh v. Trump*, 20-cv-2163 (consolidated), it is:**

**ORDERED** that Attorney General Barr's individual Motion to Dismiss, Dkt. 20, is **GRANTED**.  It is further

**ORDERED** that the official-capacity federal defendants' Motion to Dismiss, Dkt. 21, is **GRANTED IN PART AND DENIED IN PART**.  It is further

**ORDERED** that the two motions filed in *Kavanagh v. Trump* before the case was consolidated, Dkt. 21; Dkt. 22, are **DENIED AS MOOT**.

DABNEY L. FRIEDRICH
United States District Judge

June 21, 2021

3
**JA185**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BLACK LIVES MATTER D.C., *et al.*, <br><br>   *Plaintiffs*, <br><br>  v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>   *Defendants.* | No. 20-cv-1469 (DLF) |
| RADIYA BUCHANAN, *et al.*, <br><br>   *Plaintiffs*, <br><br>  v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>   *Defendants.* | No. 20-cv-1542 (DLF) |
| ISABELLA KAVANAGH, <br><br>   *Plaintiff*, <br><br>  v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>   *Defendants.* | No. 20-cv-2163 (DLF) |
| RYAN ROTH, <br><br>   *Plaintiff*, <br><br>  v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>   *Defendants.* | No. 20-cv-1622 (DLF) |

## MEMORANDUM OPINION

These lawsuits arise out of the law enforcement response to protests in Lafayette Square on June 1, 2020.  In these related cases, four sets of plaintiffs bring various constitutional and statutory claims against federal and state officials and agencies, including former President Trump, seeking both damages and injunctive relief.  Before the Court are fifteen motions to dismiss.  For the reasons that follow, the Court will grant the motions in part and deny the motions in part.

## I.     BACKGROUND

### A.     Factual Allegations

Though the parties dispute various facts as alleged in the complaints, in deciding these motions to dismiss, the Court must accept as true all material factual allegations in the complaints.  *See Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  At this stage of the proceedings, the Court will not accept the defendants' invitation to consider facts not explicitly alleged in the complaints.[1]

---

[1] For example, some of the defendants ask the Court to consider news articles referenced in the complaints that recount in detail the unrest and rioting that preceded the June 1 events in the District of Columbia.  *See, e.g.*, D.C. Defs.' Mot. to Dismiss at 4–7, Dkt. 54-1 (No. 1542); *see also* Buchanan Am. Compl. ("FAC") ¶ 46, Dkt. 29 (No. 1542) (alleging that "rioting, looting, and property damage" occurred the night before, in the area of Lafayette Square).  They also point to the factual findings in Mayor Muriel Bowser's May 31, 2021 order implementing a citywide curfew beginning at 7:00 p.m. on June 1, 2020.  D.C. Defs.' Mot. to Dismiss at 5–6 (No. 1542).  The Court will not consider these disputed allegations because they are not integral to the plaintiffs' claims.  *See Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 12 (D.D.C. 2020).  Nor would they affect the outcome here.

The plaintiffs[2] allege that "peaceful protesters assembled in historic Lafayette Park across from the White House" to protest racial injustice after the death of George Floyd and other Black people at the hands of law enforcement. *See* Buchanan Am. Compl. ¶ 1 ("FAC"), Dkt. 29 (No. 1542). They further allege that, in response to the peaceful protest, "officials, wielding batons, sprayed the crowd with tear gas, flash-bang grenades, smoke bombs, and rubber bullets." *Id.* To the extent that any of the plaintiffs allege that the law enforcement officers provided warnings before dispersing the crowd, *see, e.g.*, *id.* ¶ 56, they allege that these warnings were "futile and inadequate," *id.*, because they were given "via a megaphone approximately 50 yards away from the closest protestors," *id.*, and were "barely audible," *id.*

Though the plaintiffs urge the Court to consider the defendants' changing justifications for clearing Lafayette Square, *see id.* ¶¶ 89–95, according to the Black Lives Matter ("BLM") plaintiffs, the "professed purpose" of this law enforcement response was "to clear the area to permit the President to walk to a photo opportunity at a nearby church," BLM Third Amended Complaint ¶ 4 ("TAC"), Dkt. 52 (No. 1469). Indeed, after Lafayette Square was cleared, President Trump, "the President's Chief of Staff, the Attorney General, the Secretary of Defense, the President's daughter, and senior advisors walked from the White House to St. John's Church on Lafayette Square," *id.* ¶ 203, where the President gave brief remarks and paused for a photo, *id.* The plaintiffs also catalog statements that former President Trump made both before and after the events of June 1—in public tweets and in private discussions with governors—that allegedly show hostility to racial justice protestors. *See, e.g.*, FAC ¶ 51 (quoting

---

[2] The Court will use the plural term "plaintiffs" to refer to claims and allegations that are virtually identical in the four complaints but will note any meaningful distinctions between them.

former President Trump instructing state governors: "You have to dominate. If you don't dominate, you're wasting your time.").

The plaintiffs further allege that "[t]he Department of Justice has officially acknowledged that Defendant Barr ordered Lafayette Square cleared minutes before the assault started." TAC ¶ 5; *see also* FAC ¶ 55 ("Barr personally ordered law enforcement personnel to extend the security perimeter around the White House and clear the streets around Lafayette Park."). "United States Park Police Major Mark Adamchik was the incident commander during this event and gave directives to and had authority over other officers present." FAC ¶ 55 (internal quotation marks omitted). In addition to U.S. Park Police officers, U.S. Secret Service agents, Federal Bureau of Prisons officials, Arlington County Police Department officers, and members of the District of Columbia National Guard helped clear Lafayette Square. *Id.* ¶ 4. The Buchanan plaintiffs also allege that District of Columbia Metropolitan Police Department (MPD) Officers assisted in the Square.[3] *Id.*

"The unprovoked violence caused what news reports described as a blind panic" as the crowd dispersed from Lafayette Square. *Id.* ¶ 58 (internal quotation marks omitted). The crowd fled Lafayette Square to be met by additional District of Columbia MPD officers who deployed tear gas on the fleeing crowd. *See* TAC ¶¶ 100–04. The plaintiffs allege that they suffered injuries, both physical and psychological, as a result of the law enforcement response to the protest. For example, Isabella Kavanagh suffered second-degree chemical burns on her legs as a result of a chemical grenade that exploded as she stood "frozen with fear." Kavanagh Compl. ¶ 39, Dkt. 1 (No. 2163). Other plaintiffs remain "deeply disturbed and shaken" as a result of the

---

[3] As this Memorandum Opinion will discuss *infra*, there is also some dispute about whether the D.C. defendants were personally involved in clearing Lafayette Square.

law enforcement response.  FAC ¶ 87.  And in general, the plaintiffs "fear further retaliation in the future," *id.* ¶ 129, "if they continue to observe, record, or participate in constitutionally protected activity," *id.*

> ### B.    Procedural History

Soon after the June 1, 2020 incident, the plaintiffs brought suit in these four related cases, two of which are now consolidated.  *See* Minute Order of January 18, 2021, No. 20-cv-01622 (granting motion to consolidate *Roth* and *Kavanagh*).  The *Black Lives Matter* plaintiffs have since filed a second and third amended complaint, *see* TAC, as well as a motion for class certification, Dkt. 47 (No. 1469), while the *Buchanan* plaintiffs have filed a first amended complaint, *see* FAC.  As requested by the parties, the Court will defer a ruling on the Black Lives Matter plaintiffs' stayed motion for class certification and will permit the opposing parties 30 days after this ruling to respond to the pending motion.  *See* Minute Order of September 3, 2020.

Before the Court are 15 motions to dismiss filed by the defendants—including the former President, the former Attorney General, officials in the U.S. Park Police, D.C. National Guard, U.S. Secret Service, and the Federal Bureau of Prisons, the Arlington County Police Department, and the District of Columbia MPD; and sued in their official capacity, the Secretary of Defense, the Chief of the U.S. Park Police, the Director of the U.S. Secret Service, the Commanding General of the D.C. National Guard, and the Director of the Federal Bureau of Prisons.  The Court held a hearing on the motions on May 28, 2021.  *See* Hrg. Tr. at 1.[4]  For the reasons that follow, the Court will grant the motions in part and deny the motions in part.

---

[4] This opinion was updated to include the final hearing transcript citations.

## II.    LEGAL STANDARDS

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994).  When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions." *Am. Nat. Ins.*, 642 F.3d at 1139 (citations and internal quotation marks omitted).  But the court "may undertake an independent investigation" that examines "facts developed in the record beyond the complaint" in order to "assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (internal quotation marks omitted).  A court that lacks jurisdiction must dismiss the action.  Fed. R. Civ. P. 12(b)(1), 12(h)(3).

Rule 12(b)(3) "instructs the court to dismiss or transfer a case if venue is improper or inconvenient in the plaintiff's chosen forum." *Sanchez ex rel. Rivera-Sanchez v. United States*, 600 F. Supp. 2d 19, 21 (D.D.C. 2009).  The Court accepts the plaintiff's well-pleaded allegations regarding venue as true and draws reasonable inferences from those allegations in favor of the plaintiff. *See Abraham v. Burwell*, 110 F. Supp. 3d 25, 28 (D.D.C. 2015).  "The court need not, however, accept the plaintiff's legal conclusions as true, and may consider material outside of the pleadings." *Id.* (citation omitted).  "The plaintiff has the burden to establish that venue is proper since it is his obligation to institute the action in a permissible forum." *Sanchez-Mercedes v.*

*Bureau of Prisons*, 453 F. Supp. 3d 404, 414 (D.D.C. 2020) (internal quotation marks omitted), *aff'd*, No. 20-5103 (D.C. Cir. June 2, 2021).

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," *Iqbal*, 556 U.S. at 678, but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility," *id.* (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited, *id.*; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a

7

**JA192**

complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III.    ANALYSIS

The defendants seek to dismiss the complaints principally on the grounds that the constitutional and statutory claims are not justiciable and that the individual defendants are entitled to qualified immunity. The Court will first address the claims against the federal defendants, followed by the claims against the D.C. and Arlington defendants.

### A.    Federal Defendants

The plaintiffs together bring four categories of claims against the federal defendants. They seek (1) damages under *Bivens* and (2) injunctive relief for various alleged constitutional violations. They also allege that the defendants (3) conspired, in violation of 42 U.S.C. §§ 1985(3) and 1986, and (4) violated the Posse Comitatus Act, 18 U.S.C. § 1385.[5] The Court will address each of these claims in turn.

#### 1.    *Bivens* Claims

The plaintiffs bring monetary damages claims under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), against several named defendants in

---

[5] Only the *Buchanan* plaintiffs bring claims under the Posse Comitatus Act. *See* FAC at 47 ("Fifth Cause of Action: Ultra Vires Conduct in Violation of the Posse Comitatus Act).

their personal capacities, seeking damages for alleged violations of their First, Fourth, and Fifth Amendment rights.[6]  The government moves to dismiss the *Bivens* claims against defendants Barr, Monahan, Fennelly, Adamchik, and Seiberling for failure to state a claim.  Alternatively, the government argues that these defendants are entitled to qualified immunity.  The Court agrees that the *Bivens* claims must be dismissed because an extension of the *Bivens* remedy to this "new context" is unwarranted.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017).

The Supreme Court has set forth a two-step inquiry which governs whether an extension of *Bivens* is appropriate.  First, a court must "inquire whether the request involves a claim that arises in a new context or involves a new category of defendants."  *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (internal quotation marks omitted).  The Supreme Court's "understanding of a new context is broad."  *Id.* (internal quotation marks omitted).  The test is whether "the case is different in a meaningful way from previous *Bivens* cases" decided by the Supreme Court. *Abbasi*, 137 S. Ct. at 1859.  The Supreme Court "has made clear that expanding the *Bivens* remedy is now a disfavored judicial activity."  *Abbasi*, 137 S. Ct. at 1857 (internal quotation marks omitted).

Next, if a *Bivens* case involves a new context, a court must "ask whether there are any special factors that counsel hesitation about granting the extension."  *Hernandez*, 140 S. Ct. at 743 (alterations and internal quotation marks omitted).  At this second stage, the *Bivens* claim must be rejected if there is "reason to pause before applying *Bivens*" in the new context.  *Id.* "Central to this analysis are separation-of-powers principles."  *Id.* (alteration and internal quotation marks omitted).  A court must "consider the risk of interfering with the authority of the

---

[6] Only the *Buchanan* plaintiffs bring damages claims for violations of their Fifth Amendment rights.  *See* FAC at 45 (Third Cause of Action: Violation of the Fifth Amendment).

other branches, . . . ask whether there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, and whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* (citations and internal quotation marks omitted).

Twice in the last four years, the Supreme Court has addressed the proper approach to inferring causes of action for damages under the Constitution. *See Hernandez*, 140 S. Ct. 735 (2020); *Abbasi*, 137 S. Ct. 1843 (2017). According to the Court, *Bivens* and its progeny "were the products of an era when the Court routinely inferred causes of action that were not explicit in the text of the provision that was allegedly violated." *Hernandez*, 140 S. Ct. at 741 (internal quotation marks omitted). The Court has criticized this "*ancien regime*," noting that "[i]n later years, we came to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power." *Id.* Accordingly, "for almost 40 years," the Court has "consistently rebuffed requests to add to the claims allowed under *Bivens*." *Id.* at 743. The *Bivens* claims in these cases—brought under the First, Fourth, and Fifth Amendments—all arise in a new context.

The plaintiffs' First Amendment claim arises in a new context because the Supreme Court has never extended *Bivens* to a claim brought under the First Amendment. *See id.* at 741 (noting that the Court has recognized *Bivens* claims in the Fourth, Fifth, and Eighth Amendment contexts); *see also Bush v. Lucas*, 462 U.S. 367 (1983) (declining to extend *Bivens* to a claim sounding in the First Amendment). Even so, the plaintiffs argue that the context is not new because decades-old D.C. Circuit precedent recognized a *Bivens* claim for First Amendment violations of protesters' rights. *See Dellums v. Powell*, 566 F.2d 167, 194 (D.C. Cir. 1977). But, as both Supreme Court and D.C. Circuit precedent instruct, it is only Supreme Court decisions

that count when determining whether a *Bivens* claim arises in a new context.  *See Abbasi*, 137 S.

Ct. at 1859 ("If the case is different in a meaningful way from previous *Bivens* cases decided by

this Court, then the context is new."); *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir.

2020) (noting that "the new-context analysis may consider only Supreme Court decisions

approving *Bivens* actions").

 The plaintiffs' Fourth and Fifth Amendment claims likewise arise in a new context.  In

*Bivens* itself, the Supreme Court created an implied damages remedy under the Fourth

Amendment for an allegedly unconstitutional search and arrest carried out in a New York City

apartment, *see* 403 U.S. at 389, and in *Davis v. Passman*, the Court allowed damages under the

Fifth Amendment for alleged sex-based employment discrimination on Capitol Hill, *see* 442 U.S.

228, 230–31 (1979).  But, critically, "[a] claim may arise in a new context even if it is based on

the same constitutional provision as a claim in a case in which a damages remedy was previously

recognized."  *Hernandez*, 140 S. Ct. at 743.  In *Hernandez*, for example, the plaintiffs argued

that their Fourth and Fifth Amendment claims did not involve a new context because *Bivens* and

*Davis* had already recognized claims under those same two amendments.  *Id.*  The Supreme

Court rejected this argument, finding it "glaringly obvious" that plaintiffs' claims presented a

new context.  *Id.*  It stressed the "world of difference" between a cross-border shooting incident

and an arrest and search in a New York City apartment or sex-based discrimination on Capitol

Hill.  *Id.* at 744.

 As in *Hernandez*, "once we look beyond the constitutional provisions invoked in *Bivens*,

*Davis*, and the present case, it is glaringly obvious that [the plaintiffs'] claims involve a new

context, *i.e.*, one that is meaningfully different."  *Id.* at 743.  The claims at issue here concern

government officers' response to a large protest in Lafayette Square outside the White House,

which is markedly different from entering and searching a private apartment to enforce federal narcotics laws. The context in which these claims arise is also "meaningfully different" from the context of sex-based employment discrimination at issue in *Davis*. *Id.* The plaintiffs attempt to overcome this problem by downplaying the significance of *Hernandez*, arguing that whereas *Hernandez* was about "border security or national security," Pl.'s Opp'n at 27, Dkt. 51 (No. 1542), these cases are about "*protester* security," *id.* But, as the Supreme Court has instructed, what matters is whether the claims in this case arise in a similar context to *Bivens* or *Davis*, *see Hernandez*, 140 S. Ct. at 743, and the claims here clearly do not.

Next, the Court considers whether any special factors counsel hesitation before extending an implied constitutional damages remedy to the new context presented by these cases. *Id.* at 743. The Supreme Court has "not attempted to create an exhaustive list of factors that may provide a reason not to extend *Bivens*," *id.*, but has explained that "central to this analysis are separation-of-powers principles," *id.* (alteration and internal quotation marks omitted).

In this case, several special factors counsel hesitation. First, national security— specifically, the country's national-security interest in the safety and security of the President and the area surrounding the White House—strongly weighs against creating a *Bivens* remedy here. Though "national-security concerns must not become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins," *Abbasi*, 137 S. Ct. at 1862 (internal quotation marks omitted), the Supreme Court has repeatedly recognized that national security concerns are a weighty special factor in the *Bivens* analysis. *See Hernandez*, 140 S. Ct. at 745–46; *Abbasi*, 137 S. Ct. at 1861. And the Court has also acknowledged the importance to national security of presidential security and safety. *See Watts v. United States*, 394 U.S. 705, 707 (1969) (per

curiam) (noting the nation's "overwhelming[] interest in protecting the safety of its Chief

Executive"); *accord Wood v. Moss*, 572 U.S. 744, 758–59 (2014).

     In this context, it matters not whether the national security risk actually justified the

particular action taken.  *See Hernandez*, 140 S. Ct. at 746.  "The question is not whether national

security requires such conduct. . . .".  *Id.*  Rather, the question is whether "national-security

concerns" were present in the decision-making process the federal officials faced and thus

"whether the Judiciary should alter the framework established by the political branches for

addressing [similar] cases."  *Id.*  When it comes to managing crowd activity directly outside of

the White House,[7] decisionmakers must weigh public, presidential, and White House security

interests.  "Just as the White House area is a unique situs for first amendment activity, it is also a

unique situs for considerations of presidential and national security."  *White House Vigil for ERA

Comm. v. Clark*, 746 F.2d 1518, 1533 (D.C. Cir. 1984) (internal quotation marks and footnotes

omitted).  "For a structure of such obvious significance to presidential and national security, the

White House is singularly exposed to potential terrorist attack."  *Id.*  "In short, the need for

effective security in the vicinity of the White House is great, but the geographical position of the

Mansion renders it inherently insecure."  *Id.*  And when it comes to presidential security

specifically, the presence of a large crowd of protesters, even a peaceful one, near the president

---

[7] As noted, the Black Lives Matter plaintiffs allege that the defendants' "professed purpose" for forcibly clearing Lafayette Square was "to clear the area to permit the President to walk to a photo opportunity at a nearby church."  TAC ¶ 2.  But in their pleadings and during the hearing on these motions, the plaintiffs highlighted the defendants' varying justifications for the park clearing.  *See* FAC ¶¶ 89–95; Hrg. Tr. at 67:15–22.  They contend that these shifting explanations suggest that there was no legitimate justification for the defendants' actions.  *Id.* Regardless whether the park was cleared to protect the President, to expand the perimeter of the White House, or to enforce the curfew or prevent further violence by demonstrators near the White House, all of these possible justifications raise national security issues that counsel hesitation in extending a *Bivens* remedy here.  *See id.*

implicates presidential security questions.  *See Wood*, 572 U.S. at 762–63 (finding that

presidential security was implicated when 200 to 300 protesters congregated within weapons

range of the President).

The fact that the plaintiffs challenge "the direct and substantial involvement of . . .

*individuals*," Pl.'s Opp'n at 29–30, Dkt. 51 (No. 1542), rather than "high-level, government-wide

national defense policies," *id.*, does not mean that national security concerns did not exist.  The

Supreme Court's most recent *Bivens* case involved a challenge to one instance of a single line

officer's conduct, *see Hernandez*, 140 S. Ct. at 740, yet the Supreme Court still found that

national security was a special factor counseling against extension of the *Bivens* remedy, *see id.*

at 745–46.  The national security considerations implicated in this context counsel against

extending a damages remedy without congressional approval.  *See id.*

Relatedly, a second special factor that weighs against creating a *Bivens* remedy here is

Congress' activity in the field governing the relationship between White House and presidential

security and protesters' rights.  *Cf. Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (finding that

"Congress' activity in the field" was a special factor making it inappropriate to extend *Bivens*).

Tragically, four U.S. Presidents were assassinated in the 100-year period following the Civil

War, including three—Presidents Lincoln, Garfield, and McKinley—between 1865 and 1901.

Alarmed by this recurring national tragedy, Congress began in the twentieth century to undertake

an escalating series of measures to protect the President, including appropriating funds for the

President's protection, *see* 34 Stat. 708 (1906), and making it a federal crime to threaten the

President, *see* 39 Stat. 919 (1917) (codified at 18 U.S.C. § 871).  The House Select Committee

on Assassinations also released a 600-page report in 1979, *see* H.R. Rep. No. 95-1828, pt. 2

(1979), which proposed various reforms aimed at ensuring presidential safety and security.

Congress has acknowledged the potential for conflict between the demands of presidential security and protesters' freedoms. For example, the House Select Committee on Assassinations wrote that that "[t]he committee was acutely aware of the problem of insuring that civil liberties are preserved, while affording adequate protection to the institutions of democratic society and to public figures." *Id.* at 464. The committee was also "mindful of the need to weigh the costs that could accrue to individual privacy, group protest, legitimate dissent, political competition and social change against the benefits of stronger protective measures." *Id.* Despite these concerns, a damages remedy for federal officers' violations of protesters' rights was not among the reforms that the committee recommended or that Congress adopted.

Further, Congress has remained attentive to White House security over the last several decades. For example, in 2014, Congress held oversight hearings regarding a series of security breaches at the White House, including one by an armed fence-jumper who made it inside the White House before being detained. *See, e.g.*, *White House Perimeter Breach: New Concerns About the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014).

These examples illustrate that Congress has repeatedly considered the trade-offs between White House and presidential security and protesters' freedoms. Because of Congress' extensive activity in the field, "Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than inadvertent." *Abbasi*, 137 S. Ct. at 1862 (internal quotation marks omitted). And given the many years Congress has had "to extend the kind of remedies" sought by the plaintiffs, its silence is both "relevant" and "telling." *Id.* (alteration and internal quotation marks omitted). Congress' activity in the field thus constitutes

another special factor which makes it inappropriate to recognize a *Bivens* remedy in the new

context presented by these cases.

And finally, a third special factor counseling hesitation is the availability of alternative

remedies.  "[I]f there is an alternative remedial structure present in a certain case, that alone may

limit the power of the Judiciary to infer a new *Bivens* cause of action."  *Id.* at 1858; *see id.*

(collecting cases).  "[T]he Supreme Court has declined to extend *Bivens* . . . where other causes

of action provide redress."  *Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912,

918 (D.C. Cir. 2018).  Here, the plaintiffs seek alternative equitable relief in the form of a

permanent injunction, *see* TAC ¶ 291 (Relief Requested); FAC at 51 (Prayer for Relief), and the

Supreme Court in *Abbasi* specifically recognized "an injunction" and "some other form of

equitable relief" as adequate alternative remedies, 137 S. Ct. at 1865.  Though these alternative

avenues may ultimately prove unsuccessful, that is irrelevant "[s]o long as the plaintiff[s] had an

avenue for some redress."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001).  Indeed, the

Supreme Court has "rejected the claim that a *Bivens* remedy should be implied simply for want

of any other means for challenging a constitutional deprivation in federal court."  *Id.* (citing

*Schweiker v. Chilicky*, 487 U.S. 412, 421–23 (1988)).

In conclusion, these special factors make it inappropriate to extend *Bivens* into the new

context presented by these cases.  The Court will grant the defendants' motions to dismiss the

*Bivens* claims.

 2. *Injunctive Relief*

The plaintiffs seek an injunction under the First, Fourth, and Fifth Amendments against

the federal official-capacity defendants' alleged practices of "deploying physical force against

demonstrators to remove them from places in which they have gathered with others to express

their political opinions," TAC ¶ 232, and "deploying physical force without provocation, warning, or legal grounds to do so, against demonstrators to force them to halt or move," *id.* ¶ 237.[8]  Some of the plaintiffs also seek an injunction under the First Amendment against alleged restrictions on demonstrators' access to Lafayette Square.  *See* FAC ¶¶ 119, 51 (Prayer for Relief).

　　　　　　　　　i.　　Threatened Dispersal of and Use of Force Against Demonstrators

Before addressing the merits of this claim, the Court must apprise itself of subject-matter jurisdiction, including the plaintiffs' standing to sue.  To establish standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).  When plaintiffs seek injunctive relief, as they do here, "past injuries alone are insufficient to establish standing."  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Instead, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).  Of note, "allegations of *possible* future injury are not

---

[8] To the extent the plaintiffs attempt to sue the United States or any official capacity defendants for money damages, *see, e.g.*, TAC ¶ 292 (not limiting the request for damages to individual capacity defendants); *see also Black Lives Matter*, Official Capacity Defs.' Mot. to Dismiss at 9 n.3, Dkt. 35-1 ("Plaintiffs have sued the United States in addition to federal officials in their individual capacities."), such an attempt is improper.  "Federal constitutional claims for damages are cognizable only under *Bivens*, which runs against individual government officials personally."  *Loumiet*, 828 F.3d at 945 (citing *FDIC v. Meyer*, 510 U.S. 471, 482, 485–86 (1994)).  And "sovereign immunity shields the Federal Government and its agencies from suit."  *Debrew v. Atwood*, 792 F.3d 118, 124 (D.C. Cir. 2015) (internal quotation marks omitted).  Without any showing that the United States has waived sovereign immunity for money damages in this context, the plaintiffs may not seek money damages against the United States or the defendants sued in their official capacity.

sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted) (emphasis in original). Future injuries—even those with an "objectively reasonable likelihood" of occurring—are not adequate to establish standing. *Id.* The plaintiffs have not adequately pleaded either an ongoing injury or an immediate threat of future injury based on the defendants' June 1 clearing of Lafayette Square. Because the plaintiffs lack standing, the Court lacks jurisdiction to issue an injunction ordering the defendants to change their practices of using physical force against protestors.

In an effort to establish ongoing injury, the plaintiffs allege ongoing chilling effects resulting from the events of June 1, 2020. *See, e.g.*, FAC ¶ 78 (returning to Lafayette Square to protest has caused panic attacks); Pl.'s Opp'n at 84, Dkt. 51 (No. 1542) (plaintiffs "look over their shoulders while they engage in protest activity"). But such allegations of a subjective chilling effect resulting from the defendants' past actions are insufficient to confer standing. *Compare Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("[A]llegations of a subjective 'chill' [upon the exercise of First Amendment rights] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."); *with Clark v. Libr. of Cong.*, 750 F.2d 89, 93 (D.C. Cir. 1984) (ongoing harm shown where plaintiff alleged "a targeted investigation of an individual based solely on the exercise of his associational rights resulting in concrete harms to his reputation and employment opportunities").

The plaintiffs similarly fail to establish standing based on an immediate threat of future harm. In *Los Angeles v. Lyons*, the Supreme Court held that a plaintiff who alleges past harm lacks standing to seek injunctive relief if there is no real and immediate threat the harm will occur again. *See* 461 U.S. 95, 105 (1983). The plaintiffs allege that they continue to demonstrate in or near Lafayette Square and that they fear law enforcement officers may disperse

or attack them.  *E.g.*, FAC ¶ 73 ("Ms. Buchanan worries that at any moment, law enforcement may decide that they do not want the protesters there and use violence to get rid of them.").  The plaintiffs' primary basis for these fears are the alleged events of June 1, 2020 and President Trump's social media posts before and after the clearing of Lafayette Square.  *See, e.g.*, TAC ¶¶ 53–64; FAC ¶¶ 47–49, 64.  Significantly, the plaintiffs do not rely on any alleged law or policy as the basis for this claimed risk of future harm.  Indeed, "Plaintiffs do not challenge a large-scale policy—or any policy at all.  Rather, Plaintiffs challenge . . . the implied threat to take similar actions in the future at the President's whim."  Pls.' Opp'n at 51, Dkt. 98 (No. 1469); *accord* Pl.'s Opp'n at 36, Dkt. 51 (No. 1542) ("Nor does the FAC identify even a single policy to challenge.").

Because the plaintiffs do not claim that a law or policy has "ordered or authorized police officer to act in such manner" as allegedly occurred on June 1, *Lyons*, 461 U.S. at 106, the plaintiffs' claims of impending future harm are too speculative to confer standing to seek an injunction, *cf. id.* at 105–06 (noting the speculative chain of events that must be hypothesized "[i]n order to establish an actual controversy in this case").  Such harm would require that plaintiffs again demonstrate in Lafayette Square; that agencies headed by the official-capacity defendants again respond to the demonstration; that federal officers again use that law enforcement response as cover to deliberately target non-violent peaceful demonstrators; and that one or more of the plaintiffs again be targeted.  This hypothetical chain of events is simply too speculative to confer standing for injunctive relief.

Black Lives Matter also fails to demonstrate standing as an organizational plaintiff.  There are two forms of organizational standing—representative standing and direct standing.  As to representative standing, "[a]n association has standing to bring suit on behalf of its members

when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  Black Lives Matter lacks representative standing because, as discussed above, no individual plaintiff has standing to sue for injunctive relief in their own right.

To have direct organizational standing, "the organization's pleadings must survive the same standing analysis as that applied to individuals." *Am. Legal Found. v. FCC*, 808 F.2d 84, 89 (D.C. Cir. 1987).  To that end, Black Lives Matter alleges that it has changed its activities in numerous ways in response to the events of June 1, 2020.  For example, it has "divert[ed] resources to assessing and planning for potential violence by police," TAC ¶ 126, "enhance[d] efforts to educate members and supporters regarding the potential dangers of police violence," *id.*, and "engage[d] in a communications campaign about the events in Lafayette Square," *id.* This has allegedly "reduced its capacity to plan events and programming consistent with its mission." *Id.* ¶ 127.  Moreover, Black Lives Matter alleges that it carries out its mission through "protests [and] public accountability campaigns," among other tactics, *id.* ¶ 117, and the events of June 1st decreased participation in its protests because "[p]eople who ordinarily attend in-person protests . . . are afraid to do so because of the violence that occurred at Lafayette Square," *id.* ¶ 125.

Black Lives Matter's direct standing allegations suffer from the same infirmity as those of the individual plaintiffs—it cannot show the "continuing violation or the imminence of a future violation" that is necessary for standing to pursue injunctive relief.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998).  All of the organization's standing-related

allegations concern how it and its members were affected by the events of June 1, 2020.  Black

Lives Matter no doubt alleges that the events of June 1 have caused continuing harmful *effects* to

it and its members.  *E.g.*, TAC ¶ 125.  But it is "a likelihood of future *violations* of [Black Lives

Matter's] rights . . . not simply future *effects* from past violations" which must be alleged to

establish standing.  *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d

1268, 1273 (D.C. Cir. 1994) (emphasis in original).  Like the individual plaintiffs, Black Lives

Matter does not show that the official-capacity defendants are likely to again perpetrate the

claimed constitutional violations of June 1, 2020.  Because each of the plaintiffs lack standing to

seek an injunction against the official-capacity defendants' threatened dispersal of—and use of

force against—demonstrators in Lafayette Square, the Court lacks jurisdiction over these claims.

ii.      Restricted Access to Lafayette Square

Some of the plaintiffs also seek an injunction against restricted access to Lafayette

Square.  These plaintiffs allege that Lafayette Square is a traditional public forum and that the

defendants' "decision to erect a fence around Lafayette Park . . . infringed upon Plaintiffs' rights

to assemble, protest, and demonstrate peaceably by blocking all available access points to the

park."  FAC ¶ 119.  The Court finds that the plaintiffs have standing to challenge the alleged

restrictions on demonstrators' access to Lafayette Square.

"[G]rant[ing] plaintiffs the benefit of all inferences that can be derived from the facts

alleged," *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012)

(alterations and internal quotation marks omitted), the complaint plainly challenges ongoing

restrictions on access to Lafayette Square that have allegedly resulted from the defendants'

decision to build a fence around Lafayette Square and restrict access to it.  *See* FAC ¶¶ 119, 122.

Unlike with their allegations concerning the alleged threats to disperse and use force against

demonstrators, the plaintiffs here do not allege a one-time event, but rather that defendants constructed structures which *continue* to either limit or categorically prohibit access to Lafayette Square.

The government invokes a public notice from the National Park Service stating that "absent a law enforcement need to close the White House Complex, the restrictions will not limit the public's ability to demonstrate in the remainder of the park." Def's Reply at 8–9, Dkt. 58 (No. 1542) (alteration and internal quotation marks omitted). But standing is assessed "at the time the action commences," *Laidlaw*, 528 U.S. at 170, so the defendants' subsequent actions and current policy with respect to Lafayette Square do not negate the plaintiffs' standing.

To the extent the defendants contend that the plaintiffs' challenge to restricted access to Lafayette Square is now moot, *see* Def.'s Mot. to Dismiss at 8, Dkt. 35-1 (No. 1542) ("In any event, although Lafayette Park was temporarily closed on June 1st, the National Parks Service has since reopened the Park to the public with some modifications"), this assertion also fails. The defendants have not met the "stringent" requirement of showing that the challenged conduct—here, restricting demonstrators' access to Lafayette Square—cannot reasonably be expected to start up again. *Laidlaw*, 528 U.S. at 189 (describing the standard as "stringent" and a "heavy burden"). This is especially so given the repeated closures and modifications to Lafayette Square since this litigation began. *See* Hearing Tr. at 9:23–11:13.

Finally, the defendants make several arguments which appear to address the merits of the plaintiffs' First Amendment challenge. For example, they stress that "[t]he gates are only closed when law enforcement determines they need to close the Square for security or law enforcement reasons." Def.'s Reply at 9, Dkt. 58 (No. 1542). And they also argue that none of the permanent or semi-permanent "modifications" to the Square "prohibits demonstrations generally." *Id.* But

22

**JA207**

the federal defendants did not move to dismiss the plaintiffs' request for a First Amendment injunction on the merits under Rule 12(b)(6), and these arguments do not negate the plaintiffs' standing to seek an injunction based on plausibly alleged ongoing restrictions on their First Amendment rights to demonstrate in Lafayette Square.  The plaintiffs have standing to seek an injunction against alleged restrictions on their access to Lafayette Square.

### 3.    *Section 1985(3) and 1986 Claims*

The plaintiffs in *Black Lives Matter* seek damages against the individual-capacity defendants and an injunction against the official-capacity defendants under 42 U.S.C. §§ 1985(3) and 1986.[9]  They argue that defendants Trump, Barr, and Esper directed a conspiracy which "targeted Black people and their supporters" for illegal uses of violent force.  TAC ¶ 245 (No. 1469).  Section 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (2018).  Section 1986 also imposes civil liability on "[e]very person who, having knowledge [of a § 1985 conspiracy], and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so."  *Id.* § 1986.

---

[9] After the defendants argued that sovereign immunity bars damages against the official-capacity defendants, *see* Off. Capacity Mot. to Dismiss at 23, Dkt. 79-1 (No. 1469), the plaintiffs clarified that they "do not seek damages from the official-capacity Defendants."  Pls.' Opp'n at 89, Dkt. 98 (No. 1469) (citing TAC ¶¶ 253, 261).

The plaintiffs' have failed to adequately plead the first two essential elements of a §
1985(3) conspiracy.[10]  Accordingly, the defendants are entitled to qualified immunity as the
plaintiffs have not plausibly alleged a violation of law.  To state a claim under § 1985(3), a
plaintiff must plead four elements: "(1) a conspiracy; (2) for the purpose of depriving, either
directly or indirectly, any person or class of persons of the equal protection of the laws, or of
equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy;
(4) whereby a person is either injured in his person or property or deprived of any right or
privilege of a citizen of the United States."  *Hobson v. Wilson*, 737 F.2d 1, 14 (D.C. Cir. 1984).
Moreover, a plaintiff must adequately plead a § 1985(3) claim to maintain a § 1986 claim: "A
plaintiff who has not stated a claim under § 1985 has no basis for relief under § 1986."  *Moore v.
Castro,* 192 F. Supp. 3d 18, 36 (D.D.C. 2016), *aff'd sub nom. Moore v. Carson,* 775 F. App'x 2
(D.C. Cir. 2019).

The plaintiffs do not argue that the defendants entered into an explicit agreement, but
"courts have to infer an agreement from indirect evidence in most civil conspiracy cases."
*Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983).  The question is whether the
plaintiffs' complaint contains sufficient non-conclusory allegations, *see Iqbal*, 556 U.S. at 678,
to justify an inference that the defendants reached an agreement to target Black people and their
supporters for the illegal use of violent force.

The non-conclusory allegations on which the plaintiffs contend an agreement can be
inferred include the following: before Lafayette Square was cleared, President Trump's Twitter
posts "threatened to use and encouraged violence against protesters," TAC ¶ 5; President Trump

---

[10] Because the Court resolves these claims on this ground, it need not resolve the parties'
disputes about whether an equitable remedy is available or whether the defendants are entitled to
intracorporate immunity.

directed Barr to "personally lead the response to the unrest," *id.* ¶ 60; Barr requested "'riot teams' and other specialized agents" from other federal agencies, *id.*; on June 1, law enforcement officers met at the Joint Operations Command Center at Lafayette Square, *id.* ¶ 45; before the Square was cleared, Barr was seen meeting with federal law enforcement personnel and "pointing north towards St. John's Church," *id.* ¶ 79; federal, D.C., and Arlington officers used the same type of force to disperse demonstrators, *e.g.*, *id.* ¶¶ 141–43, 190–91; and Barr and Esper walked with the President to St. John's Church after the Square was cleared, *id.* ¶ 203.[11]

These allegations, taken as true, do not show sufficient "events, conversations, or documents indicating an agreement or meeting of the minds' amongst the defendants to violate [plaintiffs'] rights based on [their] membership in a protected class." *Barber v. D.C. Gov't*, 394 F. Supp. 3d 49, 66 (D.D.C. 2019) (alteration and internal quotation marks omitted). Rather, they demonstrate only that these officials were communicating with each other on June 1, prior to and after the clearing of Lafayette Square. Merely alleging that the defendant officials communicated, without alleging any details of those communications that suggest an unlawful agreement, cannot justify inferring the requisite agreement for a § 1985(3) conspiracy. *Cf. Abbasi*, 137 S. Ct. at 1868 (suggesting, but not deciding, that "officials employed by the same governmental department do not conspire when they speak to one another and work together in their official capacities").

The plaintiffs argue otherwise, primarily by appealing to two cases involving radically different factual circumstances. First, in *Lagayan v. Odeh*, this Court considered common law

---

[11] Throughout their complaints, the plaintiffs also frequently assert that the defendants "coordinated" with each other or acted according to a "concerted plan." *E.g.*, TAC ¶¶ 45, 76, 99, 107. But these allegations, which "are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

conspiracy and § 1985 claims arising from an alleged conspiracy to traffic the plaintiff to the

United States and enslave her.  199 F. Supp. 3d 21, 24–26, 30–32 (D.D.C. 2016).  The Court

found that the requisite agreement could be inferred because the defendants—all of whom were

related to each other—together coordinated the plaintiff's international travel to the defendants'

home in the United States.  *Id.* at 31.  Thus, the plaintiff was not required to allege "an event,

conversation, or document showing that there was an agreement among the alleged

conspirators."  *Id*. at 30 (internal quotation marks omitted).  Second, in *United States v. Scott*, the

Second Circuit considered a conspiracy claim arising from prison officers' group beating of an

inmate.  979 F.3d 986, 988–89 (2d Cir. 2020).  There, because the officers worked together to

keep the inmate restrained, restrict his ability to protect himself, and remove potential witnesses,

the evidence supported a finding of agreement despite the lack of "an extended period of

premeditation or a distinct verbal agreement."  *Id*. at 990–91.  Neither of these cases support

finding an agreement here.

The D.C. Circuit has instructed that "[t]he circumstances of the wrongdoing generally

dictate what evidence is relevant or available in deciding whether an agreement exists."

*Halberstam*, 705 F.2d at 486.  Here, the management of possible violence, enforcement of the

impending curfew, and policing of demonstrators in Lafayette Square in advance of the

President's travel across the Square generate "obvious alternative explanation[s]," *Iqbal*, 556

U.S. at 682 (internal quotation marks omitted), for the defendants' communications and activities

other than having formed an agreement to violate the plaintiffs' civil rights.  *See* FAC ¶¶ 89–95.

In the circumstances of this case, then, the plaintiffs' allegations concerning the defendants'

proximity to each other and parallel activities alone cannot justify inferring "an agreement or

meeting of the minds amongst the defendants to violate [the plaintiffs'] rights based on [their]

membership in a protected class." *Barber*, 394 F. Supp. 3d at 66 (internal quotation marks omitted).

For these reasons, the conspiracy claims will be dismissed.

>   4.          *Posse Comitatus Act (PCA)*

The *Buchanan* plaintiffs allege that the defendants deployed military police and National Guard members to Lafayette Square on June 1, 2020, in violation of the Posse Comitatus Act (PCA), 18 U.S.C. § 1385. *See* FAC ¶¶ 143–51. They seek damages for the defendants' alleged violation of the PCA, or, in the alternative, to maintain an *ultra vires* claim for declaratory and injunctive relief. The Court will dismiss both claims.

>   i.          PCA Damages Claim

Critically, the PCA does not create a private civil cause of action for damages. The PCA provides that "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385. Criminal statutes like the PCA do not always—or even generally—create a cause of action for civil damages. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (concluding that finding a "concomitant civil damages cause of action" with every criminal statute "would work a significant shift in settled interpretive principles regarding implied causes of action"); *Sai v. Trump*, 325 F. Supp. 3d 68, 71 (D.D.C. 2018) ("[C]ourts are quite reluctant to infer a private right of action from a criminal prohibition alone.") (internal quotation marks omitted). Because Congress enacted the PCA as a criminal statute, the Court must find independent evidence of Congress' intent to create a civil damages remedy before allowing such an action to proceed.

*See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.").

That evidence is lacking here. There is no indication from the text of the PCA that Congress intended to create a private civil right of action. Instead, the text creates a criminal penalty with no mention whatsoever of any civil remedy. *See* 18 U.S.C. § 1385 (violators "shall be fined under this title or imprisoned not more than two years, or both"). The plaintiffs attempt to overcome the plain text of the statute by citing extra-textual sources sounding in statutory purpose. In particular, they argue that the PCA was motivated by a long-standing "[s]trong opposition to military encroachment into civilian life" in this country. Pl.'s Opp'n at 73, Dkt. 51 (No. 1542). But the fact that Congress disfavored military encroachment into civilian life does not indicate that it intended to include a civil remedy in a statute which by its terms creates only criminal penalties. The plaintiffs provide no probative evidence regarding the enacting Congress' view of the scope or operation of the PCA, so there is no justification for finding that Congress intended the statute to include an extra-textual civil remedy.

These reasons weigh heavily against recognizing an implied cause of action for damages under the PCA, and numerous courts have found that the PCA does not create a private civil cause of action. *E.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994). The Court finds no reason to depart from the weight of the authority and will dismiss the plaintiffs' claim for damages under the PCA.

      ii.    *Ultra Vires* Claim

The D.C. Circuit has described *ultra vires* review as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). *Ultra vires* review is only available "when the agency's error is patently a misconstruction of the Act, or when the agency has disregarded a specific and unambiguous statutory directive, or when the agency has violated some specific command of a statute. Garden-variety errors of law or fact are not enough." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (citations and internal quotation marks omitted).

The plaintiffs have failed to state a viable *ultra vires* claim for the defendants' alleged violation of the PCA, which prohibits "willfully us[ing] any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws." 18 U.S.C. § 1385. The plaintiffs allege that D.C. National Guard personnel participated in the clearing of Lafayette Square on June 1, 2020. However, the issue of the PCA's application to National Guard units which have not been ordered to active duty is less than "specific and unambiguous," *Griffith*, 842 F.2d at 493. As the Seventh Circuit recently explained:

> The Posse Comitatus Act . . . only bars the Army and Air Force from domestic law enforcement, but does not apply to Title 32 National Guard duty. 18 U.S.C. § 1385 . . . . While the Army National Guard and the Air National Guard are reserve components of the Army and Air Force, respectively, the National Guards are covered by different statutes (*i.e.*, Title 32) than those that apply to the active duty forces (*i.e.*, Title 10).

*Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019). Consistent with the Seventh Circuit's analysis, the defendants argue that the PCA only applies to members of the D.C. National Guard when they have been ordered to active duty pursuant to Title 10 of the U.S. Code. And the plaintiffs here have not alleged that on June 1 the D.C. National Guard members had been ordered to active duty under Title 10. The plaintiffs respond that "in light of its unique

role among National Guard units as a federal entity, the D.C. National Guard should be considered perpetually in federal service, such that the Posse Comitatus Act would apply to it at all times." Pl.'s Opp'n at 71, Dkt. 51 (No. 1542) (internal quotation marks omitted). But the plaintiffs cite neither binding nor on-point persuasive authority supporting this novel theory. Accordingly, the Court will dismiss the plaintiffs' *ultra vires* claim.

### B.    D.C. and Arlington Defendants

The plaintiffs bring claims against the D.C. and Arlington individual officers under 28 U.S.C. § 1983 for violations of their First, Fourth, and Fifth Amendment rights, under §§ 1985(3) and 1986 for conspiracy, and against the D.C. and Arlington County municipal governments under § 1983. The individual defendants argue that they are entitled to qualified immunity, while the municipalities argue that the plaintiffs have failed to state a claim.

#### 1.    *Venue*

Before proceeding to the merits of the claims against the D.C. and Arlington defendants, the Court will consider whether venue is proper in the District of Columbia as to the Arlington defendants. Venue is "generally governed by 28 U.S.C. § 1391," *Atl. Marine Const. Co. v. U.S. Dist. Court for Western Dist. of Tex.*, 571 U.S. 49, 55 (2013), which states that "[e]xcept as otherwise provided by law . . . [t]his section shall govern the venue of all civil actions brought in district courts in the United States," 28 U.S.C. § 1391(a)(1). Section 1391 provides that: "[a] civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *Id.* § 1391(b)(2). None of the parties dispute that the events giving rise to the plaintiffs' claims occurred in the District of Columbia, in or around Lafayette Square. *See, e.g.*, FAC ¶¶ 3–4. Thus, under the general rule of venue, this district

constitutes the "judicial district in which a substantial part of the events . . . giving rise to the claim occurred," 28 U.S.C. § 1391(b)(2), and venue here is proper.

But the Arlington defendants (officers Vincent, Allen, and Black) argue that venue in this district is improper because a compact between the Park Police and the Arlington Police implies venue in Virginia. Def.'s Reply at 2–6, Dkt. 57 (No. 1542). They base this argument on Section 7302 of the Intelligence Reform and Terrorism Prevention Act of 2004, which includes a provision on National Capital Region Mutual Aid ("NCRMA"). *See* 42 U.S.C. § 5196 note. That provision establishes the venue rule for mutual aid agreements between federal and state or local governments that meet certain requirements. It states that "[a]ny action brought against a party or its officers, employees, or agents on account of an act or omission in the rendering of aid [to the receiving party]" under certain mutual aid agreements must be brought "under the laws and procedures of the State of the party rendering aid and only in the Federal or State courts located therein." *Id.* § 5196 note (d). The Arlington defendants contend that this provision applies to a 2016 agreement between the U.S. Park Police and the Arlington County Police Department to provide "law enforcement assistance in the event of an emergency of public service events" which was signed by the chiefs of both police departments. Arlington Defs.' Mot. to Dismiss Ex. D, Dkt. 36-4 (No. 1542) ("Agreement"). Pursuant to the Agreement, the Park Police requested that Arlington Police assist in managing the demonstrations on June 1, 2020. Law Enforcement Support Request Form, Dkt. 36-5 (No. 1542).

This argument is unavailing. First, in order to trigger the venue requirement of the NCRMA, an agreement involving the federal government must be executed by an "authorized representative of the Federal Government." 42 U.S.C. § 5196 note (b)(1). This includes an "individual or individuals designated" for this task "by the President with respect to the

executive branch, the Chief Justice with respect to the Federal judiciary, or the President of the Senate and Speaker of the House of Representatives with respect to Congress, or their designees." *Id.* § 5196 note (a)(1). Here, there is no indication that the Chief of the U.S. Park Police was so designated by the President. Even so, the Arlington defendants insist that the agreement is valid because the Park Police Chief acted pursuant to *implied* authority. *See* Arlington Defs.' Reply at 2, Dkt. 57 (No. 1542). But that argument holds little water where the statute explicitly requires actual authority. Here, the statute specifies who may "enter into, request or provide assistance under mutual aid agreements with localities," 42 U.S.C. § 5196 note (b)(1), and it defines a mutual aid agreement as one "authorized under subsection (b)," *id.*

Second, the Agreement itself indicates that it was not meant to incorporate the entirety of the NCRMA. For example, it describes the parties' respective authority to enter the agreement in other federal, state, and local law, rather than the relevant NCRMA statute. *See* Agreement at 1 (citing, for example, D.C. Code Ann. § 5-205, Virginia Code § 15.2-1726). And although the Agreement states that it falls under the NCRMA in one instance, *see id.*, it explicitly limits this reference to situations in which "the USPP is requested by the ACPD to provide [assistance], to which the liability provisions of [NCRMA] shall apply." *Id.* Here, by contrast, the Arlington Police were requested by the U.S. Park Police to provide assistance, not the other way around. *See* Law Enforcement Support Request Form, Dkt. 36-5 (No. 1542). Because all of the events giving rise to this suit occurred in the District of Columbia, *see* 28 U.S.C. § 1391(b)(2), and the mutual aid agreement does not require venue elsewhere, venue in the District of Columbia is proper as to the Arlington defendants.

2.      *Section 1985(3) and 1986 Claims*

The section 1985(3) and 1986 conspiracy claims against the D.C. and Arlington

defendants must be dismissed for the same reason that the parallel conspiracy claims against the

federal defendants were dismissed.  That is because, as described at length above, *supra* III.A.3,

the plaintiffs have not plausibly alleged the existence of a conspiracy.  Thus, it cannot be said

that the D.C. and Arlington officials either participated in, or had the opportunity to prevent, a

conspiracy that itself has not been plausibly alleged.

3.      *Section 1983 Damages Claims—Individual Defendants*

The plaintiffs also bring claims for damages against Arlington and D.C. officials in their

individual capacities under 42 U.S.C. § 1983.  Among other things, they allege that the

defendants violated their First Amendment rights by "suppress[ing] a peaceful demonstration

and the viewpoint it represented," TAC ¶ 264; *see also* FAC ¶¶ 152–58, and violated their Fourth

Amendment rights by "the use of physical force," TAC ¶ 271, including "chemical agents," *id.*,

which caused the plaintiffs "to move from the area around Lafayette Square, without a warrant or

probable cause," *id.*  The *Buchanan* plaintiffs also bring a separate Fifth Amendment claim for

the violation of their rights under substantive due process, although they do not distinguish

between the different categories of defendants, simply using the general term "defendants"

throughout their claims.  FAC at 45–46.

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Because qualified

immunity is "immunity from suit," the Supreme Court "repeatedly ha[s] stressed the importance

of resolving immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S. at

232 (internal quotation marks omitted). "Clearly established means that, at the time of the

officer's conduct, the law was sufficiently clear that every reasonable official would understand

that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)

(internal quotation marks omitted). "This demanding standard protects all but the plainly

incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

### i. The First Amendment

The plaintiffs bring various claims under the First Amendment, arguing that the District

of Columbia and Arlington defendants restricted their protected speech, retaliated against them

on the basis of their speech, and committed viewpoint discrimination. Two of these claims

survive the defendants' motions.

### a. Restriction of Speech

The complaints allege that the plaintiffs were engaged in a peaceful protest when federal

and Arlington defendants "destroy[ed] the peaceable gathering" with unprovoked force. TAC ¶

4. The defendants "fired (or ordered to be fired) tear gas, pepper spray capsules, rubber bullets,

and flash bangs into the crowd and physically charged at the protestors to shatter the peaceful

gathering, forcing demonstrators to flee [Lafayette Square]." *Id.* ¶ 3. The *Buchanan* complaint

alleges that District of Columbia MPD officers helped clear Lafayette Square along with the

Arlington and federal officers, *see* FAC ¶ 57,[12] while the other three complaints do not place

---

[12] The *Buchanan* plaintiffs base this allegation on "information and belief." FAC ¶ 57. The D.C.
defendants urge the Court to disregard the allegation because the facts underlying it were not
"peculiarly within the possession and control of the defendant," and therefore are improper for
pleading on information and belief. D.C. Defs.' Reply at 5, Dkt. 63 (No. f1542) (quoting *Arista
Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). At this early stage, however, the
Court will accept the facts alleged as true, *Hettinga*, 677 F.3d at 476, acknowledging that the

MPD officers on the Square itself.  The plaintiffs further allege that as "[d]emonstrators [] fled west away from the Square," TAC ¶ 3, they encountered MPD officers who "fired tear gas at demonstrators as they fled." *Id.*; *see also* FAC ¶¶ 57–58.

Taking these allegations as true, the plaintiffs have alleged an unconstitutional restriction on protected speech.  "Certain types of places are so vital to a healthy and robust public discourse that they are accorded special status under the first amendment. . . . [and] access to them is a small but invaluable part of every American's heritage." *White House Vigil*, 746 F.2d at 1526.  Lafayette Square, which sits across from the White House, is no doubt one such forum. Indeed, it is a "quintessential public forum," *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992), which provides "a unique situs for the exercise of First Amendment rights," *A Quaker Action Grp. v. Morton*, 516 F.2d 717, 725 (D.C. Cir. 1975).

In this traditional public forum, "the government cannot constitutionally prohibit all expressive activities." *White House Vigil*, 746 F.2d at 1526.  It can only adopt "reasonable time, place and manner restrictions on the exercise of free speech, so long as the restrictions are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication." *Id.* at 1527 (internal quotation marks omitted). Accepting the facts as alleged in the complaints, the government "prohibit[ed] *all* expressive activities," *id.* at 1526 (emphasis added), in Lafayette Square by violently clearing all of the peaceful protestors, *see* FAC ¶¶ 57–58.  And it did so without *any* basis.  FAC ¶ 10 (the clearing "was undertaken for no rational reason").  Further, no alternative channels of communication

---

plaintiffs have not yet had the benefit of discovery and have alleged that the defendants took specific acts, albeit in concert.  At later stages of the proceedings, the *Buchanan* plaintiffs will need to supplement this allegation with record evidence.

were left open either in the forum itself, or in surrounding areas.  TAC ¶ 109.  Accordingly, the

plaintiffs have plausibly alleged a constitutional violation.

And this violation, as alleged, would have been clear to every reasonable officer at the

time it occurred.  *See Wesby*, 138 S. Ct. at 589.  In *Edwards v. South Carolina*, the Supreme

Court decided a highly analogous case.  372 U.S. 229 (1963).  There, a crowd of about 200

individuals had gathered in front of the state capital in South Carolina to protest racially

discriminatory laws and a crowd of 200 to 300 had gathered to observe the protest.  *Id.* at 230–

31.  As alleged here, the crowd was initially peaceful.  *See id* at 231 ("There was no evidence to

suggest that these onlookers were anything but curious, and no evidence at all of any threatening

remarks, hostile gestures, or offensive language on the part of any member of the crowd.").

Nevertheless, police informed the group that "they would be arrested if they did not disperse

within 15 minutes."  *Id.* at 233.  "After 15 minutes had passed, the police arrested the petitioners

and marched them off to jail."  *Id.*  The Court found a First Amendment violation, reasoning that

"the circumstances in this case reflect an exercise of these basic constitutional rights in their

most pristine and classic form."  *Id.* at 235.  *Edwards* is not perfectly analogous, as there were no

alleged threats of arrest in Lafayette Square on June 1, 2020 (nor, on the other hand, were there

allegations of overwhelming force in *Edwards*), *see generally id.*, yet the precedential weight of

the First Amendment reasoning stands.  In light of this precedent, any reasonable officer would

have been aware that it is a violation of foundational First Amendment rights to forcibly end a

peaceful protest in a traditional public forum without any legitimate justification for doing so.

Of note, the defendants argue that the clearing of the Square was justified by a significant

government interest—the national interest in presidential security, supported by the Supreme

Court's holding in *Wood v. Moss*, 572 U.S. at 747.  There, the Supreme Court considered a First

Amendment challenge against Secret Service officers who moved protestors demonstrating against then-President Bush when the President made an impromptu decision to stop for dinner. *Id.* at 747–48. The Secret Service declined to move another set of protestors who were across the street demonstrating in favor of the President. *Id.* The Court held that the officers were entitled to qualified immunity. *Id.* at 764. The Court recognized that, as here, "[f]aced with the President's sudden decision . . . , the Secret Service agents had to cope with a security situation not earlier anticipated." *Id.* at 748. As to the question of whether the law was clearly established, the Court was unambiguous—"[n]o decision of this Court so much as hinted that their on-the-spot action was unlawful because they failed to keep the protesters and their supporters, throughout the episode, equidistant from the President." *Id.*

Although *Wood v. Moss* strongly supports recognizing qualified immunity where protestors' rights intersect with presidential security, the Court is unable at this time to credit the defendants' assertion that the clearing of the Square was done in the interest of presidential security. After all, the plaintiffs repeatedly allege that the clearing was done for "wholly illegal reason[s]," TAC ¶ 4; *see also* FAC ¶ 8 ("no justification"); *Id.* ¶ 10 ("no rational reason"). True, the *Black Lives Matter* plaintiffs allege that the defendants' "professed purpose" was to "to clear the area to permit the President to walk to a photo opportunity at a nearby church," TAC ¶ 4, but the Buchanan plaintiffs point to a broader range of motives, FAC ¶¶ 89–95; Hrg. Tr. at 76:3–15. And all of the plaintiffs argue that the defendants' explanations for the clearing shifted over time. *See, e.g.*, TAC ¶ 4 (describing the President's travel as the *professed* purpose and going on to say it was "wholly illegal"); Hearing Tr. at 67:15–22 (*Black Lives Matter* plaintiffs pointing out the "shifting justifications"). At this early stage of the proceedings, without any record evidence, the Court cannot assess the defendants' asserted bases for the clearing the Square, nor can it

determine other facts relevant to this claim.  As this case moves forward, both parties will have the opportunity to prove their respective positions with record evidence.

b.   Retaliation

To state a claim for First Amendment retaliation, a plaintiff must allege that: "(1) he or she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up).  The Supreme Court recently clarified the contours of the causation element in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).  There, the Court held that "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Id.* at 1722.

The plaintiffs allege that they were engaging in protected speech—peacefully protesting in Lafayette Square—when the Arlington defendants (and, in the case of the *Buchanan* plaintiffs, the D.C. defendants) attacked them violently without provocation.  *See* TAC ¶¶ 1, 3; FAC ¶ 57.  They allege that the protest was entirely peaceful and that the defendants had no legitimate basis for the violent attack besides animus toward the protestors and their message.  *See* FAC ¶ 8 (alleging that it "seems [the protestors] were removed simply because they were offering a message of racial justice and equality different from the President's.").  Likewise, the plaintiffs allege that the D.C. defendants who sprayed chemical agents on the fleeing crowd a block away from Lafayette Square did so to disrupt the protestors' racial justice demonstration.  *See* TAC ¶

223 (alleging that the D.C. defendants' "actions were based on and/or taken in retaliation for the viewpoint being expressed by the demonstrators").

To be sure, the plaintiffs do not allege any explicit evidence indicating that the individual Arlington and D.C. defendants held personal animus against the plaintiffs' exercise of protected speech. *See generally* FAC, TAC. Rather, they argue that, given the extreme nature of the defendants' actions, plus the shifting and insufficient explanations therefore, "the only reasonable inference from Defendants' conduct is that they forcibly dispersed protesters . . . in retaliation for Plaintiffs' exercise of protected First Amendment activity." FAC ¶ 120. Of course, direct evidence of retaliatory animus is not required, especially at this early stage of the proceedings. "Causation may be inferred—especially at the pleading stage—when the retaliatory act follows close on the heels of the protected activity." *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015) (internal quotation marks omitted). Because of the defendants' shifting explanations for the clearing, at this early stage, the plaintiffs have plausibly alleged that the defendants did not have a non-retaliatory motive for their actions and that they reacted with overwhelming force disproportionate to any rational need. *See* TAC ¶¶ 4, 8, FAC ¶ 9; Hrg. Tr. at 67:15–22 (*Black Lives Matter* plaintiffs noting shifting justifications). Therefore, the plaintiffs have sufficiently alleged a claim of First Amendment retaliation.

Having found a plausible allegation of a constitutional violation, the Court must consider whether the right alleged to be violated was clearly established at the time. No doubt, the general right to be free from retaliation for protected speech is clearly established. *See Reichle v. Howards*, 566 U.S. 658, 665 (2012); *Hartman v. Moore*, 547 U.S. 250, 256 (2006). But the Supreme Court has held that such a formulation draws the question at too high a level of generality. *Id.* ("Here, the right in question is not the general right to be free from retaliation for

one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause.").

The appropriately tailored question is whether a peaceful protestor has the right to be free from government violence in retaliation for the message of their protest. The Court finds that every reasonable officer would have been aware of such a right on June 1, 2020. *See Wesby*, 138 S. Ct. at 589. In *Quraishi v. St. Charles County, Missouri*, 986 F.3d 831 (8th Cir. 2021), the Eighth Circuit decided a case highly analogous to this one and held that a "robust consensus of cases of persuasive authority" clearly established that deploying a tear-gas canister without warning at peaceful reporters at a police brutality protest violated the right to be free from First Amendment retaliation. *Id.* at 839. So too here.

Even if the case law were insufficient to provide notice, though, the right to be free from government violence for the peaceful exercise of protected speech is so fundamental to our system of ordered liberty that it is "beyond debate." *Wesby*, 138 S. Ct. at 589; *see Edwards*, 372 U.S. at 235 (finding that peaceful protestors "reflect an exercise of [] basic constitutional rights in their most pristine and classic form"). Taking the facts as alleged, this is the "rare obvious case where the unlawfulness of the officer's conduct is sufficiently clear even [if] existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted); *see Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (Gorsuch, J.) (reasoning that "some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing").

As noted above, the parties will have the opportunity to attempt to prove and rebut their claims at the discovery stage. And record evidence gathered during discovery will shed light on

whether the defendants had a legitimate, non-retaliatory justification for their actions on June 1, 2020. At this early stage, taking the alleged facts as true, the plaintiffs have alleged enough to overcome qualified immunity and survive the motions to dismiss.

### a.   Viewpoint Discrimination

Finally, the plaintiffs raise the separate point that the defendants violated their First Amendment rights by discriminating against them based on their viewpoint. *See* Pls.' Opp'n to Def. Barr et al. at 38–39, Dkt. 98 (No. 1469). Though viewpoint discrimination can violate clearly established rights to First Amendment exercise, the plaintiffs have failed to connect clearly established law to the more specific facts at issue here.

The plaintiffs rely heavily on *Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997), where the court held that the National Park Service violated the First Amendment by threatening to arrest demonstrators who spoke out against President Clinton's veto of a bill banning partial birth abortions at President Clinton's inauguration. *Id.* Critically, the Service did not threaten demonstrators espousing *other* viewpoints, and actually admitted that it discriminated on the basis of viewpoint. *Id.* at 1456. But that case is quite different than this one, where the plaintiffs allege that the defendants cleared *all* protestors from Lafayette Square. *See, e.g.*, TAC ¶ 206 (describing the purported class as "[a]ll individuals present at Lafayette Square").

The plaintiffs attempt to overcome this fact by arguing that there were no counter protests present, so the entire crowd held the same viewpoint. *See* Pls.' Opp'n to Fed. Defs. at 57, Dkt. 51 (No. 1542). But they provide no support for the seemingly novel proposition that restricting the speech of an entire crowd, without *any* differentiation as to viewpoint between crowd members, can constitute viewpoint discrimination simply because the members of the crowd are presumed to hold homogenous views. Rather, the plaintiffs appear to base their viewpoint

41
**JA226**

discrimination argument on tweets by former President Trump.  *See* TAC ¶¶ 53–64.  In

particular, they compare President Trump's tweets criticizing protestors with tweets praising

demonstrators in favor of his own viewpoints.  *See id.*; Pls.' Opp'n to Defs. Barr et al (No. 1469).

These allegations are of little relevance to the qualified immunity analysis here, though, as they

do not relate to the Arlington or D.C. defendants.  And to defeat qualified immunity, a plaintiff

must allege that "each [defendant,] through the official's *own* individual actions, has violated the

Constitution."  *Elkins v. District of Columbia*, 690 F.3d 554, 564 (D.C. Cir. 2012) (emphasis

added).

ii.    The Fourth Amendment

The plaintiffs also bring Fourth Amendment claims against the D.C. and Arlington

defendants for unreasonable seizures conducted with excessive force.  The plaintiffs have not,

however, pointed to a violation of any clearly established Fourth Amendment right that can

overcome the defendants' entitlement to qualified immunity.  Taking the facts in the light most

favorable to the plaintiffs, the officers attacked and improperly *dispersed* the protesters—they

did not restrain them or attempt to seize them in place.  *See* TAC ¶¶ 83–101; *contra Horse v.

District of Columbia*, No. 17-cv-01216 (D.D.C. Sept. 27, 2019) (law enforcement officers

detained and handcuffed protestors).  Indeed, quite the opposite was true—the officers attempted

to cause the protestors and fleeing crowd to leave their location, rather than cause them to remain

there.  *See* TAC ¶¶ 83–101.  And the plaintiffs allege that they all did in fact leave Lafayette

Square.  *See* FAC ¶¶ 84–85 (alleging that plaintiff Field "walked away from the barricades" and

then "continued to walk away from the police and military's attack").  These alleged facts lie in

stark contrast to the Supreme Court's recent holding that "the application of physical force to the

body of a person *with intent to restrain* is a seizure even if the person does not submit and is not subdued." *Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021) (emphasis added).

One could make the argument that, although the plaintiffs were not physically restrained, their freedom of movement was restrained because the defendants sought to route them in certain directions. But even assuming that the plaintiffs were seized by being forced to leave Lafayette Square, the plaintiffs have not pointed to a case clearly establishing that attempting to move members of a crowd (rather than keep them in a location) can constitute a seizure. And where assessing qualified immunity in the context of the Fourth Amendment, the Supreme Court has repeatedly "stressed the need to *identify a case* where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Wesby*, 138 S. Ct. 577 at 590 (emphasis added).

In an effort to ground their claim in relevant precedent, the plaintiffs point out that "Supreme Court and Circuit precedent hold[s] that even a momentary limitation of a person's freedom of moment is a seizure if it results from means intentionally applied." Pls.' Opp'n at 3, Dkt. 98 (No. 1469); *see also id.* at 55. But this frames the issue at far too high a level of generality, which the Supreme Court has repeatedly instructed against. *See, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality.") (internal quotation marks omitted). The relevant question is not whether a momentary use of force can constitute a seizure—of course, it can—but whether the use of tear gas to move members of a crowd can constitute a seizure. Because the plaintiffs have pointed to no case clearly establishing an answer to that question, the defendant officials are entitled to qualified immunity.

iii.     The Fifth Amendment

The *Buchanan* plaintiffs allege that the defendants violated their right to substantive due

process under the Fifth Amendment.  FAC at 45–46 (Third Cause of Action).  Specifically, they

allege that "[b]y violently attacking unarmed protesters engaged in expressive conduct,

Defendants have engaged in conduct that was so egregious, so outrageous that it may fairly be

said to shock the contemporary conscience . . . and therefore constitutes excessive force in

violation of the Due Process Clause of the Fifth Amendment."  *Id.* ¶ 134 (citation and internal

quotation marks omitted).

As an initial matter, the Fifth Amendment does not apply to the Arlington defendants, as

they are not federal actors.  After all, "actions of the *federal* government are reviewed under the

Fifth Amendment."  *United States v. Al-Hamdi*, 356 F.3d 564, 573 n.11 (4th Cir. 2004)

(emphasis added).  "Regardless, the standards employed by the Supreme Court in analyzing due

process claims under the Fourteenth Amendment apply with equal force to claims raised under

the Fifth Amendment."  *Id.*  And "the Due Process Clause, whether it be the one found in the

Fifth Amendment or the Fourteenth Amendment, protects individuals from deprivations of due

process by state actors."  *Fennell v. AARP*, 770 F. Supp. 2d 118, 132 (D.D.C. 2011).

To violate the dictates of due process, the alleged conduct must be "so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience."  *Cnty. of

Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  The D.C. Circuit has outlined four "sensible

guidelines," *Norris v. District of Columbia*, 737 F.2d 1148, 1150 (D.C. Cir. 1984), to evaluate

whether government action shocks the conscience: [(1)] "the need for the application of force,

[(2)] the relationship between the need and the amount of force that was used, [(3)] the extent of

injury inflicted, and [(4)] whether force was applied in a good faith effort to maintain or restore

discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* (internal quotation marks omitted).

Important here, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cnty. of Sacramento*, 523 U.S. at 842 (internal quotation marks omitted); *see also Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 541 (D.C. Cir. 2015) (holding that because the plaintiff's "claim of illegal seizure is cognizable under the Fourth Amendment," it "therefore cannot proceed under the doctrine of substantive due process"). And a claim need not be certain to succeed under the more specific amendment to foreclose substantive due process analysis. "Substantive due process analysis is . . . inappropriate," *Cnty. of Sacramento*, 523 U.S. at 843, when the plaintiffs' claims are "*covered by*" a more specific amendment, *id.* (emphasis added). As discussed above, the First Amendment's protection against restrictions on speech and retaliation on the basis of speech provides "an explicit textual source of constitutional protection" for the conduct alleged here. *Id.* at 842 (internal quotation marks omitted). Thus, "the more generalized notion of substantive due process" cannot provide a basis for relief. *Id.* (internal quotation marks omitted).

4.     *Section 1983 Municipal Liability*

Finally, the plaintiffs bring claims for municipal liability, alleging that the District of Columbia and Arlington County were deliberately indifferent in failing to train their officers about the use of chemical irritants against protesters. *See* FAC ¶¶ 152–154; TAC ¶¶ 275, 281.

To state a claim for municipal liability, a plaintiff must allege that the municipality followed a "policy or custom" that resulted in the constitutional injury. *See Monell v. Dep't of*

*Soc. Servs. of City of New York*, 436 U.S. 658, 691–94 (1978).  Under this rule, "a municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation."  *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989) (internal quotation marks omitted).  The plaintiffs must allege either (1) an express municipal policy; (2) actions of a final municipal policymaker; (3) custom with the force of law; or (4) deliberate indifference, which can include a failure to train.  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

Here, the plaintiffs do not allege that the municipalities followed an express policy to improperly deploy chemical irritants and other force on protestors.  *See generally* TAC; FAC. Rather, they allege that the District of Columbia "fail[ed] to train or supervise" officers, TAC ¶ 275, and was "deliberately indifferent to the risk of constitutional violations," *id.* ¶ 281.  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  But the Supreme Court has made clear that "deliberate indifference" in this context requires a significant showing. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id.* at 61 (internal quotation marks omitted).  "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983," because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident."  *City of Canton*, 489 U.S. at 391–92 (1989).  For these reasons, "[a] municipality's culpability for a

deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*,

563 U.S. at 61.

As support for D.C.'s alleged failure to train its officers, the *Black Lives Matter* plaintiffs

point to five past incidents, unrelated to the Lafayette Square events, in four of which the

Metropolitan Police Department used chemical irritants on crowds. *See* TAC ¶¶ 110, 113. The

incidents span a period of twenty years. *Id.* The *Buchanan* plaintiffs, meanwhile, cite a news

article which asserts that use-of-force incidents by MPD officers has steadily increased in the last

five years, *see* FAC ¶ 154, and point to the MPD's response to protestors during the 2017

inauguration, where "police pinned hundreds of protesters into city blocks, used frequent flash-

bang grenades, and heavily deployed tear gas," *id.*

The *Buchanan* plaintiffs do not provide specific allegations as to Arlington County's

policies or customs, *see generally* FAC ¶¶ 152–58, but instead conclude in their briefing that

"Arlington County was deliberately indifferent when it failed to properly train . . . Arlington law

enforcement officers, on how to appropriately provide mutual aid at the June 1, 2020 Lafayette

Park protest." Pls.' Opp'n to Def. Vincent at 38, Dkt. 50 (No. 1542). They argue that "President

Trump publicly urged a violent and aggressive law enforcement response," *id.*, and "[i]n light of

these statements, and the nature of the preceding protests, Arlington County should have known

that the Arlington Defendants needed to receive 'more or different' training on the use of force at

upcoming protests."[13] *Id.*

---

[13] These allegations are plainly insufficient. The plaintiffs only point to former President's
Trump's public statements—they allege no pattern or practice by Arlington County itself and
provide no specific allegations as to how its specific training program failed. *See* FAC ¶¶ 152–
58. The plaintiffs alternatively request leave to amend, asserting that they would allege that
"complaints against ACPD police personnel rose by 55 percent between 2018 and 2019." Pls.'
Opp'n at 39, Dkt. 50 (No. 1542). But even accepting that proffer, a single allegation about use

47
**JA232**

Accepting these allegations as true, these isolated incidents over the course of two decades in a metropolis as large as Washington D.C. are insufficient to meet the high bar for alleging a municipal policy or custom, as they are too far removed in time to be "so persistent and widespread as to practically have the force of law." *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (internal quotation marks omitted); *see, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) (finding 27 incidents of excessive force over a period of four years in Fort Worth to "not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct"); *Ramos v City of Chicago*, 707 F. Supp. 345, 347 (N.D. Ill. 1989) ("[A]lleging six incidents of police brutality over a ten year period in a city as large as Chicago with a police force in excess of 10,000 members is unremarkable, and in no way indicates a policy or custom.").

What is more, many of these alleged incidents are too far removed from the specific facts alleged here to have put the District on constructive or actual notice of a failure in training. *Connick* is instructive. 563 U.S. 51. There, the plaintiffs argued that a prosecutor's office had failed to train its prosecutors on *Brady* violations by pointing out that "during the 10 years preceding his armed robbery trial, Louisiana courts had overturned four convictions because of *Brady* violations by prosecutors in Connick's office." *Id.* at 62. The Court rejected this argument, holding that "[t]hose four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here

---

of force in general is not particularized enough to the facts here to imply a policy or custom on the part of Arlington County to unlawfully use chemical irritants and force against protestors. Thus, any such amendment would be futile. *SAI v. DHS*, 149 F. Supp. 3d 99, 126 (D.D.C. 2015); *see also Hettinga*, 677 F.3d at 480 (affirming denial of leave to supplement on futility grounds).

[since] [n]one of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind." *Id.* at 62–63.  In other words, the previous incidents were not sufficiently tailored to the precise failure at issue.  Such is the case here, where the *Buchanan* plaintiffs point to evidence that the MPD increased its use of force *generally*.  *See* FAC ¶ 154.  They provide only one prior incident specific to protestors, the 2017 inauguration. *Id.*  Even the *Black Lives Matter* allegations, which are tailored to protests, only cite three incidents that relate in any way to the White House or presidential events.  *See* TAC ¶ 110 (alleging that MPD used "excessive force against demonstrators during the counter-inaugural demonstrations near the White House in January 2005," and "used excessive force against and unconstitutionally detained demonstrators during the counter-inaugural demonstrations in Adams Morgan in January 2005").  And of those incidents, only one is alleged to have involved protestors near the White House, a critical fact here.  *Id.*  Although other Courts have found past incidents of MPD use of tear gas to be sufficient to state a claim for municipal liability, *see, e.g.*, *Horse v. District of Columbia*, No. 17-cv-01216 (D.D.C. Sept. 27, 2019), the Court finds here that these particular allegations are insufficiently similar.  "Because [the majority of alleged] incidents are not similar to the violation at issue here, they could not have put [the District] on notice that specific training was necessary to avoid this constitutional violation."  *Connick*, 563 U.S. at 62.

Accordingly, the municipal liability claims will be dismissed.

***

At this preliminary stage, without a factual record, the Court's rulings are based solely on the allegations in the complaints. Before either party has had an opportunity for discovery, it would be premature for the Court to draw any conclusions about why Lafayette Square was cleared on June 1 or whether the law enforcement officers' actions were justified. The parties will have an opportunity to litigate the facts after discovery.

Taking the allegations of the complaint as true, as the Court must when ruling on a motion to dismiss, the plaintiffs have plausibly stated a claim under 42 U.S.C. § 1983 for First Amendment violations by Arlington County and District of Columbia officials. According to the complaints, the defendants used force, without warning, to break up a crowd of peaceful protestors who were exercising their First Amendment rights in Lafayette Square, a historic and "quintessential public forum," *Doe*, 968 F.2d at 87, which provides a unique situs for the exercise of First Amendment rights," *A Quaker Action Grp.*, 516 F.2d at 725. As alleged, the defendants prohibited all expressive activities in Lafayette Square without any basis at all; they left open no alternative channels; and they forcibly dispersed protestors because of the plaintiffs' exercise of their protected First Amendment rights. Reasonable officers would have known that such alleged actions violated clearly established law. Thus, the plaintiffs' claims for damages against the Arlington County and D.C. officials survive the motions to dismiss.

The plaintiffs' *Bivens* claims for damages against the federal defendants do not. Unlike state officials, federal officials are not subject to the remedies of 42 U.S.C. § 1983. Supreme Court precedent dictates that the Court not extend a damages remedy against federal officials to a "new context," *Abbasi*, 137 S. Ct. at 1859, like this one, where national security interests are implicated and alternative remedies exist, *id.*

One claim for equitable relief against the federal defendants survives. The plaintiffs have

standing to challenge the continued restrictions on access to Lafayette Square because they have plausibly alleged an ongoing injury.  To this day, over a year after the events of June 1, Lafayette Square remains subject to heightened restrictions that periodically limit protestors' access to the Square.  Despite the change in Administrations, the federal defendants have not met the high bar of showing that this claim has been mooted by subsequent events.

Finally, the plaintiffs' remaining claims for injunctive relief are dismissed for lack of standing, and their remaining statutory claims are dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are granted in part and denied in part. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

June 21, 2021

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C. *et al.*, | |
|      *Plaintiffs*, | |
|     v. | No. 20-cv-1469 (DLF) |
| DONALD J. TRUMP *et al.*, | |
|      *Defendants.* | |
| RADIYA BUCHANAN *et al.*, | |
|      *Plaintiffs*, | |
|     v. | No. 20-cv-1542 (DLF) |
| DONALD J. TRUMP *et al.*, | |
|      *Defendants.* | |

## **<u>ORDER</u>**

On June 21, 2021, the Court granted in part and denied in part the defendants'
motions to dismiss in these related cases.  Order, Dkt. 159 (20-cv-1469); Order, Dkt. 68 (20-
cv-1542).  In that order, the Court dismissed all claims against the individual-capacity federal
defendants.  *Id.* at 2–3.  The Court dismissed some claims against the official-capacity federal
defendants, the District of Columbia defendants, and the Virginia defendants.  *Id.*  At the
request of the parties,, these cases have been stayed while the plaintiffs and the official-
capacity federal defendants engaged in settlement discussions  *See* Minute Order of July 14,
2021.  On April 13, 2022, the parties informed the Court that they had reached a settlement.
Notice of Filing of Settlement, Dkt. 182 (20-cv-1469); Notice of Settlement, Dkt. 86 (20-cv-
1542).  The plaintiffs now seek entry of partial final judgment pursuant to Federal Rule of
Civil Procedure 54(b).  Pls.' Unopposed Mot. for Entry of Partial Final J. or for Certification

of Interlocutory Appeal, Dkt. 184 (20-cv-1469); Plaintiffs' Unopposed Mot. for Entry of Rule

54(b) Final J., or, in the Alternative, to Certify Order and J. for Interlocutory Appeal Pursuant

to 28 U.S.C. § 1292(b) and to Stay Case Pending Appeal, Dkt. 89 (20-cv-1542).  The

individual-capacity federal defendants consent to this motion, and the District of Columbia

and Virginia defendants do not oppose it so long as the case remains stayed pending appeal.

*See id.*  The deadline for oppositions to this motion was May 11, 2022, *see* Minute Order of

April 14, 2022, and none have been filed.  Accordingly, the motion is ripe for resolution.

Federal Rule of Civil Procedure 54(b) provides that "[w]hen an action presents more

than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party

claim—or when multiple parties are involved, the court may direct entry of a final judgment

as to one or more, but fewer than all, claims or parties only if the court expressly determines

that there is no just reason for delay."  This is in contrast to the standard rule, which provides

that "a 'final decision'" for the purposes of an appeal "ordinarily must resolve every claim of

every party in a case."  *Attias v. CareFirst, Inc.*, 969 F.3d 412, 416 (D.C. Cir. 2020) (citing

*Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020)).  There are "three

requirements for an otherwise interlocutory order to be certified as a final judgment: (1) the

order must resolve a distinct 'claim for relief'; (2) the order must be 'final' with respect to

that claim; and (3) the district court must permissibly determine that there is 'no just reason

for delay' in entering judgment."  *Id.* at 417 (citation omitted).  Here, the June 21 Order

completely resolved the *Bivens* claims against all the individual-capacity federal defendants

by dismissing them entirely.  These defendants were the only ones against whom *Bivens*

claims had been asserted.  Accordingly, they were "distinct 'claim[s] for relief,'" *id.*, that

were definitively and completely resolved.  Thus, the plaintiffs' request satisfies the first two

prongs for entry of partial final judgment.

     To determine whether there is "no just reason for delay," the Court must "consider[] the 'judicial administrative interests as well as the equities involved.'" *Id.* (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980)).  The judicial administrative interests are "avoiding piecemeal appeals of claims that are not truly 'separable' and . . . avoiding decision of 'the same issues more than once even if there were subsequent appeals.'" *Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 44, 46 (D.D.C. 2008) (quoting *Curtiss-Wright*, 446 U.S. at 8–9).  "The equities consider the impact of delayed review on the parties." *Id.* (citing *Curtiss-Wright*, 446 U.S. at 9–10).  Here, there will not be piecemeal appeals of claims that are not separable because the plaintiffs do not bring *Bivens* claims against the non-appealing defendants.  For the same reason, the D.C. Circuit will not be faced with deciding the same issues more than once.  Under the equities analysis, delayed review would cause duplicative discovery if the D.C. Circuit disagrees with this Court on the dismissal of the *Bivens* claims against the individual-capacity federal defendants.  Thus, this Court concludes that there is no just reason for delay.

     For the foregoing reasons, it is hereby

     **ORDERED** that the plaintiffs' Unopposed Motion for Entry of Partial Final Judgment, Dkt. 184 (20-cv-1469), is **GRANTED**.  It is further

     **ORDERED** that the plaintiffs' Unopposed Motion for Entry of Partial Final Judgment, Dkt. 89 (20-cv-1542), is **GRANTED**.  It is further

     **ORDERED** that the plaintiffs' Unopposed Motion for Certification of Interlocutory Appeal, Dkt. 184 (20-cv-1469), is **DENIED AS MOOT**.  It is further

     **ORDERED** that the plaintiffs' Unopposed Motion for Certification of Interlocutory

Appeal, Dkt. 89 (20-cv-1542), is **DENIED AS MOOT**.  It is further

      **ORDERED** that the plaintiffs' Unopposed Motion for Stay Pending Appeal, Dkt. 184

(20-cv-1469), is **GRANTED**.  Accordingly, it is hereby **ORDERED** that *Black Lives Matter*

*D.C. et al. v. Trump et al.*, 20-cv-1469, is **STAYED** pending appeal.  It is further

      **ORDERED** that the plaintiffs' Unopposed Motion for Stay Pending Appeal, Dkt. 89

(20-cv-1542), is **GRANTED**.  Accordingly, it is hereby **ORDERED** that *Buchanan et al. v.*

*Trump et al.*, 20-cv-1542, is **STAYED** pending appeal.

      A separate judgment will be entered.

      **SO ORDERED.**

DABNEY L. FRIEDRICH
United States District Judge

May 16, 2022

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C. *et al.*,

         *Plaintiffs*,

     v.

DONALD J. TRUMP *et al.*,

         *Defendants.*

No. 20-cv-1469 (DLF)

### PARTIAL FINAL JUDGMENT

For the reasons stated in the Memorandum Opinion, Dkt. 160, and the Order, Dkt. 185, and in accordance with the Order, Dkt. 159, it is hereby

**ORDERED** that **FINAL JUDGMENT** of dismissal is **ENTERED** in favor of defendants William P. Barr, Mark Adamchick, Jonathan Daniels, Sean Cox, Luis Feliciano, Jeffrey Hendrickson, Nicholas Jarmuzewski, Bryan McDonald, Cara Seiberling, Lawrence Sinacore, Thomas LoCasico, and Sean Kellenberger against the plaintiffs as to Counts 1 and 2 of the plaintiffs' Third Amended Complaint, Dkt. 52.

**SO ORDERED**.

DABNEY L. FRIEDRICH
United States District Judge

May 16, 2021

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RADIYA BUCHANAN *et al.*, <br>        *Plaintiffs*, <br>   v. <br> DONALD J. TRUMP *et al.*, <br>        *Defendants.* | No. 20-cv-1542 (DLF) |

## <u>PARTIAL FINAL JUDGMENT</u>

For the reasons stated in the Memorandum Opinion, Dkt. 69, and the Order, Dkt. 90, and in accordance with the Order, Dkt. 68, it is hereby

**ORDERED** that **FINAL JUDGMENT** of dismissal is **ENTERED** in favor of defendants William P. Barr, Mark Adamchick, Gregory Monahan, Russell Fennelly, and Cara Seiberling against the plaintiffs as to Count 4 of the plaintiffs' Amended Complaint, Dkt. 29.

**SO ORDERED**.

May 16, 2021

DABNEY L. FRIEDRICH
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C.; Toni SANDERS; J.N.C.; Kishon MCDONALD; Garrett BOND; Keara SCALLAN; Lia POTEET; Dustin FOLEY; and E.X.F., *on behalf of themselves and all others similarly situated*, | |
| *Plaintiffs*, | No. 1:20-cv-01469-DLF |
| v. | |
| William P. BARR; Mark ADAMCHIK; Jonathan DANIELS; Sean COX; Luis FELICIANO; Jeffrey HENDRICKSON; Nicholas JARMUZEWSKI; Bryan MCDONALD; Cara SEIBERLING; Lawrence SINACORE; Thomas LOCASCIO; and Sean KELLENBERGER, *in their individual capacities*, | |
| *Defendants*. | |

**NOTICE OF APPEAL**

Plaintiffs Black Lives Matter D.C., Toni Sanders, J.N.C., Kishon McDonald, Garrett Bond, Keara Scallan, Lia Poteet, Dustin Foley, and E.X.F., hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's May 16, 2022, Partial Final Judgment, ECF 186 (which incorporates by reference this Court's June 21, 2021, Opinion and Order on Defendants' motions to dismiss, ECF 159 & 160), granting judgment to Defendants William P. Barr, Mark Adamchik, Jonathan Daniels, Sean Cox, Luis Feliciano, Jeffrey Hendrickson, Nicholas Jarmuzewski, Bryan McDonald, Cara Seiberling, Lawrence Sinacore, Thomas LoCascio, and Sean Kellenberger, on Counts 1 and 2 in the Plaintiffs' Third Amended Complaint, ECF 52.

May 16, 2022

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Sonia Tabriz (D.C. Bar No. 1025020)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

Respectfully submitted,

/s/ Scott Michelman
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
American Civil Liberties Union Foundation
    of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org

Kaitlin Banner (D.C. Bar No. 1000436)
Dennis Corkery (D.C. Bar No. 1016991)
Jonathan Smith (D.C. Bar No. 396578)
Washington Lawyers' Committee for Civil
    Rights and Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

RADIYA BUCHANAN, et al.,

       *Plaintiffs*,

    v.

DONALD J. TRUMP, et al.,

       *Defendants*.

**Case No. 1:20-cv-01542-DLF**

---

## NOTICE OF APPEAL

Notice is hereby given that All Plaintiffs in the above-captioned case hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Order, Dkts. 68-69, dismissing the Individual-Capacity Federal Defendants (William Barr, Gregory Monahan, Mark Adamchik, Russell Fennelly, and Cara Seiberling) as well as Plaintiffs' *Bivens* claims, which was certified as a final judgment pursuant to Rule 54(b) on May 16, 2022, Dkt. 90.


Dated:   May 16, 2022

                 Respectfully submitted,

                 */s/  Greta  B.  Williams*

                 Greta B. Williams (D.C. Bar No. 1006968)
                 Naima L. Farrell (D.C. Bar No. 1023230)
                 Matthew Guice Aiken (D.C. Bar No. 1616755)
                 GIBSON, DUNN & CRUTCHER LLP
                 1050 Connecticut Avenue, N.W.
                 Washington, D.C. 20036-5306
                 Tel:  202.955.8500
                 GBWilliams@gibsondunn.com
                 NFarrell@gibsondunn.com
                 MAiken@gibsondunn.com

                 Randy M. Mastro (*pro hac vice*)
                 Orin Snyder (*pro hac vice*)
                 Anne Champion (*pro hac vice*)
                 Katherine Marquart (*pro hac vice*)

**JA245**

Lee R. Crain (*pro hac vice*)
Amanda L. LeSavage (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Tel:  212.351.4000
RMastro@gibsondunn.com
OSnyder@gibsondunn.com
AChampion@gibsondunn.com
KMarquart@gibsondunn.com
LCrain@gibsondunn.com
ALeSavage@gibsondunn.com

*Counsel for Plaintiffs Radiya Buchanan,
Ann Dagrin, and Lindsay Field*

**JA246**

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2022, I electronically filed the foregoing Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished via the appellate CM/ECF system.



*/s/ Scott Michelman*
Scott Michelman